# EXHIBIT 1

# DEPOSITION

# DR. JAMES DAHLGREN

# PART 2

Page 99

THE DEPONENT: Well, I think the proper phrase for her current status is that she is in a remission. People with this disease, especially if they still have some abnormalities on their bloodwork, which she does, I would say that rather than use the word "cure," I would say that she's in a prolonged remission.
Q She's been in remission for about 8.5 years following diagnosis. Agreed?
A Yes. January of 2000 she was originally diagnosed.
Q Do you have an opinion, to a reasonable degree of medical probability, what the the chances are, the probabilities are of her coming out of remission given her specific characteristics?
A I, unfortunately, didn't think about that question before. So I have to go through this. She indicated that she was still seeing the doctor frequently. She's still having lots of symptoms, but they are not necessarily symptoms of leukemia. In other words, she's in remission. I don't know what the likelihood of recurrence is, but I think it is probably significant. But I don't know. I can't put a percentage on it.
Q Can you confirm for us that under the FAB system, at least, she was diagnosed with an M5?

Page 100

A I didn't make a note about that. Let me look and see. So many different records here. Yes. That Oncology Partners called it an M5.
Q In your opinion, to a reasonable degree of medical probability, does the fact she had an M5, does that fact by itself make it any more or less likely that the cause or a cause of her disease was from toxins from the refinery?
A I am not aware of any data that would allow us to answer that question. The data on the patients who developed AML following benzene exposure has never identified the sub types that were present. They simply lumped them together as AMLs or some cases just leukemia in general without even specifying AML.
Q In your opinion, to a reasonable degree of medical probability, what is the lowest cumulative dose of benzene expressed in ppm years that has been associated in a statistically significant result with an increased incidence of AML in humans above a background rate?
A Well, there is no lowest level. The lowest purported level was Dr. Glass' paper which reported an excess of leukemia in petroleum workers exposed to between one to two ppm years. In terms of the other issues which -- by the way, Dr. Glass did not report a

Page 101

threshold, which means that in looking at the data they couldn't identify a level below which there was no excess. And that's consistent with all of the other data in the literature, going back to the earliest case reports where some people developed leukemia with very short-term low-level exposure, leading to the issues that I've discussed several times before about no safe level has been established.
Dr. Nathaniel Rothman gave a paper in Montreal, in July, at the international toxicology conference, and he was talking about the lowest level that would cause adverse effects, including leukemia. And he made the point that at very low levels there's a greater impact on people, adverse impact than would be predicted from extrapolation from high dose studies. I basically printed out something at the break that makes, sort of makes the same point. These are some papers that show very little dose response from the lowest level to the highest level, indicating that there's -- Dr. Rothman made the point that once you get above probably a part per million, you've reached the saturation for the creation of the toxic intermediates. So you don't get a lot more leukemia when you go above a part per million, and you don't get a lot of the lymphomas and the other diseases.

Page 102

Most of the attention now is at the lower end of the exposure curve. We're looking at people with genetic abnormalities in the low parts per million that I was mentioning earlier, thus confirming the fact that extremely low levels are capable of causing genetic damage. As I've said, I think most experts, including myself would believe that those genetic abnormalities are predictive of future adverse effect.
Q Okay. And with respect, I again move to strike that portion of your answer where you testify about what other people think.
May I see whatever it is that you printed up, please.
A These are from Hayes, 2001, a couple of graphs, talking about ppm years when they were using a very high metric.
(Pause in proceedings)
BY MR. RIFF:
Q As you understand it, is the term "risk" as expressed in these graphs a relative risk?
A I might have to go back to the paper and see. It obviously reflects the risk, but I don't know for sure if it's relative risk.
Q Is the reason or at least a reason you brought this here to show that this figure from Hayes, '97,

shows a risk for ANLL/MDS less than 40, a risk greater than -- somewhere between 1 and 10?
A Looks like about 5.
Q Okay.
A The only real reason for showing that is to show the flattening of the curve.
Q I see. Perhaps minor point, but does this whisker graph show that the confidence interval for the less than 40 datum includes a risk of 1?
A Yeah. It looks like it goes past 1 there.
Q Okay. Do you mind if -- can I have that and attach it since we've discussed it?
A Sure.
MR. LUNDY: Make a copy of it.
MR. RIFF: Okay. We'll mark it as 9. We'll make some copies later.
(Defendant CHEVRON USA, INC.'s Exhibit 9 was marked for identification by the Certified Shorthand Reporter and is bound separately)
BY MR. RIFF:
Q Can you refer us to any published epidemiological study that shows that there's an increased risk -- withdrawn.
Can you refer us to any epidemiological study



that shows there's a statistically significant increased risk for AML in humans at a cumulative exposure less than one ppm year?
A I don't understand the question.
Q Okay. Has any epidemiologic study, to your knowledge, reported out that at a cumulative exposure to persons, to humans less than one ppm year, that is, exposure to benzene, that that exposed population has an increased risk of contracting AML above background?
A Yes. The Glass paper that I just told you showed no threshold. So even -- there was a four-fold excess of leukemia in the people who were exposed to one ppm year. Obviously, that's not a threshold. It means that there's a level below that where you're still getting an effect. That's certainly consistent with what I've been saying about the genetic effects, and it's consistent with the case reports that describe people who have been exposed for only a few months developing leukemias. And it is, you know, consistent with another factor which I think is important for us to realize, which is that this person was not exposed as an adult, as the people in most of these worker studies were exposed as adults. People that are exposed as children are expected to be more sensitive. So to extrapolate from, let's say, the Glass study and assume



that children would be more sensitive, clearly the implications for that study would be that below one would be more than enough to increase the risk for AML in children.
Q Okay. I hear you. With respect to an epidemiologic study, a published epidemiologic study, is it the Glass study that you would rely on for the proposition at a cumulative dose of one ppm year or less results in an increased incidence or an increased risk of AML in humans?
A No. Rinsky study made the same point back in 1977. He said there will still be an excess of leukemias even at one part per million. Now, he didn't go so far as to say that it would be one ppm year. But, clearly, his data was consistent with an effect even below that level. And all of the studies that I'm aware of that studied the epidemiology and have careful risk assessment -- careful measurements, such as the Chinese worker studies, have steadily pointed towards no threshold. I don't think Glass is the only one. It's just that her study made the point that they had a four-fold excess of between one and two ppm years but no threshold. I think that the -- I mean, any study where we have good exposure data and we don't have exposure misclassification.



One of the issues that was raised that I did notice in the defense reports that came yesterday is that they included a bunch of studies where clearly the exposure had not been well characterized and there were people included that did not have exposure with people that did, and deluded the effect. That's very common in these large worker studies where they study thousands of people but don't have any real data on exposure. That's why the Chinese worker studies are so important.

Then the second point about those worker studies that were cited by some of the defendants' experts, they failed to take into account the healthy worker effect; that is, they had some excesses of AML and cancer, Hodgkin's and multiple myeloma, but they weren't statistically significant when compared to the general population mortality rates. But if you realize that workers who are able to maintain employment and work in the petrochemical industry, for example, their SMRs and cancer rates are 30 percent on average lower, so that the predicted value for healthy worker SMR would be about .7. A lot of these studies relied on by the defendants did not take that healthy worker effect into account.

Number three, a lot of those studies of workers didn't run mortality studies. Many of the cancers that

we're talking about don't result in death; for example, we mentioned Hodgkin's disease earlier. If you do a mortality study, you're not going to find very much Hodgkin's because by and large in the United States most people survive it because of the techniques that were developed over the years. And -- well, that's my criticism of a lot of the responses that I saw from the defendants, briefly looking at some of their reports.
Q Is the Glass study that you're referring to the Glass 2003 study that you reference at page 93 of Exhibit 7?
A Yes. I believe that's the paper I'm referring to.
Q Okay. Now, I want to just put a finerpoint on this, if I can. I am interested in your telling me about any epidemiology study that reports data which shows a statistically significant increased risk for the development of AML in people who are exposed at one part per million year or less.
A Well, since --
Q Let me interrupt you to put a finer point on it. I understand from your earlier answer I think that in one or more studies there may be text or discussion about how they -- how the authors interpret the data and what they think it means. But I'm interested in the



question about the data themselves. Do you understand my question and my distinction?
MR. LUNDY: I think it's been asked and answered.
BY MR. RIFF:
Q If there's anything more to add in light of my question, please do. If you think you've answered it, then I'll move on.
A I think I've answered it. As I've just testified, the research is now moving towards looking at these lower-level exposures, using genetic end points because they're obviously easier to get and you can get them right away. I mean, in the last five years there have been numerous papers that I mentioned this morning and some of them, many of them are covered in my write-up. But I didn't put in my write-up the parts per billion that they were exposed to, you know, the people living next to oil refineries in Los Angeles; the Reynolds study, for example, by implication well below a part per million and the occurrence of childhood leukemia in excess. They don't have ppm years, but they do certainly have information that is instructive in terms of cancer's effects in human beings at levels that are probably below a part per million.
Q The Glass article you reference at page 93 from



September 2003, is that part of Dr. Glass' Australian health watch work?
A Yes. Yes. She was doing the research for the Australian Petroleum Institute.
Q Have Dr. Glass and her colleagues updated, that is to say, published updated data from the Australian health watch study since September 2003?
A Yes. She's published a couple of commentaries on the data, mainly making the point that it's possible that the exposure levels that were reported were too low and that it's creating the impression that people get the disease at too-low level. But I think that's nonsense because of all the other data that I mentioned to you, which is the genetic effects that are occurring in the Chinese worker studies at below part per million, clearly corroborating what she found in the original study.
Q Dr. Dahlgren, in your opinion, to a reasonable degree of medical probability, what is a dose or exposure of benzene that you would be willing to say for a given patient with AML was too low to have been a cause?
A There is no level. There is no threshold. I mentioned to you -- maybe I didn't mention to you, but -- I did. I just mentioned Dr. Rothman's



presentation in Montreal last July. But the point is there is no safe threshold. The American Petroleum Institute made that point in 1948. Dr. Mehlman made that point in 1996 I think it was. And I think every other scientist whose looked at this data is pretty much coming to the same conclusion, that there's no safe level of exposure to benzene. Background levels may well be a factor.
Now, the point is that it's hard to distinguish how much disease is coming from the background levels. No one has really seriously looked at that. But these studies that I mentioned earlier about the genetic changes associated with children in Bangkok, and policemen in Milan, and all these other low-level studies are beginning to give us further evidence of the lack of a safe level.
Q Where is Milan?
A Milan, Italy.
Q Oh. Milan. Got it. Okay. Did Ms. Schrader, as far as you could tell, have an MDS phase of her disease?
A I don't know. She suddenly got sick in 2000. She was feeling crappy for a while prior to that, but finally she just got so weak and tired. She went to the doctor, and she was working very hard. She thought she





faf8f9c7-4323-4aea-b387-72b624dfff94

Page 111

was weak and tired from working so hard. But she was in an acute blast crisis when she was diagnosed. Whether or not she had some prodrome. There was -- I think I mentioned in '99 she was -- she had a low white count. Let's see if I can find my reference to that. I think it's in my comment on the medical records. Let see see if I can find it.

Anyway, my recollection is that there was a white count in '99 that was on the low side. There it is. Yeah. It's on page 4, paragraph 4. The doctors who saw her in November of '99 in fact did see low white count, low red count, low platelet count, and they didn't do anything about it. Now, that may have been MDS that preceded her acute AML.

Q Did you notice in the medical chart that this patient, just prior to diagnose in 1999 and 2000 time period, was being treated with an investigational drug for ulcer disease?

A Let's see. There was -- she did have some right upper-quadrant pain in November '99. I don't know if I reported what they treated her with. So I don't think I know the name of whatever drug it was they were giving her.

Q Okay. That was my question. Whether you did or did not.

Page 112

A Not a lot of data in here beyond that November '99 report. I mean, there may have been more doctoring, but I don't think I have all those records. Most of the records I have follow the diagnosis of AML.

Q Did you discuss with this patient that she did not undergo a third cycle of consolidation chemotherapy?

A No. I did not discuss that with her.

Q Did you note it?

A I don't even remember if I noted it. Unless I've got it written down here. I must tell you that it's not uncommon in my experience, because people get so sick with these chemotherapy regimens, that it's not unusual for them to decline. But she did make the comment to me that she felt lucky to have survived and that she was determined to see her children graduate, and she felt like she had a real strong will to live. But I didn't record that she didn't take the third cycle.

Q Do you have an opinion, to a reasonable degree of medical probability, whether her cytogenetics, specifically a translocation, a 911 translocation is a favorable prognosis?

A I do not know.

Q Do you adopt the terminology of de novo versus secondary AML?

Page 113

A Yeah. I saw the doctor from Chicago was using de novo a lot. I wouldn't understand de novo to mean etiopathic, which means we don't know what caused it. De novo suggests there is no cause, the term. It arises for no reason. But that isn't usually the case. There usually is a reason. We just don't necessarily know what it is. But I would use the term etiopathic, meaning physician taking care of the patient doesn't know what the cause is. As I've said several times today, the standard oncologist doesn't investigate cause. They don't carefully investigate the person's background and exposures.

There was a study done in Belgium a few years ago by Robert Lowries where he had his residents, occupational medicine residents going into the general medical wards in the hospital in Belgium and interview every patient who is admitted to the medical service. They found 40 percent of the patients had significant occupational exposures that would be relevant for their diagnosis, but not a single one of the primary care doctors had asked them about it. And that has great implications for prevention. Because if they aren't asking, they're not going to learn. They're not going to advance their knowledge. Unfortunately, that situation still exists for us in both Belgium and the

Page 114

United States.

Primary care doctors and specialists in various fields, including oncology are not probing, looking for cause. It doesn't affect the treatment, so they don't consider it relevant.

Q In your opinion, to a reasonable degree of medical probability, are there any etiopathic cases of AML in the human population?

A Well, yes. I mean when -- just like with the other diseases we talked about, there are patients that are diagnosed with -- even if you do probe and look for a cause, you don't necessarily find it in every case. But as I say, there's not a lot of good effort in that direction in most cases.

Q Do you have an opinion, to a reasonable degree of medical probability, as to what percentage of AML cases in a given year in this country are etiopathic?

A Well, I would say the majority probably because of the reasons that I've stated.

Q Do you have an opinion, to a reasonable degree of medical probability, without guessing or speculating as to what percentage of the AML cases in the US on an annual basis would be characterized as etiopathic even after a probing occupational medicine inquiry?

A No. I don't know.

Q In your opinion, to a reasonable degree of medical probability, what significance, if any, is there in Ms. Shrader's case that she had an 11q23 translocation?
A I don't know. I didn't see that having been done on her.
(Pause in proceedings)
BY MR. RIFF:
Q Do you have an opinion, to a reasonable degree of medical probability, whether patients with an 11q23 AML have a shorter latency period than alkylating agent-induced AML?
A No. I don't have an opinion about that.
Q Do you have an opinion, to a reasonable degree of medical probability, whether or not benzene exposure is associated with the induction of 11q23 translocations?
A I don't recall from memory what the effects have been attributed to benzene exposure. I posed this question to Dr. Smith, and he said, "At this point in time we cannot say with assurance that any particular genetic defect will 'always be associated' with the exposure to benzene. We're still in the phase of trying to study that, Doctor."
Q Is that Dr. Martyn Smith?



A Yes.
MR. RIFF: M-a-r-t-y-n.
Q Did you talk to him specifically about this case or was that a more general conversation?
A General conversation. He recently wrote an opinion piece in the Journal of -- what's the name of that journal? -- International Journal of Occupational and Environmental Health in which he opined that at this stage of knowledge you cannot use a genetic marker to determine the presence or absence of benzene as the cause of an illness because the studies that have been done so far are contemporaneous with the exposure, and you wouldn't be able to look at someone months or years later and determine whether or not there was a defect of the type that's been associated with benzene. In other words, it may be -- some of the markers and changes that they have seen doing genetic studies suggest that certain changes, certain of the genes seem to be related or a higher percentage will occur in patients with benzene exposure, but by no means is it specific or is it necessarily going to be permanent. It might go away after a while. So he cautioned against trying to use those sorts of markers as indicators of benzene-induced disease.
Q Was that -- bear with me a moment, please.



Withdrawn.
A That paper is not in my write-up because it only came out last month. I wrote this write-up before that.
Q Okay. Is that paper that you just discussed, the Smith paper, is that a study or is it --
A No.
Q -- an article, or a comment?
A It's a commentary. But I mean, he's the person who probably would be the most logical person to comment on whether or not such markers are valid because of his extensive study in the area.
(Recess was taken)
BY MR. RIFF:
Q Dr. Dahlgren, people who breathe are being exposed to benzene; true?
A Yes.
Q Benzene is an established human carcinogen; true?
A Yes.
Q There are other established human carcinogens other than benzene?
A There are, yes.
Q Is ethanol, the ingredient of beer and wine, an established human carcinogen?



A It's not considered 1A. I believe National Toxicology Program has listed it is a human carcinogen, but I think they're the only ones. And it's probably kind of a misnomer in a sense because obviously the role that ethanol plays in increasing cancer risk is it probably is a promoter, similar to the mechanism I mentioned for PAHs. It increases the enzymes that process certain other chemicals into the carcinogenic agents. Ethanol itself and its metabolites are not by themselves carcinogenic. But there's epidemiological evidence that's indicative that it can be a cancer promoter, increasing the risk of certain smokers, for example, who smoke cigarettes and drink alcohol, there's an increase in the cancer risk associated with the ones that drink alcohol versus nonalcohol drinkers.
Q Is there a safe level of exposure to alcohol?
A I've never seen any data on that question. Obviously, millions of people -- billions of people around the world imbibe alcohol on a regular basis and it's certainly not a potent cause of cancer, if it is. If it was, I think we would be seeing even more cancer than we're seeing.
Q Is sunlight an established human carcinogen?
A For skin cancer and melanoma there's good evidence that the closer you are to the equator and the

lighter your skin color, that it can be a carcinogenic agent, yes.
Q Is there a safe level of exposure to sunlight?
A I don't know if anybody has established anything along those lines in terms of any thresholds.
Q Okay. We earlier discussed today your opinion concerning the roles of -- the role of PAHs in the metabolism of benzene --
A Yes.
Q -- in humans. Okay. And I have that answer in mind, and here is my question: Apart from that mechanism, in your opinion, to a reasonable degree of medical probability, is Ms. Schrader's AML or was Ms. Schrader's AML caused, in whole or in part, by PAHs from the refinery?
A As I say, I think only in the sense that it would probably act as a promoter under those circumstances. But I don't know of any data that would implicate PAH by itself as a cause for AML or leukemia in general.
Q Okay. I also have in mind your earlier answer in discussion when we were talking about hydrocarbon solvents generally and whether they do or could not contain benzene. So we don't necessarily have to reincorporate that answer to the next question unless



you want to. But here is the question: Other than benzene and PAHs, to the extent you just commented, is there any other toxin from the refinery which, in your opinion, to a reasonable degree of medical probability, was a cause of Ms. Schrader's AML?
A Not that I know of.
Q Now, in your opinion, to a reasonable degree of medical probability, was Ms. Schrader's treatment for her AML appropriate?
A Yes.
Q Is her current medical care, in your opinion, to a reasonable degree of medical probability, appropriate?
A Poor lady has got a lot of problems. I think from what she told me, and I obviously don't have a lot of detailed records of everything that's happening with her, but my general impression is that she's being cared for properly.
Q Did you see her -- withdrawn.
Did you examine her, Ms. Schrader, on April 14, 2008?
A Yes. Along with the other three.
Q Okay. Where did you do those exams?
A In a doctor's office in Cleves. I forget the doctor's name. General practitioner who treats a lot of



the people in the town.
Q (a lot of the people).
Q In your opinion, to a reasonable degree of medical probability, is there any medical monitoring or surveillance that Ms. Schrader reasonably should have, going forward, on account of her exposure to toxins from the refinery that she is not already receiving?
A I don't know. You know, I don't really want to necessarily have her go through the spiral CT and the colonoscopy routine just because she's not doing well healthwise. That puts her in a different category, I think. I mean, this lady has still got a low lymphocyte count. She's anemic. I don't know. I just don't think she's a great candidate for vigorous treatment. If she gets another cancer, which is a distinct possibility, I'm not sure what I would want to do about it.
Q In what -- in what sense, apart from what you just said, is she not in good health?
A Weak, tired, doesn't have much energy. She's in chronic pain, sleeps poorly. She's very overweight. She's just very unhealthy.
Q Have you formed any opinions -- withdrawn.
Have you formed an opinion, to a reasonable degree of medical probability, with respect to whether exposure to toxins from the refinery was a cause of any



other adverse health effect or disease that she has had or presently has? And by "other," I mean other than her AML.
A Uh-huh. I understand. Well, she has chronic rhinitis and sinusitis, starting when she was 10 years old, and has been a chronic problem for her ever since. And I think her doctors have called it allergic rhinitis, but it doesn't fit that pattern since it doesn't come and go with pollen or some other allergic factor. So I think it's more consistent with an injury to her upper respiratory tract, causing it to be abnormal. She also has chronic stomach problems.
Q Like what?
A Burning in the stomach, numerous episodes where she vomits. Vomiting started when she was 19, about the time she got married. All through her 20s she had GI problems. Later on she developed generalized body pain, poor memory --
Q Can I keep you with the gastrointestinal for a minute?
A Sure.
Q Let me make sure you're answering the question I'm asking. Are you opining, to a reasonable degree of medical probability, that her gastrointestinal problems or any of them were caused, in whole or in part, by

exposure to toxins from the refinery?
A Yes. I am trying to answer that. GI problems started long before she had her treatment for her AML or the AML itself. That's why I'm giving you the age of onset for these symptoms, because it's not common for someone to develop those kinds of generalized GI problems of burning in the stomach and vomiting at age 19 and then have it continue. I mean, she was diagnosed with her cancer at 37. So she had, you know, about 18 years of symptom prior to the AML diagnosis. Anyway, the point is that both the GI problems, and then I was going to go on to these other problems.
Q Go ahead then, please.
A That she had starting at even -- subsequent to the GI problem sometime -- she can't be very precise, but prior to the AML she developed this poor memory and generalized body pain, which all of which got worse when she was exposed to the chemicals to treat her AML. Her current status is worse than it would have been if she hadn't had the AML treatment. But I think those three things that I just mentioned -- her upper respiratory, her GI, and her memory and body pain -- predated the AML and were due to the exposure from the refinery.
Two other things: She had children who were low birth weight but full term. It's called reduced



birth weight for gestational age, and it's characteristic of PAH toxicity. Women who are exposed to PAHs have that problem. And I believe that in her case that was why she had these, both of her babies that she had were low for their birth weight.
Q Can I ask you about that?
A Yes.
Q Why don't you finish your answer, then I'll ask you about it.
A Let's go -- before I go to another topic, let's . . .
Q Okay. Is that phenomenon you just described, the low birth weight for full gestational age, seen in cigarette smoking?
A Yes.
Q Is it seen in any other form of PAH exposure of which you're aware?
A Yes. Dr. Perea and her colleagues studied the people in Poland and in other places -- I forget the other places, but Poland has a lot of industrial pollution with PAHs -- and looked at nonsmokers and measured PAH levels in the babies in the cord blood and correlated the birth weight with the PAH at levels that they had. And it wasn't just in smokers. This was environmental PAH exposure. I believe she did the same



thing in New York City. So this is not just limited to smokers. It occurs in environments where PAH levels are well higher, if you will, and you can begin to see the effect.
Q Is there a biomarker of exposure for PAHs in humans?
A Yes.
Q What is it or what are they?
A Well, depends on the PAH we're talking about. But for PAHs as a whole, PAH, DNA adducts in lymphocytes are a marker of exposure and will persist for up to six months after the exposure ends. Hydroxypyrene is a chemical that appears in the urine of people exposed to PAHs, but probably only present for days to weeks after the exposure stops. Then there's alpha and beta and naphthyl which is a metabolite of naphthalene which is the simplest PAH. Those -- there's probably some others. But those are the ones that come to mind that are biomarkers of PAH exposure.
Q Are any of those biomarkers of PAH exposures persistent beyond say one year of exposure?
A No. They all are clear, the PAH adducts being the longest. And they usually don't reflect the exposure after about six months. The age of the lymphocytes, when the lymphocytes are cleared from the



circulation, those adducts are no longer seen.
Q Do you have an opinion, to a reasonable degree of medical probability, whether or not Ms. Schrader's peptic ulcer disease was caused, in whole or in part, by refinery toxins?
A No. I don't have an opinion about peptic ulcer disease being related to the exposures.
Q Same question with respect to carpal tunnel syndrome?
A No. No opinion.
Q Same question with respect to arthritis?
A No opinion.
Q Same question with respect to refractory reflux?
A Are you talking about gastroesophageal reflux?
Q I am.
A No opinion about that.
Q Same question with respect to fibromyalgia?
A I don't think she has fibromyalgia. I think she had chronic peripheral pain, most likely from the same neurological thing we were talking about earlier with the other person. Because it goes back to a time when she was much younger. The exact time when it came on is not even clear from her record. But I didn't find that she had the typical findings of fibromyalgia when I





faf8f9c7-4323-4aea-b387-72b624dfff94

examined her. I know someone, maybe more than one of her doctors have made that diagnosis. But patients with fibro usually have tender muscles and trigger points. She had neither of those. She has a more diffuse type of pain consistent with the neurological damage that I mentioned earlier, although I didn't find I don't think any evidence of decreased pinprick on her absent reflexes. I'm sorry. She did. She had increased pinprick in the legs, decreased pinprick in the arms, and generalized decrease in dependent reflexes compatible with peripheral nervous system disease. So I believe that's the more likely cause -- mechanism of chronic pain syndrome that she has.

There is no doubt some contribution to this peripheral nerve damage from her chemotherapy that she received for AML. Given the fact that she had some of that pain, generalized fogginess in thinking and so on before, with memory impairment and so on, similar to the other person that we were talking about, I believe that that's a consequence, at least in part, of her exposure to the organic chemicals coming from the plant.

Q If, hypothetically, fibromyalgia were a correct diagnosis for these signs and symptoms that we were just talking about, hypothetically, if that were the case, do you have an opinion, to a reasonable degree of medical



probability, whether or not that fibromyalgia was caused or contributed to by refinery toxins?

A No. I don't have an opinion about whether that caused fibromyalgia or not.

Q I am paid to be complete. Let me ask you this one. Do you have an opinion, to a reasonable degree of medical probability, whether or not her hemorrhoids were caused or contributed to by toxins from the refinery?

A No opinion.

Q Same question with respect to hiatal hernia?

A No opinion.

Q Okay. So apart -- withdrawn.

So accounting for what you've written in your report in Exhibit 7, your supplemental report in Exhibit 8, and your answers to my questions today, have we covered the gist of your opinions related to Michelle Schrader?

A Yes.

Q Okay. Then we're almost done, I think.

Is the information that you have considered in this case drawn from the following places: the medical records of the patients, your interview and examination of the patients, and the literature cited in your report and appendices?

A Well, there's other factors that aren't in that



report and aren't in the history that the patients gave me, information from documents of the company's contractors and also the other experts like Dr. Rosenfeld, Dr. Chereminisoff, talking to other people who were in the neighborhood; my knowledge about the risks and hazards associated with refineries that isn't necessarily discussed in my report but which is part of my background, training, and knowledge. So there's quite a bit -- I've got a few stacks of it here. And I've got a CD with all of the documents that were sent to me that reflected Chevron's contractors; study by ATSDR; study by the Ohio Department of Health, showing a fivefold excess of cancer in the town; vapor intrusion; paperwork that talked about the risk of the benzene and other organic solvents going into the basements; the calculated increase risk of cancer associated -- this is a company study showing an increased risk; the risk calculations by Dr. Rosenfeld on what his numbers would translate into in terms of increased risk of developing disease, particularly cancer; the contractors for Chevron who calculated the risks, using much lower exposure numbers than Dr. Rosenfeld and Dr. Chereminisoff. But, nevertheless, even with the very low numbers they showed some increased risks with the environment there.



I think it's important to realize that Chevron has spent millions and millions of dollars trying to clean up the environment in order to try to protect people from future harm. There's a lot of information that I have been privy to.

Q Fair enough.

A That goes in to my opinion.

Q Is the CD or does the CD that you referenced contain all of the documentary material -- material you've reviewed?

A I think so.

Q Okay.

A I mean, I can't guarantee that it's totally complete, but I try to make it complete.

MR. LUNDY: Only statement I want to make is that you have asked him questions today in this deposition that triggered responses referring to other literature to support his answers and opinions in response to your questions. So I think that would broaden the scope of what's on these documents, because he cited that literature to you in response to your questions. So that would be included in his opinions as well.

THE DEPONENT: I didn't put the Drinker paper or a couple of other documents that talk about odor

Page 131

threshold on the CD. But I have printed copies of those two -- at least two of those documents which are being added I guess today in response to some questions you've asked.
Q Okay. And may I get a copy of the CD that has that material on it?
MR. LUNDY: Sure.
THE DEPONENT: Of course. That's why I brought it for you.
BY MR. RIFF:
Q Thanks. All right. Have you spoken with any of the other experts in this case about this case?
A Chereminisoff and Rosenfeld.
Q When did you last speak with Rosenfeld?
A Yesterday.
Q Was the discussion about the attic dust work?
A Yes.
Q Anything else?
A We talked about all the issues, about the basis for his opinions on -- his assessments, and measurements, and so so.
Q Had you talked to him about this case before yesterday?
A Yes.
Q How many times would you estimate?

Page 132

A Two or three times, probably.
Q Okay. Other than the plaintiffs, folks in the neighborhood who you may have spoken with, Chereminisoff and Rosenfeld, have you talked to anybody else about this case, and we can include counsel, of course.
A Yeah.
Q Who else?
A That would be -- I was going to add the lawyers and some of the lawyers' staff, but that would be it.
Q All right. Did you talk with anybody from the Ohio Department of Health?
A No.
Q Did you talk with anybody from the ATSDR?
A No.
Q In your opinion, does the -- start again.
In your opinion, to a reasonable degree of medical or scientific probability, does the Ohio Department of Health analysis or study, looking at cancer incidence in Hooven, permit the scientific conclusion that any increase in cancer incidence is due to the presence of the refinery?
A Well, standing by itself, no. But taken in the context of what we know about interviewing people in the town and knowing what we know about the risks associated with close proximity to refineries, knowing what the

Page 133

chemicals are that are emitted, knowing what we know from everything that's been done so far, it makes a compelling case, particularly because of the very high rate of excess cancer. This is a cancer cluster on steroids, really quite striking, but totally consistent with the fact that we've got four people sitting in front of us here who share one thing in common, that they had significant exposure early in life to the atmosphere around the refinery, and they've got pretty unusual illnesses. And the fact that the four of them -- there are others with similar diseases, but it's almost a cluster itself just these four plaintiffs, if you understand what I'm saying. In other words, you wouldn't expect four cases of these bone marrow problems in a small town of 500 people and especially if you consider that these aren't the only four. I mean, like, for example, I think Ms. Runck's brother has non-Hodgkin's lymphoma, and there's a whole bunch more that have been described in the questionnaire survey that we did. So I think what we're talking about here is a cluster of illnesses that the Ohio Department of Health didn't opine as to cause, but they didn't know as much about it as we do now. There's no evidence that the people doing that study are fully aware of what the emissions were from the refinery, what the literature

Page 134

says about being in close proximity to refinery. Clearly, just because they didn't offer an opinion about it doesn't mean that it doesn't support my opinion as to what's going on in this town. I think it does. I think it's very compelling when taken in the context of everything else we know.
Q Have you undertaken any statistical analysis of the incidence of cancer in any population in and around Hooven or Cleves?
A No. Not at this point. I did mention a questionnaire survey where we had over 200 people. But I haven't done any analysis of it at this point other than to just note that there seems to be an excess of lymphohematopoietic disease in the population, but I didn't do any formal statistics on it.
Q Have the data from those questionnaires been aggregated in any form of database?
A No. But on the CD that I'm going to give you, the raw data is there.
Q What was the selection method by which those 200 or so questionnaires were acquired?
A I believe that they were people who signed up with the attorney, the plaintiffs.
Q Were you present when those questionnaires were filled out?



JAMES DAHLGREN, M.D.

Page 135

A No. They were filled out basically -- I don't know who supervised them. But they were filled out and sent to us.
Q Did you design the questionnaire?
A Yes.
Q What direction, if any, did you give to counsel with respect to how those questionnaires should be distributed among the population in and around Hooven and Cleves?
A I recommended that they administer the questioner rather than just give it to them and tell them to fill it out. I told them they should supervise the process.
Q What information did you receive from counsel as to the method by which those questionnaires were distributed and filled out?
A I don't recall.
Q Assuming that the questionnaires were provided to clients of counsel, would that represent a selection bias?
A Yes. It certainly would. But what's interesting about that, the fact is that they're drawn from a population that is known, more or less. And when you look at certain prevalence rates of certain diseases that jump out at you and the lymphohematopoietic

Page 136

diseases jump out at you, but other cancers do, too. I mean, just like the Ohio Department of Health study, certain cancers jump out at you as being the type that you'd expect from the type of exposure that was going on here.
Q If you don't know the answer to a question, just tell me, and we'll move on. In the Ohio Department of Health cancer incidence study, how many of the residents who reported having cancer lived in Hooven before 1986?
A I don't know. The data that -- let me get what I've got which is a very thin report. What they did was I think a prevalent -- no. They did an incidence study of people between 1996 and 2003 who were diagnosed with cancer during that eight-year period. They compared it to expected national rates. But I don't think they have data on whether they were there prior to 1986 or not. I think we can say, though, from what we have observed with the four people here and what has been my experience with small towns like this is people tend to stay in the same area. They may move from house to house, like these people did, but they stay in the same neighborhood because that's where their family and friends are. So you could infer that most of these people probably had been there quite a while and would

Page 137

have been there prior to '86.
Q If my notes are correct, the Ohio Department of Health study wrote:
"The 12 different sites/types of cancer diagnosed among Hooven residents differ with respect to risk factors, latency, course of disease, and probability of survival. For this reason it is not likely a specific point source of exposure or a single risk factor is playing a role in the increased cancer burden."
My question of you is, do you agree with that second sentence?
A Well, I understand what they're saying. I just think that it's a little bit odd since the number of -- the cancers on which there are the greatest excesses which is on this report. I don't have all of them. There's 18 of the 25 cancers are identified here. And the female breast and lung and bladder make up 13 of the 25. So they're overrepresented, and those are all characteristically PAH type of cancers. And, therefore, in my opinion, the greatest excess were in the types of cancers that you would expect to be in excess from this population -- from this exposure. So if you've got a

Page 138

point source for PAHs and you've got these increased cancer rates, it certainly fits.
Q Does that answer mean you do not agree with the second sentence that I read to you?
A You know, I don't know where they're coming from because they haven't identified in the piece I have what all the cancers were. We only have on this piece four, five different kinds of cancer. As I've said -- actually I should -- I forgot to include colon. So 16 of the 25 are typical of PAH exposure. And the odds ratios are significantly elevated for breast, lung, and bladder, fivefold excess. Not likely when you have a fivefold excess to be due to a confounder. So in my opinion the study is very consistent with arising from the refinery. And for the department of health to say that there were too many different kinds to be from the same source just doesn't make any sense in view of what I've got sitting in front of me.
Q Did you -- withdrawn.
You did not speak with or otherwise communicate with anybody from the department -- Ohio Department of Health study, did you?
A You asked me that already. I said no.
Q Okay. Okay. I'm just going through a couple of things, and we'll wrap this up. Have you formed an

opinion, to a reasonable degree of medical probability, whether or not the exposure classification methods and description in the Chinese worker NCI studies are accurate?
A As far as I know. They've gone to great lengths to make them accurate. Not only did they do individual worker measurements with personal dosimeters, but they also did urine metabolites to confirm the exposures and the exposure levels. So I think probably of all the studies that have ever been done of benzene exposure, they've got by far the best exposure characterization.
Q In your opinion, to a reasonable degree of medical probability, is the Chinese/NCI exposure classification work superior to the Plyofilm cohort classification studies?
A Yes.
Q Can you explain why, why you think that?
A Dr. Rinsky and his colleagues had industrial hygiene data, but not for every year they had to extrapolate a lot of the data. So it is not as good as the Chinese studies.
Secondly, they didn't have a control group, whereas the Chinese studies have controls, matched controls of other people, working people. So they were



actually comparing apples to apples. And that made it even more powerful because Rinsky compared them to national rates, again, taking into account the healthy worker affect which tends to bias the results towards being negative.
Q When I was referring to the Plyofilm study, or cohorts, or whatever I said, I was including in my question or intending to all of the various reevaluations done of that cohort in the published literature. My question is considering all of those reanalyses and studies of the Plyofilm cohort, is it your opinion that the Chinese NCI exposure classification work is superior to the Plyofilm cohort?
A Yes. I think it is.
Q For the reasons you just said?
A For the reasons I said, yes. I mean, they measured benzene under controls. They went to great lengths to get good data.
Q In your opinion, to a reasonable degree of medical or scientific probability, is gasoline a human carcinogen?
A Well, if it contains benzene and it usually does, yes, it would be a carcinogen agent. Gasoline itself as a substance is not listed as a human carcinogen. It's listed, I think, as probable or



possible human carcinogen based on the fact that some of the studies in humans have found some increased kidney cancer rates and that kind of thing. But it seems to me that if you've got benzene in there and there's going to be exposure to benzene, then you're being exposed to a class 1 human carcinogen because you're being exposed to benzene.
I suppose, theoretically, somebody might argue that the other ingredients would possibly make benzene not carcinogenic, but I've never seen any data to that effect. It may alter the metabolism if you've got pure toluene in a rat and you may not get as much cancer as you would get if you didn't have toluene there. But in terms of reducing the risk in gasoline, I just don't know that there's any data to support that.
Q In your opinion, to a reasonable degree of scientific probability, do the refinery worker epi studies support the conclusion -- never mind. Withdrawn.
Did you write the appendix on benzene toxicity that's attached to your reports in this case for this case?
A Yes.
Q In the sense that you started with a tableau rosa for this case and drafted all the text for



this case?
A No. I took a prior text and modified it to be appropriate to this and added new papers and studies that weren't present in the prior write-up. Some of the write-up I had done before for another case.
Q What is the teaching of Reynolds 2003 in your opinion?
A That living near a refinery increases the risk of developing cancer, particularly leukemia. The reason Reynolds used children's cancer is because it's likely that the address that the person has at the time of the diagnosis would be a place where they had been living during the period of time when the cancer would have been formed; whereas, if you do a similar study on adults, you can be almost positive that the address on their day of diagnosis will not reflect where they were five, 10, 15, 20 years before, when they would have had their most important exposure to raise the risk. But I think you can certainly take the data from that and extrapolate it to fact that living near a refinery increases cancer risk significantly and particularly in the lymphohematopoietic area.
Q Was the malignancy in question in Reynolds' ALL?
A Yes. It was childhood leukemia.

Q What other peer reviewed literature would you cite for the proposition that living near a gasoline -- withdrawn.
What other peer reviewed literature would you cite for the proposition that living near a refinery is associated with a statistically increased risk of hematopoietic malignancies?
A There's four references at the end of that paragraph. All four of them are addressing either living near gasoline stations or refineries as the exposure source, and then the occurrence of childhood leukemia as the end point of interest.
Q I have Smith, 1988; Savitz and Feirgold, F-e-i-r-g-o-l-d, 1989; Knox, '97; and Crosogneni, C-r-o-s-o-g-n-e-n-i, 2004. Are those the ones?
A I believe there's some more that have been published since or I have found since. But those all address that question, environmental exposure in childhood leukemia.
Q Can you refer me to any peer reviewed article for the proposition that living near a refinery results in increased incidence of Hodgkin's disease?
A No. I can refer you to a paper I'm writing of increased of Hodgkin's disease in Sugar Creek, Missouri where there's an abandoned refinery and where we have a



very high rate of Hodgkin's disease among the people who live there. I can refer you to some data which we're probably going to add to that paper of the very high rate of Hodgkin's disease at Beverly Hills High School where they were exposed to 18 active oil wells. So I think what I think is going on is that if you're exposing children or young people who are still in their adolescence to benzene, you get a different type of lymphoma or -- we haven't seen any AML in either of these groups who are were exposed as children. Some adults who were exposed at Sugar Creek got AML, but all the kids got Hodgkin's. There appears to be a pattern that, you know, unfortunately has not been looked at previously, but which we are attempting to publish, write up and publish.
Q So far, at least with respect to the peer reviewed published literature, you cannot refer me to a study showing an increased incidence of Hodgkin's disease from folks living near a refinery; correct?
A Yeah. Not that I recall from memory at this point. And doesn't mean it doesn't exist. Just that I don't have it currently in my possession.
Q Can you refer me to a peer reviewed publication study which demonstrates an increased incidence of AML among residents living near a refinery?



A No. I think all of the studies that I am aware of were looking at childhood leukemia. For the reasons I've indicated, these environmental studies -- it would be very hard to do. You would have to get the people with AML and get the history of where they lived. So far no one has been able to do that.
Q Okay. Similarly, you can refer me to no peer reviewed published study showing an increased incidence of multiple myeloma among residents living near a refinery; correct?
A Correct.
Q The Plyofilm cohort, including the most recent update, does not show an increased -- that is to say, statistically significant increased incidence of non-Hodgkin's lymphoma. Am I correct on that?
A I think the key word here was "statistically significant." And I think the problem with that is they were comparing it to national rates, not worker rates, and the numbers are relatively small. I think the more convincing study is the Chinese study which did show a statistically significant increase in non-Hodgkin's lymphoma.
Q Can you think of any other published peer reviewed study which shows a statistically significant increased incidence of non-Hodgkin's lymphoma for



benzene-exposed workers other than the Chinese study you just referenced?
A Yes. In fact, I'll give you the whole printout. What did I do with it? I've got a whole load of papers that Dr. Smith so conveniently put together for me. Where did it go? It's here.
This is a paper that I didn't put in the prior write-up, but it has a whole bunch of papers showing increased risk. Some of them are statistically significant, some aren't for non-Hodgkin's lymphoma associated with exposure to benzene.
Q Thank you.
Okay. The witness has handed me Smith, et al. 2007 from Cancer Epidemiol Biomarkers Prevention. I think that's -- the title of the article is, "Benzene Exposure and Risk of Non-Hodgkin Lymphoma." Okay.
Thank you. I actually am aware of that paper.
All right. Let's see. Dr. Rosenfeld refers to a unit of PAH, I think he refers to it as a cigarette unit?
A Uh-huh. Right.
Q Had you ever heard of that unit before as referenced to PAHs?
A Well, he has used that in other cases that I'm aware of. If you're asking me did someone besides

Dr. Rosenfeld used it, no. Usually the way you quantify cigarette exposure is by pack years. His number could be converted to pack years. In fact, I think he does in his report mention what would be the equivalent number of cigarettes per day with each one of the exposure estimates. It's a metric that parallels pack years. It's just using the concentration of PAHs that are present in cigarettes according to one of the published studies, and then doing the equivalency calculation.

Q Are the -- I'll try again. Is the collection of PAHs in cigarette smoke the same collection of PAHs from the Gulf Oil/Chevron refinery emissions?

A I don't know the answer to that.

Q As a matter of medical toxicology, does the composition of the suite of PAHs matter?

A Well, some PAH combinations probably have a higher benzo(a)pyrene equivalence than others. I know Dr. -- what's his name? Dr. -- I can't remember the name of the paper now. But there's a paper that was published where they examined this question and looked at asphalt, cigarettes, creosote, coal tar pitch and compared the TEF or cancer potency factors for the different mixtures of the PAHs. And the -- well, cigarettes were similar to asphalt, if I remember correctly. Creosote was similar to coal tar pitch, and



coke ovens had the highest potency of cancer-causing capacity. They're all clustered along, you know, being significant in the sense that they all represent cancer-causing mixtures, but some are more potent than others.

Q Is benzo(a)pyrene the most potent?

A No.

Q What is the most potent PAH relative to cancer effect?

A I think it's a methylanthracene 312. Methylanthracene I think has got a potency factor three times greater than benzo(a)pyrene. In fact, I think the original study that was done actually said it was five times more potent, but most people use three times more, the lower figure.

Q Are TEFs keyed off of the benzo(a)pyrene toxicity?

A Yes.

(Pause in proceedings)

BY MR. RIFF:

Q Have counsel asked you to read and consider in detail the expert reports produced by defendant experts?

A Well, he gave them to me yesterday. I presume he wants me to read them. He didn't say anything. But I'm just assuming that's what he wants me to do.



Q Okay. Do you plan to do that?

A Yes.

Q Is there any other work in this case that counsel have asked you to do that you've not yet done?

A No.

Q Then I don't have any other questions for you. I thank you for your time.

A Okay.

MR. LUNDY: Let us talk. We may want to ask one question before we quit.

(Recess was taken)

MR. RIFF: Can I have this for Friday?

THE DEPOSITION OFFICER: Yes.

MS. SWEENEY: Let's go back on the record.

EXAMINATION

BY MS. SWEENEY:

Q Dr. Dahlgren, throughout this deposition you've gone through a number of things, and I just want to summarize a few things that your opinions today have been based upon. First of all, would it be safe to say that all of your opinions are based within a reasonable degree of medical probability?

A Yes.

Q Second of all, when you were asked by the



plaintiffs' counsel --

MR. RIFF: No. Defendants' counsel --

MS. SWEENEY: Asked by me. Asked by plaintiffs' counsel.

MR. RIFF: I'm sorry. Start again please.

Q You were asked by plaintiffs' counsel to take an examination of all four of these women; is that correct?

A Yes.

Q Can you go over just very quickly your examination and what information you took from them just in a general sense. It doesn't have -- that apply to all of them.

A I think all consistently reported emissions from the refinery, living close to the refinery, living there when they were either in utero or certainly all of them when they were youngsters. So they all four shared that in common. And they reported odors and pollution from the plant. Some of them talked about private wells even that they used in the '30s and '40s. So they all describe I think consistently the situation of heavy exposure from the refinery.

Q Okay. I guess more specifically you took first a history from the women; correct?

A Yes.

Q That history involved -- what type of questions did you ask them? Did you ask them about their employment? Did you that into consideration?
A Oh, yes.
Q Did you take into consideration their residence during their entire lifetime?
A Yes.
Q Did you take into consideration where they went to school?
A Yes.
Q Then did you take into consideration their proximity of their employment, and their residence, and their school to the refinery?
A Yes. I mean, yes, I did.
Q Okay. And in that sense of the word, now you're telling me that there was some sort of historical information that consistently came from the women about the odors coming from the refinery; correct?
A Yes.
Q Can you describe what consistently all four of those women described?
A They described it like a petroleum like odor, not rotten egg odor. And they couldn't really describe it very well, which is not unusual in this complex mixtures which may not be typical of something they're



familiar with. So they described it as a petroleum odor that they associated with the refinery, but it was pretty consistently there during the whole time the plant operates; sometimes worse, sometimes less, but they were smelling something almost all the time.
Q Did any of the women during your descriptions -- was it consistent? I don't know -- relate to you how the odors from the refinery might have physically affected them?
A Yes.
Q Describe that.
A They said when it was particularly bad they would experience symptoms of either headache or nausea, irritated eyes and throat, cough. Various symptoms that you'd expect from being exposed to some type of air pollutant.
Q Is there a particular time period that these women all described these type of symptoms or this type of odor that were emanating from the refinery?
A Whenever they were were close to the refinery during the years that it was open.
Q Can you describe for the record how these descriptions by these women, both their mental -- I mean, their mental impressions or the odors that they described and their physical descriptions of what



happened would affect your determination as to their dose received from the refinery?
A Well, if you're getting symptoms, you're at pretty high dose level, assuming we're talking about something like gasoline which probably was a major constituent of the vapor coming off that plant. If you are experiencing symptoms, you're in the hundreds of parts per million range with gasoline vapor, for example. Secondly, you're well above the threshold, odor threshold. If you're experiencing symptoms and you're smelling an odor, you're above the odor thresholds. Odor thresholds for gasoline is 10 parts per million and, therefore, they were really exposed to quite high levels which would include the constituent parts which would include benzene.
Q As to your opinion that you've enunciated in each of these women's reports, did you independently reach a conclusion based upon that calculation as to whether their exposure from the toxins from the refinery caused their disease?
A Yes. It was my impression that the -- that that independent of calculations by Dr. Chereminisoff and Dr. Rosenfeld constituted evidence to me of significant high level exposure and is why I think their estimates are probably on the low side, because they



didn't have numbers as high as they would need to be in order to have odor and irritative symptoms.
Q Okay. Have you cited within your opinion medical articles that give you the basis for your formulas and calculations when you determined whether or not the odors have caused the diseases related to these women?
A Yes, I mean, a number of those studies that I've referred to in my writeup in this discussion today describe adverse effects below the level of odor and below the level of irritative symptoms. So when we're talking about literature that demonstrates toxicity, it would be below what these people experienced, making it quite definite that their exposures were high and high enough to cause adverse effects.
Q Okay. Did any of these -- outside of these what I would call continual exposures, did any of the plaintiffs or did all four of them relate descriptions of explosions at the refinery?
A Yes. They all talked about fires and explosions that occurred and flooding, too, that occurred where they would have unusual exposures as a result of those unusual events. Peak exposures we might call them.
Q How would these peak explosions or peak

exposures affect your calculations as to these women's exposure to the products that we've been talking about, benzene and the PAHs, in fact?
A As we touched upon I think this morning, peak exposures are probably more harmful because they overcome all of the bodies' defense mechanisms and cause permanent injury to the genetic code, whereas lower doses, presumely there's more ability to repair the abnormalities. So that if you have some peak exposures but you're cumulative dose is still low, you can still have harmful effects. So peaks are important in the toxicity of benzene in particular.
Q Would also the proximity to the explosion have a bearing on the concentration of their exposure during an explosion or --
A Or fire.
Q Right. Would their proximity have a basis?
A Yes. Definitely.
Q Are you aware that Carol Lipscomb, during her youth, lived directly across the gatehouse at the refinery?
A Yes. I think I mentioned that this morning.
Q We talked -- or I didn't talk today, but defense counsel asked you some questions about the Drinker study. I don't know if you've attached it to



your deposition. Did you have it today?
A Yes. I have a copy.
MS. SWEENEY: I'd like to have it attached as Exhibit No. 10, please.
MR. RIFF: That's Drinker '45?
MS. SWEENEY: I'm sorry. Did I say '49?
MR. RIFF: No. You didn't say. There's several Drinker studies. He referenced '45.
MS. SWEENEY: 45.
MR. RIFF: He also referenced '48, but that was --
MS. SWEENEY: I'd have to go back to the exact year.
THE DEPONENT: You know what, this is a threshold toxicity of gasoline vapor. I don't know what -- it was actually '43. I'm sorry.
MS. SWEENEY: I'm going to have us make a copy and attach it as Exhibit No. 10, please.
(Plaintiffs' Exhibit 10 was marked for identification by the Certified Shorthand Reporter and is bound separately)
BY MS. SWEENEY:
Q I also believe that during our discussions today or discussions with the defendant you also talked



about Martyn Smithyn Smith's research; is that correct?
A Yes.
Q And I am holding in my hand what I believe is the March of 2007 study. Is that the report that you just most recently talked about?
A It summarizes the literature on link between benzene and non-Hodgkin lymphoma.
Q Okay. This would be an earlier study of his in 2005 called, "Use of 'Omic' technologies to study humans exposed to benzene"; is that correct?
A Yes.
Q Is that also one of the studies of MartynMartyn Smith that you discussed previously in your deposition?
A Yes.
Q You talked about the American Petroleum Institute's findings in 19- --
A 48.
Q -- -48, is that correct, earlier?
A Yes.
Q In 1948, was that published in a peer review -- was it a published peer review article that we can cite to or what is that?
A It was peer reviewed. It was published. But it was published as a pamphlet by the API for use by its members. It was clearly peer reviewed and made widely



available.
Q Who constituted the group of people that formed that opinion?
A Toxicologists working for the oil companies.
Q I'm assuming -- do you have a copy of that?
A Yes.
Q Can we also attach that to your deposition today? We'll call that Exhibit 13.
(Plaintiffs' Exhibit 13 was marked for identification by the Certified Shorthand Reporter and is bound separately)
MS. SWEENEY: 2007 is the first one. That's Exhibit 11.
And Exhibit 12.
(Plaintiffs' Exhibits 11, 12 were marked for identification by the Certified Shorthand Reporter and are bound separately)
BY MS. SWEENEY:
Q The 19- -- what did we say? -- the 1948 API case studies, was that the first published, if you want to call it that way -- opinion that there were no safe levels of exposure for benzene?
MR. RIFF: Foundation.

Page 159

You can answer.
THE DEPONENT: The committee was reading the published articles on benzene toxicity that had been published up to that time. One of the larger studies published in '39, as I recall, had made that point, because they were seeing people who were exposed for short periods of time to what they at that time thought was relatively low levels and getting sick. So the authors of that large case report made that statement, and then the API committee basically reiterated it in their report.
BY MS. SWEENEY:
Q As far as you're concerned, is it correct to say that the opinion that there are no safe levels of exposure to benzene has not changed over the course of time since then?
MR. RIFF: Objection; passive voice construction. I don't know who's opinion you're talking about, is or somebody else?
MS. SWEENEY: His. I'm asking is it his opinion during this deposition. He cited numerous different studies at this point. And we can go through them if you want me to go through my notes. I'm trying to get it through quickly.
MR. RIFF: I just want to know what you're

Page 160

asking him.
MS. SWEENEY: Whether that opinion in the scientific community has changed.
MR. RIFF: You're asking whether it's his opinion --
MS. SWEENEY: Yes.
MR. RIFF: -- or are you asking what the scientific community is --
MS. SWEENEY: I want to know his understanding of what the scientific literature reflects as to that opinion of whether there's a safe level of exposure to benzene since the APA study.
THE DEPONENT: API. I apologize.
MR. RIFF: And I object; foundation.
MS. SWEENEY: I think we've gone through a number of the studies. I'll be honest with you. I think we've gone through this over and over. You went over this over and over. So all I'm doing is attaching that study and then asking him the same question you asked earlier.
MR. RIFF: I have no problem your asking what he thinks. I have a problem when you ask what other people think.
MS. SWEENEY: I'm entitled to ask him what his interpretation of the literature is. I'm entitled to

Page 161

ask him that.
MR. RIFF: I agree. You are. That's a perfectly good question.
THE DEPONENT: Yes. I think that the literature, as I've said, reiterated and validated that original opinion of the API, there really is no safe level of exposure to this stuff, namely benzene.
BY MS. SWEENEY:
Q These are, once again, kind of cleanup things from counsel's earlier questions, which I'm not sure you know the answers to. But did the Ohio Department of Health, do you know, take in consideration a specific dose from the refinery when they made their findings that you referred to earlier?
In fact, we'll attach that as well to the deposition. So that will be the last.
(Plaintiffs' Exhibit 14 was marked for identification by the Certified Shorthand Reporter and is bound separately)
BY MS. SWEENEY:
Q Whether or not they took into consideration specific dose model or dose relationship from the refinery when they made those findings?
A As far as I know, they did not make any dose

Page 162

analysis.
MS. SWEENEY: Those are the questions I have.
MR. RIFF: Let me just follow up on a couple of points.

FURTHER EXAMINATION
BY MR. RIFF:
Q Is everything you know about the Ohio Department of Health study found on Exhibit 14?
A Yes.
Q Exhibits 11 and 12 are not properly considered studies, are they?
A Well, this is a review paper --
Q Right.
A -- that sites numerous studies.
Q Agreed.
A And so you asked me are there published peer reviewed studies of NHL and benzene, and there's a whole bunch here.
Q That's not really what I'm asking.
A It's a review of a bunch of studies.
Q Fine. It's not original research?
A No. Itself is not original research. All of the papers they quote are.
Q And 12 is not original research is it?

A No. This is -- what he's doing here is doing, again, like a review paper that would be useful for people that wanted to do research in the field and are looking for the markers that are most helpful. And it really kind of relates to some of the questions we've discussed about what it means to look at some of these genetic markers.
Q Okay.
A He actually says that we should start doing proteomics. It's a more efficient way of looking at the genetic changes.
Q Let me ask you a hypothetical question. Let's assume that you did not have any information from Dr. Rosenfeld concerning a quantitative exposure or dose assessment for these four people. Do you understand so far --
A Yes.
Q -- my hypothetical?
A Yes.
Q Under my hypothetical, in your opinion to a reasonable degree of medical or scientific probability, would you have enough information to form the medical causation opinions you've stated here today?
A Yes. I think Dr. Rosenfeld's studies, as I've said several times, I believe underestimate the exposure



for the reasons I've stated. But they certainly reinforce and underscore the fact that there's been a significant exposure of the plant based on his calculations and estimates. So it's reinforcing my opinion, but it's not -- if he didn't have it, I think I could still say that these people, because of the history they gave me and what we know about the exposures that they described, would be definitely consistent with a cause and effect relationship.
Q And further to my hypothetical, if you did not have any of Dr. Rosenfeld's quantitative dose or exposure analysis, the information on which you would -- withdrawn.
Please tell me what is the information that you've received other than Dr. Rosenfeld's quantitative dose and exposure assessment that permits you to opine to a reasonable degree of medical probability the toxins from the refinery caused the adverse health effects that we've discussed today?
A I'd say most of it is the contractor work by the Chevron people. If we didn't have Dr. Rosenfeld and Dr. Chereminisoff, we have all the data that they've generated at the request of the EPA. We have a mountain of data here on the contamination which involves millions of gallons of hydrocarbons right under



and next to the town. I mean, I think most of the harmful exposure took place when the plant was operating, and there was an air plum sitting on that town. As the people said, they could smell the odor constantly and, therefore, they were in an odor plum. And that odor plum undoubtedly contained not only benzene but other chemicals. This is not one of these things where we're making a lot of speculation about exposure. The exposure is well documented here by the company itself and its contractors.
Q Which Chevron contractor characterized air emissions from the plant or from the refinery during its operations?
A Mr. Machado or Dr. Machado, whatever it is. But there were other people -- I don't remember their names, which companies it was -- talked about the volume of materials that were dumped in the ground or leaked into the ground, and by implication there was clearly some amount of -- I don't think they calculated what the plum was or what the amounts were. But clearly they, by implication, were describing a refinery that was discharging a great deal of product into the atmosphere and into the ground. I don't recall which one. I'd have to go through the records to see where we got the clue about that. But I mean, that coupled with what the



patients told me would indicate that the plant was definitely a heavy polluter.
Q Put aside for the time being, please, the expert reports from the defendants' experts that I think you told me you just got yesterday, which would include Machado.
A Yes. That's correct.
Q Let's put that aside for a moment. Let's put aside for a moment Dr. Rosenfeld's work relative to a quantitative dose or exposure assessment. Putting that aside, are you aware of any other quantitative dose or exposure assessment that purports to describe in a quantitative fashion the dose or exposure of these four patients to any refinery toxin?
A No. Obviously, I don't know of anybody else that tried to look at these four individuals and quantify their exposure.
Q Without guessing or speculating, do you have an opinion to a reasonable degree of scientific or medical probability what the concentration of gasoline in these four plaintiffs' breathing zones were or a range of them while they lived near and around this refinery during the refinery's operations?
MR. LUNDY: Object to the form of the question.
MR. RIFF: Because?

MR. LUNDY: I don't understand it. He might.
MR. RIFF: That is not --
MR. LUNDY: I'm being truthful, so I'm objecting to the form.
If you understand it, you can answer it.
MR. RIFF: Let me restate it so we're clear.
Q The way my mind is working on this, I think you told me, I think you cited this Drinker '43 article for the proposition that the odor threshold for gasoline in air is, from memory I think you told me it was 10 parts per million?
A No. The Drinker study is for irritative symptoms, the threshold for irritative symptoms. I have an MSDS I printed off this morning on the issue of what one of the oil companies stated was the odor threshold for gasoline just so I'd have something in writing that addressed the issue. Here it is.
Q Okay. Thank you. This is from CHS, Inc., whatever that is.
A I don't know either.
Q Well, last page says, "Cenex," C-e-n-e-x. Maybe that's what it is. You show me or just tell me. What does it say is the odor threshold for gasoline?
A 10 parts per million. Where is it? It should be here because I looked at it this morning. Here it



is. Right up here it says, "Odor."
Q Okay. It says, "Odor: Threshold approximately 10 ppm." And in your opinion, is that approximately correct?
A I think so. I mean, as you know, there's quite a bit of variability of thresholds, depending on people. But I think that's a fair -- in other words, odor thresholds are fairly high compared to what we're now learning are safe levels of exposure to things like benzene.
Q Okay. Now what I'm really wondering is whether you have information that you can relate to us, without guessing or speculating, that has a scientific basis as to what the concentration of gasoline vapor was in air when these four folks were smelling it when the refinery was operating?
A I've already given you the opinion that it was probably in excess of 10 parts per million because they had symptoms oftentimes. You eliminate symptoms, they were much higher. So the levels I believe that they -- constantly smelling the petroleum odor means they were constantly being exposed to an air plum. What's the exact constituents of that I can't say. But as I've indicated to you, I believe that gasoline vapor would be probably the major constituent because it's more



volatile than jet fuel or diesel fuel, and therefore would be the most likely thing to constitute the majority of the vapor.
Q And I'm sorry if we're going over things we've already talked about. But is the Drinker article, Exhibit 10, the reference that you are citing to as to the concentration of gasoline vapor in air which induces irritative symptoms?
A Yes.
Q What is that level?
A .2 percent that we discussed earlier. This is a lousy copy. I think they should go back and make a better copy. Lowest exposure that he used was 0.027 percent. They could smell it at that level. The last individual lost the odor at 3:00 p.m. after six hours. That's an important point which I had forgotten to make earlier, that you get what's called olfactory fatigue if you're exposed to chemicals; so that the level that you're going to smell it at actually rises with continuous exposure. The fact that these people smelled it may have meant that it was probably even higher. But at that level, which is 270 parts per million -- am I guessing that right? I think that's right -- people can smell it, but they don't have too much in the way of symptoms. The six individuals at



that dose level showed hyperemia of their eyes. Following complaints: Loss of appetite in one, dizziness in two, sickness of the stomach in one, slight; cough or feeling in the throat as if they were catching a cold, five. 13 people in the group, yeah, so five of the 13. Then irritation of the eyes in nine of the 13. So the irritation of the eyes are fairly sensitive.
Experiment 2, they put in 160 parts per million, 0.16 percent. Nine women. Let's see. Did they do any men? I guess it was -- sorry -- eight women jumping down. Four out of the eight still had irritation of the eyes. All subjects smelled gasoline coming into the room. One lost the sense of smell after one hour, another after three hours, still another after seven. The others detected the gasoline throughout the day.
Let's see. There's some other experiments. I won't go through them. But they basically indicated that the exposure levels that I thought it was two-tenths of a percent, but I think I was at 0.- -- Here it is. Experiment 3, commercial gasoline delivered in concentration of 0.26 percent. This caused much higher rate of symptoms in the -- all of the patients at that level had symptoms.

Page 171

Q Okay. What is it that these four patients told you with respect to whether they were having any irritative symptoms from the odor from the refinery?
A Of the four, I think at least two gave me a distinct history of eye irritation. The others weren't quite so clear in terms of their symptoms. But one of them said took her breath away. Another one said it made her vomit. Different things. I'd have to go back through my notes to see what other details there are. I think it was a consistent theme.
Q Do you have an opinion to a reasonable degree of scientific probability whether or not refinery workers as a group are likely to have experienced higher exposures to refinery emissions than residents living in Hooven and Cleves outside this particular refinery?
A Well, depends on where they were working, what they were doing, whether the wind was blowing. But in general, when you have people living next to a refinery 24/7, their exposures are probably greater, especially when you consider infants and small children breathe per unit weight more than adults and are probably more sensitive to the effects. Environmental exposures are really quite different. An adult male worker may get used to not smell things, not be irritated by them, whereas a child living across the street might well be

Page 172

symptomatic.
Now, I don't have any information about the symptoms of the workers in this particular facility. I do have some experience with the refineries here in Los Angeles, interviewing workers. I can tell you that they, from time to time, would complain about releases that made them sick. That was not uncommon in my interviewing workers. I was the consultant for many years to the Oil, Chemical and Atomic Workers' Union in Los Angeles and worked with them on health and safety issues, particularly related to chemicals. And there were certain jobs where the exposures actually were quite irritating and very unpopular with the employees as a result. But I don't know if this HoovenHooven plant was similar to the ones here in LA or not. It may or may not have been.
Q And last, do you have an opinion to a reasonable degree of scientific probability whether service station workers in the era before vapor recovery likely would have a higher exposure to gasoline than the residents of Hooven and Cleves relative to this particular refinery?
A I don't remember any data on the prevapor recovery. The Perera study, which I mentioned earlier, which is in my write-up on the environmental exposures,

Page 173

looked at service station attendants and measured their levels of benzene in the air at around 50 parts per billion, as I recall. And the I suppose the Italians have vapor recovery system. This is modern-day system. I think they probably have vapor recovery. I'm not sure. Whatever it is, service station attendants did have exposures. And they had, in this particular study I'm referring to, genetic abnormalities that they felt were related to the exposures even at those low levels.
Q My question was about service station workers prior to vapor recovery and whether you have an opinion to a reasonable degree of scientific probability concerning the -- those workers' exposure and those to gasoline as compared with, let's say, these four folks who lived in and around Cleves and Hooven?
A I can only speak from personal experience, because when I was in high school I worked at a gas station. It was the prevapor recovery era. We did not smell gasoline unless we spilled it on the ground. So I would suspect that service station people probably had less exposure than these people based on their odor complaints.
MR. RIFF: I have no other questions.
Follow-up?
MS. SWEENEY: No.

Page 174

MR. LUNDY: No.
MR. RIFF: Off the record for a second.
MR. LUNDY: I want a copy.
MR. RIFF: Send the original to me.
MR. LUNDY: I want a copy. And disk.
MR. RIFF: I do not believe counsel wish to depart too far from the Federal Rules here relative to this deposition. However, let's just make sure the following is agreed upon: I am ordering the transcript, and as noticing party the original is going to come to me; under standard practice I'm ordering an original and one. I want the doctor to have adequate time to read and correct the deposition. So my proposal is that --
Off the record again.
(Discussion held off the record)
MR. RIFF: Back on the record.
I'm expediting the plaintiffs' experts' depositions. This one I've expedited to be done on the 18th, Friday. I understand that at least Hunter and probably Mary Brigid as well want to get e-mail versions of this when it's finished.
MR. LUNDY: Sure.
MR. RIFF: In that event, why don't we agree Federal Rules notwithstanding, the witnesses can have 15 days from the date of the e-mail to counsel to make

corrections, if any, to their testimony. And within five business days thereafter, counsel, who is the proponent of the witness, will notify other counsel in writing of any changes. And if those things don't happen, then the transcript, as prepared by the reporter, will be the final form. Is that okay?

MS. SWEENEY: That's fine.

MR. LUNDY: Fine.

You sent an errata sheet with your deposition?

THE DEPOSITION OFFICER: Yes.

MR. LUNDY: That's fine.

MS. SWEENEY: Send the rough to my e-mail address.

(Whereupon, at 4:54 p.m., the deposition of JAMES DAHLGREN, M.D. was concluded)

* * *

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at ______________________ on ____________.
(Place) (Date)

______________________________
(Signature of Deponent)



DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss.
COUNTY OF ________________ )

I, Name , hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR issued by the Court Reporters Board of California and which is in full force and effect. (Bus. & Prof Section 8016.)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties. (Civ. Proc. Section 2025(k)(1).)

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b), and prior to being examined, the deponent was first duly sworn by me. (Civ. Proc. Section 2025(r)(1).)

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given. (Civ. Proc. Section 2025(r)(1).)

///



I have not and shall not offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. Section 2025(k)(2).)

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. Section 2025(k)(3).)

Dated: ____________________, 2008

______________________________