# EXHIBIT 6

## AFFIDAVIT OF

## JAMES G. DAHLGREN, M.D.

# PART 1

STATE OF CALIFORNIA )
) ss. AFFIDAVIT OF **JAMES G. DAHLGREN, M.D.**
COUNTY OF LOS ANGELES )

I, James G. Dahlgren, first being duly sworn, hereby depose and state that:

I am over the age of eighteen (18) years, of sound mind and capable of making this affidavit. The facts recited herein are made on my personal knowledge. I have never been convicted of a crime involving moral turpitude.

I am a medical doctor specializing in occupational and environmental medicine with nearly forty years experience. I earned my B.A. from the University of California, Los Angeles in 1964 and my M.D. from the University of California, San Francisco in 1968. I served my medical internship at Boston Veteran's Administration Hospital, where I also served a residency in internal medicine. I served an additional residency in internal medicine at Cedars-Sinai Medical Center, Los Angeles, California. From 1971 to 1973. I was a Fellow in Infectious Diseases at U.C.L.A. Medical Center where my research was on toxicology of antibiotics. I practiced occupational medicine from 1973-75. In 1973-74 I took classes at UCLA School of Public Health in Biostatistics and Epidemiology. I served as Director of Ambulatory Care Services, Department of Medicine, at Cedars-Sinai Medical Center from 1975-77. In 1977 I entered private practice and have continued in practice to this day.

In private practice I concentrate on occupational and environmental medicine. This practice includes toxicology, medical surveillance, bi-monitoring, disability evaluation, and risk communication. In 1986 I founded Pacific Toxicology Laboratory, a company specializing in measuring human exposure to toxic chemicals. From 1995 to 2006, I have

served as Medical Director at Industrial Health, Inc., in Palo Alto, California. Since 1997 I have served as Medical Director at MedRight in Santa Monica, California. In my capacity as medical director for these two companies I assist companies in managing risk from occupational and environmental exposures as well as assisting injured workers to return to work more quickly.

I have held several academic positions, including Lecturer at the UCLA School of Public Health, where I have taught Introduction to Occupational Medicine and Toxicology. I have served as an Assistant Professor of Medicine at UCLA from 1975-77 and as a Clinical Assistant Professor of Medicine at the UCLA School of Medicine from 1977 to the present. I also served as a Teaching Fellow in Medicine at Tufts University from 1968-70.

I edited the book "Human Toxic Chemical Exposure," and have written several articles, presentations, and abstracts on occupational and environmental medicine, as detailed in my C.V. I am currently or have been a member of several medical societies: American College of Occupational and Environmental Medicine (ACOEM) (1975-present); Society for Occupational and Environmental Health (SOEH); Medichem, an International Organization of Professionals for Occupational Health in the Chemical Industry; Western Occupational and Environmental Medicine Association (WOEMA); American College of Physicians (1972-93); American Thoracic Society (ATS) (1978-93). I am also the founder and past president of the California Society of Industrial Medicine and Surgery (CSIMS).

I am serving or have served on several medical committees. I have served as a director of the California Society of Industrial Medicine and Surgery (CSIMS). Since 1985 I have been a member of the Division of Occupational and Environmental Medicine Advisory Committee of the UCLA Department of Medicine. I have also served on the

Environmental Carcinogenesis Committee of the UCLA School of Public Health.

Essentially, I have spent decades studying and treating the effects of environmental toxic exposure. Specifically, I published an important study on Hodgkin's disease from exposure to the chemicals arising from a refinery. More information on my education, training, and experience in toxicology and environmental and occupational toxicology is contained in my curriculum vitae, which is attached to this affidavit and is incorporated by reference.

Chevron has made a motion to exclude me from testifying as an expert on the grounds that I have used unscientific methodology to reach the conclusion that the four plaintiffs have injuries from their exposures to toxic chemicals from the closed Chevron Refinery in Hooven, Ohio. All of the allegations by Chevron about my methodology have been addressed in my prior reports. I have provided sound scientific based opinions about the nature of health effects that can occur from exposure to chemicals from a refinery. The emphasis on benzene and polycyclic aromatic hydrocarbons (PAHs) is due to the fact that the health problems of the four plaintiffs are well known to be caused by these chemicals. I have reviewed extensive history and physical examination including residence and work history, tobacco and alcohol use, family history, medical history and a review of systems. I questioned them on the issue of how they were exposed to Chevron's chemical emissions. I visited the Hooven/Cleves area surrounding the refinery site. I reviewed each plaintiff's medical records. I conducted a thorough review of Dr. Chereminisoff and Dr. Rosefeld's expert reports in relationship to the information provided to them by the plaintiffs and added their knowledge about the community and the refinery activities. I reviewed the literature on similarly situated plaintiffs and the risks they run for developing various diseases. Finally I was provided a copy of all documents currently produced by the

Defendants in this case as well as though authored by the ATSDR, U.S. EPA, the Ohio Department of Health and the Ohio EPA. I have reviewed these as part of informing myself about the facts of this case.

1. The Chevron motion to exclude my testimony is not addressing my methodology, but rather is addressing my conclusions. I have followed the guidelines outlined by the Federal Judiciary in the chapter on medical causation[1]. I will address the issues raised by Chevron and then will outline the medical causation methodology I have used throughout my career and which is identical to the guidelines.
2. Chevron has alleged that I do not think there is a safe level of exposure to benzene and that a single molecule can cause cancer and that the courts' have ruled that such an opinion is not admissible as bad science. What I actually believe and said several times in my July 15, 2008 deposition is that the scientific literature has not determined a safe level of exposure. At this time there is no study which has determined the level of benzene exposure that does not increase the risk of cancer. I further said that there is an acceptable level of cancer risk of 5 X $10^{-6}$. The California Office of Environmental Health Hazard Assessment (OEHHA) published a document in 2001 that reached the conclusion that exposure to benzene in drinking water at a level of 0.15 PPB (parts per billion) would keep the cancer rate in people using that water to a level of 1 extra cancer case in a million people (1 X $10^{-6}$)[2]. The range of drinking water levels that OEHHA reported range of water levels that would result in a cancer risk of 1 X $10^{-6}$ ranges from 0.08 PPB to 1.2 PPB. OEHHA did not discuss the genetic susceptibility issue or the age of exposure issue or exposure to other carcinogens simultaneous to the benzene exposure. The

"safe" levels referred to by some people are the Maximum Contaminant Level (MCL). OEHHA noted that the 1 PPB MCL level used by California and the 5 PPB MCL used by the USEPA are based on "technical feasibility" not health based standards. Dr. Rosenfeld has calculated a dose for all the plaintiffs well above the dose that is contemplated by the OEHHA levels for lifetime exposure. I am stating that very low levels of benzene exposure can and do cause diseases including cancer. Dr. O'Conner wrote an article in 1999 noting that the increasing background levels of benzene in urban air from environmental sources directly paralleled the rise of the incidence of non-Hodgkin's Lymphoma (NHL), which includes Multiple Myeloma[3]. O'Conner and colleagues noted that in the USA the rate of all cancers increased 1.2 % between 1973 and 1990, but that B cell lymphoma's including NHL and Multiple Myeloma increased 3.5%. Thus there is a 3 fold higher increase than for all types of cancer in a population exposed to increasing amounts of benzene in the environment. O'Conner and colleagues note that in England an expert scientific panel recommended that benzene air levels not exceed 1 (one) PPB (i.e. 0.070 PPM-Years) in order to reduce the risk of cancer. This amount is often exceeded in urban areas, especially near gas stations and refineries. Here is a quote from page 44 my report on Carol Lipscomb where the occurrence of cancer in people exposed similarly to the four plaintiffs, documenting that cancer can and does occur from exposures to petroleum sources in cases exactly like or very similar to the Hooven Refinery:

> *" Benzene can cause more significant and rapid damage in children than in adults because of differences in susceptibility and the overwhelming number of opportunities this chemical has to come into contact with children. One study found that the most densely populated areas of the state have the highest combined exposure scores (Reynolds 2003). It has been suggested that increased incidence of leukemia is caused by exposure to benzene from automotive sources (Smith 1988, Savitz and Feirgold 1989, Knox 1997, Crosognani 2004). In Britain, Knox et al found that cases of childhood leukemia were clustered around industrial sites. The geographical association was mainly with petroleum derived volatiles and kiln and furnace smoke and gases, as well as effluents from internal combustion engines (Knox 1997)."*

These are only some of the peer reviewed articles that document cancer in the lymphohematopoetic tissues. Reading the Chevron motion makes me think Chevron did not read my reports. I noted the same error in the defendant's experts reports. They say things which are simply wrong. I have provided numerous references on each cancer and that the cancers occur at very low levels, in fact lower than occurred in Hooven.

3. Chevron has asserted that the issue in this case is not benzene but rather gasoline, diesel and crude oil exposure. They assert that the studies I cited only indicate that pure benzene can cause the lymphohematopoetic/hematological disorders suffered by the four plaintiffs. This assertion is wrong. I have cited numerous articles that report leukemia including Acute Myeloneous Leukemia (AML), lymphoma including Hodgkin's and non-Hodgkin's and Multiple Myeloma. I also noted that MGUS is a forerunner of malignancy or pre-lymphoma which frequently evolves into a lymphoma, most often the type of B cell lymphoma known as Multiple Myeloma. The articles that I cited were not pure benzene but rather studies of workers and residents in communities with exposures similar or even identical to the residents in Hooven. There is only one exception and that is the Pliofilm workers, who are thought to have experienced a predominately pure benzene exposure. The refinery worker studies done by industry report excesses of

lymphohematopoetic cancers[4]. Here is a table from an industry study of refinery workers:



Table 7 *Observed and expected deaths by cause, SMRs, and their 95% confidence limits for all (3536) cohort members continuously exposed to benzene (person-years = 64 482·5)*

| *Cause of death (8th ICDA)* | *Observed deaths* | *Expected deaths* | *SMR* | *Lower limit* | *Upper limit* |
|---|---|---|---|---|---|
| All causes | 531 | 613·12 | 86·61 | 79·4 | 94·3 |
| All cancers (140–209) | 123 | 117·71 | 104·5 | 86·8 | 124·8 |
| Cancer of buccal cavity and pharynx (140–149) | 2 | 4·11 | 48·7 | 5·9 | 175·8 |
| Cancer of digestive system (150–159): | 26 | 33·27 | 78·2 | 51·1 | 114·6 |
| Cancer of oesophagus (150) | 4 | 3·79 | 105·5 | 28·7 | 269·1 |
| Cancer of stomach (151) | 5 | 7·06 | 70·8 | 22·9 | 165·5 |
| Cancer of large intestine (153) | 10 | 9·27 | 107·9 | 51·9 | 198·3 |
| Cancer of liver (155–156) | 1 | 2·43 | 41·2 | 1·0 | 228·9 |
| Cancer of pancreas (157) | 4 | 6·49 | 61·6 | 16·8 | 157·6 |
| Cancer of respiratory system (160–163): | 49 | 40·10 | 122·2 | 90·2 | 161·7 |
| Cancer of lung (162–163) | 47 | 37·74 | 124·5 | 91·4 | 165·7 |
| Cancer of bone (170) | 2 | 0·63 | 317·4 | 38·4 | 1145·8 |
| Cancer of skin (172–173) | 1 | 2·13 | 47·0 | 1·2 | 261·0 |
| Cancer of prostate (185) | 6 | 6·45 | 93·1 | 34·1 | 202·7 |
| Cancer of bladder (188) | 3 | 2·86 | 105·0 | 21·6 | 306·9 |
| Cancer of kidney (189) | 4 | 2·86 | 140·0 | 38·1 | 358·0 |
| Cancer of brain and central nervous system (191–192) | 6 | 3·90 | 153·9 | 56·4 | 335·2 |
| Lymphatic and haematopoietic cancer (200–209): | 15 | 11·74 | 127·8 | 71·4 | 210·9 |
| Lymphosarcoma and reticulosarcoma (200) | 3 | 2·65 | 113·0 | 23·3 | 330·6 |
| Hodgkin's disease (201) | 2 | 1·78 | 112·2 | 13·6 | 405·1 |
| Leukaemia and aleukaemia (204–207) | 6 | 4·43 | 135·4 | 49·6 | 294·9 |
| Other lymphatic tissue cancer (22, 203, 208) | 4 | 2·77 | 144·7 | 39·4 | 370·0 |
| Benign neoplasms (210–239) | 3 | 1·78 | 169·0 | 34·8 | 494·1 |
| Diabetes mellitus (250) | 8 | 8·81 | 90·9 | 39·2* | 178·8 |
| Diseases of blood (280–289) | 1 | 1·34 | 74·4 | 1·9 | 413·1 |
| Diseases of circulatory system (390–458): | 269 | 295·46 | 91·0 | 80·4 | 102·7 |
| Arteriosclerotic heart disease (410–413) | 189 | 199·90 | 94·5 | 81·5 | 109·0 |
| Vascular lesions of central nervous system (430–438) | 31 | 40·74 | 76·1 | 51·7 | 108·1 |
| Non-malignant respiratory disease (460–519): | 21 | 32·44 | 64·7* | 40·0 | 99·0 |
| Pneumonia (480–486) | 8 | 13·27 | 60·3 | 26·0 | 118·7 |
| Emphysema (492) | 10 | 7·34 | 136·2 | 65·5 | 250·4 |
| Diseases of digestive system (520–577): | 12 | 33·34 | 36·0† | 18·6 | 62·8 |
| Cirrhosis of liver (551) | 8 | 18·55 | 43·1* | 18·6 | 84·9 |
| Diseases of genitourinary system (580–629) | 3 | 10·25 | 29·3* | 6·0 | 85·6 |
| Accidents, poisonings, and violence (E800–E998): | 73 | 75·59 | 96·6 | 75·8 | 121·5 |
| Accidents (800–949) | 47 | 50·07 | 93·9 | 68·9 | 124·9 |
| Motor vehicle accidents (810–827) | 27 | 23·27 | 116·0 | 76·3 | 168·9 |
| Suicide (950–959) | 9 | 15·28 | 58·9 | 27·0 | 111·8 |

*Significant at 0·05. †Significant at 0·01.

This report by Otto Wong sponsored by the oil industry reported an increased rate of the lymphomas and leukemia in refinery workers. The findings are proven to be significant in light of subsequent studies by Hayes, Yin, Patel, Reynolds, Wilenson and others which document with better exposure information, better control groups and morbidity rather than mortality data that lymphohematopoeitic cancers are in excess in workers and residents exposed to petroleum. These studies along with many others were outlined in my prior reports and will be supplemented below support my opinions that exposure to gasoline, crude oil and mixtures of solvents that contain benzene, not pure benzene causes the cancers seen in these four plaintiffs.

4. The industry sponsored studies of refinery workers often report an increase of lymphohematopoetic cancers but they do not reach statistical significance. The industry studies have design flaws that tend to bias their results to the null. By design they often do not usually reach statistical significance. In spite of the flaws they usually do show excesses of lymphohematopoeitic cancer deaths. Often the studies by industry are reported as "negative" while studies by independent sources are positive. The most serious flaw in industry sponsored studies is in exposure misclassification. For example even though there is an excess of cancers in the refinery workers studied by Wong, he has included workers who worked in a place where they did not have any benzene exposure. Even among the workers with possible benzene exposure, Dr. Wong has not given any information about the amount or duration of benzene exposure. He and most other industry studies include workers with as little as one day of work in a refinery. The industry studies do not compare the death rates to a comparable working population because they use national death rates. It is well established that there is a phenomenon called the healthy worker effect (HWE)[5,6]. In order to be hired and to keep working you need to be healthier than the average person. A worker especially in the US petrochemical industry has health care, eats a better diet and lives in a cleaner environment. The death rate for workers is significantly better than the general population. The studies done by the US National Cancer Institute (NCI) of workers exposed to benzene in China took HWE into account and compared the rates of cancer in a comparable employed control group. By way of example here is paper published by the NCI on these points[7]. The NCI studies measured the benzene levels in both the exposed and control work places to confirm the amount of

benzene exposure. The industry studies use death certificates as the source of information about their workers. Using death rates tend to reduce the number of cancers that are found because many cancers are cured or not recorded on the death certificates. NCI used morbidity and mortality data to count all the cancers and used medical records to confirm the cancers. As a result of the design of the industry studies they will undercount the incidence and prevalence of cancers. On the other hand the studies that are have better exposure classification, better controls and include the incidence of the cancers are consistently positive. An example of this is the Glass studies of Australian refinery workers which showed cancer occurring at low doses and short term exposure, similar to the historical case reports which stressed the role of individual susceptibility, such that in some cases people died after very short and low level benzene exposure[8].

5. The American Petroleum Institute (API) toxicology committee made that point. Contrary to Chevron's assertion that the committee was saying that the new air level would be protective, they quoted from Hunter who reported the following[9]:

4%. An occasional nucleated red cell was seen. There was considerable variation in shape and occasional polychromatophilia and stippled cells. The cell volume was 86 cu.μ.

*Course:* The patient was discharged with a diagnosis of mild diabetes and a question of chronic benzene poisoning or chronic myelogenous leucemia. A biopsy was not performed. He was seen again on June 9th, 1939 and the blood findings at that time were as follows: r.b.c. 4.8 million per c.mm.; w.b.c. 21,000 per c.mm.; polynuclears 73%; lymphocytes 3%; mononuclears 5%; eosinophiles 9%; basophiles 3%; myelocytes 4%; young polynuclears 2%; normoblasts 1%. The platelets seemed to be increased and the red cells still showed considerable variation in size and shape.

CONCLUSIONS

1. Eighty-nine individuals exposed to benzene fumes have been observed and studied.

2. Histologic material was obtained by necropsy in 8 of the 10 fatal cases, and by biopsy of the sternal marrow in 1 fatal and in 2 living cases.

3. Depending on the degree and duration of exposure, an analysis of the blood pictures indicates that benzene may bring about: polycythemia or anemia; leucocytosis or leucopenia; leucemia or leucemoid blood picture (either lymphatic or myeloid); eosinophilia; megalocytosis or microcytosis; the presence of immature marrow elements in an otherwise normal blood.

4. The early diagnosis of poisoning depends upon an evaluation of the complete blood picture rather than upon the existence of a leucopenia.

5. Splenomegaly may appear in protracted cases of poisoning.

6. Women are no more susceptible to poisoning than men, and acclimatisation to the fumes does not seem to occur.

7. The first signs of poisoning may appear with the onset of an infection, long after exposure has ceased.

8. It is doubtful whether any concentration of benzene greater than zero is safe over a long period of time.

Note conclusion number 8 by Hunter in 1939. Hunter notes that animal studies had confirmed the occurrence of leukemia from benzol exposure. Benzol is a benzene/toluene mixture and thus further refutes the notion of the only toxicity from benzene occurs when it is present alone. As noted above the environmental regulations are based on technical feasibility. Chevron has wrongly asserted that regulatory values are protective. The allowable or recommended environmental and occupational exposure levels to benzene are set on what is feasible, the health issues must of necessity be given less weight. As noted below the level for worker exposure has been lowered to the point now that NIOSH recommended work-room air to be no more than 0.1 PPM for 8 hours. Allowable levels of benzene in the environment should of necessity be far lower than worker levels. New studies of blood cells in benzene exposed workers show that 0.1 PPM will not be protective[10].

6. Chevron has asserted that Monoclonal Gammopathy of Unknown Significance (MGUS) has not been studied as to causation. This is wrong. A study by Pasqualetti found that exposure to petroleum products is a risk factor for developing MGUS[11]. Further MGUS is a precancerous condition. It frequently evolves into a lymphoma including Multiple Myeloma or other hematological malignancies. Kyle and colleagues reported that MGUS evolves to a hematological malignancy in 19% of cases within 10 years[12]. It is also a fact that Carol Lipscomb's and Jean Runck's doctors have described the condition as a pre-malignancy. In persons with MGUS there blood/lymphatic system is likely to become a full blown lymphoma In Carol Lipscomb's case Dr. Wagner's opinion on 4/10/2006 of the CT of her chest confirms several left supra-clavicular and axillary lymph nodes, the largest measuring up to 3 cm in greatest dimension. The doctor states that the lymph nodes have increased in size and number since the study of 07/2005. The patient on 07/16/03 had a bone marrow which revealed hypercellular marrow. It is an abnormal finding to have hypercellular bone marrow and is seen in benzene poisoning. A hypercellular marrow is abnormal consistent with a transition to a malignancy. Dr. Brahmamdam's impression of the patient in 2006 includes: 1. Axillary adenopathy that is worse on current CT; 2. MGUS 3. Bone marrow biopsy shows florid follicular hyperplasia with progressive transformation of germinal centers and focal collections of lymphocytes. The doctor opines that these findings are a precursor of lymphoma. As I stated in my deposition, the patient has a pre-lymphoma condition which is in the process of transforming into a malignancy. Jean Runck's diagnosis of MGUS has been updated by her doctor on August 14, 2008. Here is that doctor's report:

ONCOLOGY PARTNERS NETWORK
OPN

**MEDICAL ONCOLOGY**
**AND HEMATOLOGY**
(513) 451-4033
(513) 451-4118 - Fax

**RADIATION ONCOLOGY**
(513) 681-7800
(513) 385-3045 - Fax

**Patient Name:** Runck, Jean
**Sex:** female
**Note Date:** Aug 14, 2008

**Birth Date:** Dec 15, 1932
**Patient ID:** 810979

**Visit Date:** Aug 14, 2008

**Diagnosis:**
Primary - 200.80 - Other named variants of lymphosarcoma and reticulosarcoma, unspecified site, Diagnosed 2002 (Active)

**Chief Complaint:**
lymphadenopathy of unclear aetiology///////

**Impression:**
1.AXILLARY ADENOPATHY IS WORSE ON CURRENT CT
2.MONOCLONAL; GAMMAPASTHY IS STABLE
3.biopsy from afip consultation is back -IT SHOWS FLORID FOLLICULAR HYPERPLASIA WITH PROGRESSIVE TRANSFORMATION OF GERMINAL CENTERS AND FOCAL NECROTOTIZING GRANULOMAS -THIS PRECURSOR OF HODGKINS DISEASE /
PET IS NEGATIVE EXCEPT IN AXILLA/
repeat ct in oct 2007 is stable -no progression to lymphoma
we repeated ct again feb 2008 and it is stable.
081408 - ct has no progression of lymphoma
spep is stable

**Plan:**
continue follow up with scans/
spep in 6 months

E-Signature: Dr. Ranga S Brahmamdam

Further information regarding this patient visit including physical exam, review of systems, laboratory values, toxicities, medication list, etc. are included in the electronic medical record and are available upon request.

CC: Joann M Lohr, M.D
Marc A Alexander, M.D

The patient, Jean Runck has a pre-lymphoma condition similar to Carol Lipscomb. The etiology of this condition is the same as for causation of lymphomas. Elsewhere in this and my prior report, the etiology of lymphoma is definitely related to exposure to emissions from an oil refinery. Multiple Myeloma is a subtype of B cell lymphoma. In articles already cited lymphohematopoetic cancers are well know to be caused by benzene. PAHs have also been reported to increase the risk of Multiple Myeloma[13].

7. Chevron asserts that I opined that gasoline is entirely made up of benzene. This is not true I do not believe that nor did I ever say anything like that. I did say that the fact that the residents/plaintiffs could smell gasoline odors meant that they were being exposed to high levels, over 100 PPM of gasoline vapor. I was not asked what proportion of the gasoline vapor is benzene. The answer to that is benzene vapor levels can be very high when gasoline is being pumped or stored. A study by the US Coast Guard showed very high levels of benzene in the area where gasoline is being loaded or unloaded. The area air samples of benzene from gasoline activity ranged from <0.04 PPM to 170 PPM. Gasoline vapor in the same area studies ranged from 1.7 to 90,000 mg/m3[14]. These findings are consistent with Dr. Rosenfeld's findings and with the symptoms reported in the plaintiffs that they were exposed to harmful levels of gasoline and benzene vapor. This study means that a refinery where they are making and transporting gasoline, benzene is present in the gasoline vapor in very high amounts. Thus smelling gasoline means that the person is exposed to high levels of benzene. Dr. Rosenfeld has addressed the issue of benzene in gasoline vapor. Obviously, benzene is present in gasoline vapor.

8. Chevron suggests that benzene in a mixture like crude oil or gasoline is not dangerous. This is completely wrong. Dr. Pyatt opined that benzene in a mixture does not cause the same diseases as pure benzene. He does not offer one human study that finds less toxicity from a mixture containing benzene. It is true that toluene inhibits the metabolism of benzene to its toxic intermediates. Because benzene is toxic after it is metabolized there is a modifying effect of toluene on benzene effects that has been reported in experimental settings <u>only</u>. In the real world of human case reports and epidemiology, the studies in humans involve

mixtures where benzene is only a component of the mixture. It is not true that toluene prevents benzene toxicity. Toluene does reduce the toxicity of benzene in studies in animals and in vitro as noted by Dr. Pyatt. Even in these experimental studies, the toluene does not eliminate the toxicity of benzene. No one believes that toluene will make benzene safe. Every human study from 1897 to the present has reported on benzene in a mixture with toluene and other organic solvents. The experiments reported by Dr. Pyatt do not assert that toluene will make benzene safe. The argument is a "red herring".

9. Chevron says that I did not rule out *de novo* as a cause of the plaintiffs' lymphohematopoetic disorders. It is by definition that if one has a known cause for the disorder, then by definition it is not *de novo*. *De novo* means of unknown cause. If a person has a blood disorder or a lymphatohematopoeitc cancer like AML without a known cause like benzene, radiation or treatment with chemotherapeutic drugs then it would be a *de novo* case. I stated in my deposition that doctors do not routinely ask their patients about exposures because that does not affect treatment. Chevron is trying to twist that answer into saying that I do not agree that some lymphohematopoetic cancers are of unknown cause. There are such cases. However, if an effort was made I am sure some, but not all, of the *de novo* cases would have a cause.

10. Chevron alleges that benzene is present in the urban air and therefore I cannot implicate the Hooven refinery as the cause of the plaintiffs' injuries. It is true that there is a widespread contamination of our society by benzene. As noted above there is reason to believe that this low level background may be contributing to NHL and other cancers in the general public. What we have in Hooven is a higher

level than background as noted by the odors reported by the plaintiffs and the calculations by Dr. Rosenfeld. These plaintiffs were exposed to gasoline and other vapors. These exposures in Hooven increase the likelihood of contracting cancer and blood disorders. Just finding four serious lymphohematopoietic disorders in this small town indicates a problem exists. The millions of dollars that Chevron has been forced to spend on clean-up indicates a threat to health in Hooven. It is absurd to say this town has not been contaminated by dangerous chemicals.

11. Chevron alleges that "a large number of epidemiologic studies of refinery workers and others occupationally exposed to petroleum products or emissions show no causative link between the exposures and blood disorders." The reference given for this absurd statement is a report by David Garabrant on pages 15 to 25 of his report. The good doctor is silent on AML. He provides three tables that he says are persuasive to him that there is no link between benzene and Multiple Myeloma, Hodgkin's or non-Hodgkin's disease. He does not go into great detail, but simply lists the various studies uncritically. He accuses me of cherry picking only positive studies and ignoring the negative ones. I believe he is the one who is guilty of distorting the facts. First of all benzene is a class I human carcinogen according to International Agency on Cancer (IARC), USEPA, OSHA, National Toxicology Program, American Conference of Governmental Hygienists etc. Benzene causes damage to DNA and interferes with numerous aspects of cellular function which promotes the final expression of cancer. Dr. Martyn T. Smith wrote a review paper noting several of the mechanisms by which benzene causes cancer. Here is a paragraph from his paper which allows us to see why benzene has been the cause of

so much ill health over the years[15]:

> An overall hypothesis for benzene-induced leukemia is proposed. Key components of the hypothesis include *a*) activation of benzene in the liver to phenolic metabolites; *b*) transport of these metabolites to the bone marrow and conversion to semiquinone radicals and quinones via peroxidase enzymes; *c*) generation of active oxygen species via redox cycling; *d*) damage to tubulin, histone proteins, topoisomerase II, other DNA associated proteins, and DNA itself; and *e*) consequent damage including DNA strand breakage, mitotic recombination, chromosome translocations, and aneuploidy. If these effects take place in stem or early progenitor cells a leukemic clone with selective advantage to grow may arise, as a result of protooncogene activation, gene fusion, and suppressor gene inactivation. Epigenetic effects of benzene metabolites on the bone marrow stroma, and perhaps the stem cell itself, may then foster development and survival of the leukemic clone. Evidence for this hypothesis is mounting with the recent demonstration that benzene induces gene-duplicating mutations in human bone marrow and chromosome-specific aneuploidy and translocations in peripheral blood cells. If this hypothesis is correct, it also potentially implicates phenolic and quinonoid compounds in the induction of "spontaneous" leukemia in man. — Environ Health Perspect 104(Suppl 6):1219–1225 (1996)

12. Dr. Myron Mehlman wrote two review papers in which he uses the Hill "guidelines" to assess the "weight of the evidence" regarding benzene and various cancers. He cites 220 references in the 2004 paper and 143 in the 2008 paper. He documents with great detail that benzene is a multiple organ, potent carcinogen. It causes all types of cancer. Here is table four and five from his 2008 paper[16]: