UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

\- - -

| | | |
|---|---|---|
| CAROLYN BAKER, et al., | . | Case No.: 1:05-CV-227 |
| | . | |
| Plaintiffs, | . | Cincinnati, Ohio |
| | . | |
| - v - | . | Wednesday, November 12, 2008 |
| | . | 9:00 a.m. Hearing |
| CHEVRON USA, INC., et al., | . | |
| | . | ***Daubert* Hearing** |
| Defendants. | . | |

..............................

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, CHIEF JUDGE
TRANSCRIPT ORDERED BY: Andrew Agati, Esq.

APPEARANCES:

For the Plaintiffs: LUNDY & DAVIS, L.L.P.
BY: Hunter W. Lundy, Esq.
P.O. Box 3010
Lake Charles, Louisiana 70602-3010

BRENT COON & ASSOCIATES
BY: Mary Brigid Sweeney, Esq.
and Christopher J. Hickey, Esq.
and David P. Pavlik, Esq.
1220 West Sixth Street, Suite 303
Cleveland, Ohio 44113

For the Defendants: STEPTOE AND JOHNSON, L.L.P.
BY: Lawrence P. Riff, Esq.
and Jason Levin, Esq.
633 West Fifth Street, Suite 700
Los Angeles, California 90071

Also Present: David Pyatt, Ph.D.
Dr. Ranjit Machado

Law Clerk: Patrick F. Smith, Esq.
Courtroom Clerk: Mary C. Brown
Court Reporter: Mary Ann Ranz

\- - -

I N D E X

OVERVIEW by Mr. Riff Page 6

| | Direct | Cross |
|---|---|---|
| DEFENDANTS' WITNESS: | | |
| **DAVID GARABRANT, M.D.** | 17 | -- |

DEFENDANTS' Motion for Summary Judgment, re: Punitive Damages By Mr. Levin Page 39

OVERVIEW by Ms. Sweeney Page 44

| | Direct | Cross |
|---|---|---|
| PLAINTIFFS' WITNESS: | | |
| **JAMES DAHLGREN, M.D.** | 46 | 90 |

PLAINTIFFS' Motion for Summary Judgment, re: Punitive Damages By Mr. Pavlik Page 92

PLAINTIFFS' Motion in Opposition to Exclude Dr. Chereminisoff By Mr. Lundy Page 97

* * *

WEDNESDAY, NOVEMBER 12, 2008

P R O C E E D I N G S (9:05 a.m.)

THE CLERK: Please be seated. Case Number C-1-05-227: *Carolyn Baker, et al. versus Chevron USA, Inc., et al.*

THE COURT: Okay. Good morning, everyone.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: We have a number of, for lack of a better term, *Daubert* motions in this case. I think all counsel have indicated that they recognize that the defendants' motion regarding Dr. Dahlgren is the key. If that were granted, it might be dispositive of the case.

Is everyone in agreement that perhaps we should begin with that and see where we go? I think everyone is aware that we only have three hours. That's not to say we couldn't continue in progress to another date and time; but at this juncture, that's all we have.

Counselors, how do you feel about that?

MR. RIFF: Your Honor, I'm Larry Riff for the defendants. We're fine proceeding in that fashion.

THE COURT: Okay.

MR. LUNDY: I'm Hunter Lundy for the plaintiffs, Your Honor. We're fine with proceeding however the Court so desires.

THE COURT: Okay. Okay. Mr. Riff, did you want to speak to your motion?

MR. RIFF: Yes, Your Honor. Is the protocol that I do it from here?

THE COURT: It's your choice, but that's where the microphone is. It makes the court reporter happy and I don't have to miss anything either.

MR. RIFF: Well, good morning, Your Honor. Thank you.

I am assuming, and I'm sure my assumption's correct, that you've read everything and don't need me to restate things.

What I would propose to do, if it would help the Court, is to put on some evidence from an expert witness who is in court with us, David Garabrant, M.D., who has, among other things, evaluated the question whether Dr. Dahlgren has employed a scientific method or has not.

And, frankly, I think anything Doctor -- anything that I would say would be less interesting and informative than what Dr. Garabrant would say. So if the Court would like that -- or let me put it this way: That is what we would like to do, if it please the Court.

THE COURT: That's fine with me.

Mr. Lundy, any objection?

MR. LUNDY: I think this is Ms. Sweeney's witness, Your Honor.

MS. SWEENEY: Your Honor, I have no objection. Just for the record, I would like to note we were not given notice

of his appearance, though we have his expert report and his opinion in this matter. He has given an opinion.

THE COURT: Okay. Mr. Lundy, did you want to make any, or Ms. Sweeney, any sort of opening remarks or comments before we move on to the testimony of Dr. Garabrant?

MS. SWEENEY: Yes, Your Honor, I would.

THE COURT: Okay.

MS. SWEENEY: In response to their motion, I'm opposing, as you know, their motion *in limine*.

I want to say for the record that it will be shown both through my brief and the standards that the Court is evaluating Dr. Dahlgren and his opinion, you will find that Dr. Dahlgren, when he testifies, and the evidence will show, that he has met not only the standards of *Daubert*, but he's also followed medical standards and evidentiary standards promoted by the Federal Judiciary itself outside of *Daubert*. And in consideration, after his testimony, you will find that Dr. Dahlgren has thoroughly examined the issues in this case and has met all the *Daubert* standards set before him.

THE COURT: Okay. You have Dr. Dahlgren here?

MS. SWEENEY: Yes. So I would like to, as part of my case-in-chief or my motion or response, I would like to present testimony from Dr. Dahlgren himself.

THE COURT: Okay. That's fine.

MR. RIFF: Your Honor, we didn't know Dr. Dahlgren

would be here, but we anticipated that. We have no objection.

Before I call Dr. Garabrant, may I just identify the couple of issues that I think are critical here?

What we are not doing, of course, is having a debate about whether Dr. Dahlgren's opinions have great convincing force or do not, whether a fact finder should accept them or not.

We are focusing on his method and whether the method of reaching his conclusions do or do not comply with precepts of science and, accordingly, do or do not comply with the requirements of *Daubert*.

Now there are two major problems as a matter of scientific method that we're going to highlight here. There are others that I think we'll get to, but two that I really want to focus on.

The first, Your Honor, is the problem of idiopathic disease in a population. Now these four plaintiffs have diseases. Each of the four diseases is different. They're separate from one another. And the claim is that each of them was caused, in fact, by benzene from the Chevron refinery over the years.

Each of these diseases, Your Honor, exists in the population generally at some rate, at some background incidence.

For example, really the clearest one in my mind is Ms. Schrader, Plaintiff Ms. Schrader, who has or had a disease

called acute myelogenous leukemia, which I'll call AML here on out.

AML -- I'll start that again.

There are approximately 12,000 new cases of AML diagnosed in the U.S. year in and year out. And all parties agree, and Dr. Dahlgren has admitted in deposition, that at least half -- and probably well more than that -- but at least half of those cases science and medicine have not identified a cause. It is unknown to science at present. And the medical term of art is "idiopathic," which simply means "not known at this time."

It is also true, Your Honor, that with this disease AML, it has been established, and we clearly concede, that heavy, prolonged overexposures to the substance benzene has been shown as capable of causing AML in humans.

And I just digress a little bit to say that those studies do not involve gasoline. They do not involve these kind of mixed type of hydrocarbons that are one- or two percent benzene, but involve pure benzene. Shoemakers in Turkey, huddled over pots of pure benzene in poorly ventilated rooms for decades, that kind of stuff, workers in the U.S. pre-World War II in rubber plants, and that sort of thing, using pure benzene, that's where that science comes from that shows that benzene is at least capable of causing AML in humans.

Here's the problem -- here's the scientific problem that we all confront: When you have a plaintiff who has AML and

has an exposure to benzene -- in this case, in our view a nominal exposure and I will develop that theme with you a little bit -- how as a matter of science and medicine does an expert witness say, to a reasonable degree of medical probability, that that one patient with that one disease, that one diagnosis, is or is not within the 6-, 7-, 8,000 cases a year of the disease that are idiopathic. There's got to be more than simply a gut feel, a professional judgment, or other euphemism for what the law calls *ipse dixit*: Because I say so. And that's the biggest problem we have, and I submit the Court ought to have, of Dr. Dahlgren's approach here in his opinions.

He cannot articulate using the language of science, using the precepts of science, using a logical step-wise analysis how, for example, Ms. Schrader's benzene -- disease, her AML, was caused by the Chevron benzene, as opposed to being simply one of the thousands and thousands of idiopathic cases.

Okay. So that's one thing that we will focus on. And it's not limited to Ms. Schrader, by the way, Your Honor. Ms. Schrader's case is in some ways the easiest case for plaintiffs, because at least it is conceded by us -- and, frankly, by all right-thinking scientists who have studied the question -- that benzene is at least capable of causing the disease in question.

With the other three plaintiffs who do not have leukemia

-- and, frankly, at least in one of the cases it's not clear what she has. But in these other three diseases which we will go through, it is not agreed by us, or we think by any right-thinking scientists, that benzene in any dose and for any duration are capable of causing those diseases. That's another problem with Dr. Dahlgren's analysis which we'll talk about. But it is not one of the big two that I'm trying to highlight for you. I've talked about one of the big two, which is the problem of idiopathic disease.

The next problem that's independent of the first problem, in our view required an exclusion of his opinion, deals with the concept of dose.

This is a toxic tort case, Your Honor, and there is no more central concept in this case than the concept of dose. If this case is tried, at least half of the evidence by both sides will be on: What were these plaintiffs' doses and to what? And let me just articulate what I mean by "dose" and what I think the evidence will show in the case "dose" means.

"Dose" relates, Your Honor, to the amount of a toxin or a pharmaceutical, a chemical, a substance, the amount of a substance that actually makes its way into the body in some fashion and gets to an organ or tissue where it has an effect or a potential effect.

And the reason -- I just want to distinguish for you, Your Honor, this concept of exposure on the one hand and dose on

the other.

We can be -- a person can be exposed to a substance, but in the language of science, what matters is not if someone has an exposure, a potential for a dose, but what the actual dose is itself. Okay.

Now, in the world of benzene toxicology and epidemiology and, frankly, litigation, there is a unit of dose that is described in the literature by the epidemiologists, the physicians and the toxicologists, as an odd unit and it warrants a moment's comment. The unit is called a part per million-year, PPM-year, and the concept, Your Honor, is this:

There is -- there is benzene in the air, and, frankly, there's benzene in the air here. Benzene is ubiquitous. Benzene is everywhere -- in this courtroom, in our homes, and everywhere in measurable amounts, albeit small, usually in the parts per billion range, but in a workplace or near a refinery or coming out of the tailpipe of a car. There is benzene in the air in a certain concentration, and the concentration is expressed in parts per million.

I don't know if the Court has had familiarity in the past with that, that unit, but it's an abstract concept. It's the idea that if you have a volume of air and hypothetically were to divide it into a million volume metric units, you'd just count up how many of those units are oxygen, nitrogen, asbestos fibers, benzene, and other things we find in air.

Okay. So that's parts per million.

If somebody breathes air with benzene in it at a certain concentration measured in parts per million over the course of a year, the scientists in this area would describe that cumulative dose as -- in the unit of a PPM-year.

So let me give you an example to make the point. Let's say one has a worker in a Firestone Tire plant in 1939 where there was crummy industrial hygiene. This is a hypothetical; I don't know whether it's true or not. But it was crummy industrial hygiene and they were using pure benzene, and there's seven parts per million benzene in the air that those workers are breathing in and out all day long, five days a week, 50 weeks a year.

Well, a worker in that circumstance for one year would have a seven PPM-year dose. Okay? A worker in that situation for five years would have a 35 PPM-year cumulative dose.

Okay. And I use this hypothetical of a workplace because all -- all or most of the science in this area does come out of the occupational setting, so this concept of a year is really a work year.

Now the reason I'm burdening you and the record with this explanation is because science has looked at the question, What is the dose necessary to cause or even increase the risk of a benzene-related disease in humans? It's an obvious question. It's one that -- that professionals in this field

have been looking at for decades and decades. And because this is science and not a poetry class, scientists use numbers to describe it rather than words. Numbers rather than words like "significant," "a lot," "high." Words like that. It's -- it's a quantitative analysis.

Now here's the point: I think the evidence is uncontroverted on this record in discovery and on this record before you on this motion that for the disease leukemia, acute myelogenous leukemia that Ms. Schrader had, before humans are at an increased risk of contracting that disease from benzene, the minimum cumulative dose shown by science as necessary is 40 parts per million-year. Forty parts per million-year. The correct number may be as high -- that correct minimum number may be as high as 200 parts per million-years, but it may be as low as 40 parts per million-years.

Now with that background, I want to point out to you, Your Honor, that for purposes of this motion we have taken the plaintiffs' exposure assessment numbers -- which we think are wrong -- but we have taken them and we have converted them into the unit of parts per million-years, and the plaintiffs' experts agree we did the math correctly.

So here's the point: The undisputed evidence before you on this hearing is that Ms. Schrader, for example, who has AML -- the disease that is capable of being caused by benzene so long as there is at least 40 parts per million-years --

Ms. Schrader's cumulative dose from the Chevron refinery is .12 parts per million-years -- .12, which is a whole lot less than 40.

And, similarly, we have calculated -- and again on this record I believe it is undisputed -- what the parts per million benzene doses are for the other three plants, and I will just tell you what they are.

Ms. Brown actually had the highest with 3.1 PPM-years. Ms. Runck, R-U-N-C-K, .5 PPM-years. And Ms. Lipscomb, 2.2 PPM-years.

Now for at least the last 400 years, Your Honor, in the western world, the number one precept of toxicology is and has been that the dose makes the poison. Dose really matters. And it is within the common experience of this Court and every juror that dose matters, everybody knows that ten beers is different than one. Three hours in the sun is different than three minutes in the sun, and so, too, with benzene.

Now with all of that said, the big No. 2 problem with Dr. Dahlgren's methodology is he does not account for dose. He ignores it. And I guess I use my forensic license to say that I understand why he ignores it. If I were in his shoes, I'd ignore it, too, because if he didn't ignore it, it would completely undercut his causation opinion.

You can't get to a causation opinion that benzene causes AML in a human when you're talking about a 0.12 parts per

million dose. Now I guess we'll hear what Dr. Dahlgren has to say about that point, but it is a big problem for us and I submit for the Court, too.

Now, last point is that they produced a PowerPoint -- before I get Dr. Garabrant up there, we have an objection and I hope the Court has noted we have an objection to Dr. Dahlgren's *post hoc* 39-page declaration that he put in, and I just want to remind the Court of how we got to this point. And I would tell the Court that Dr. Dahlgren and I know each other real well. We're both from L.A. We've had lots of cases together, and it's just another courtroom where Dr. Dahlgren and I see each other.

So he produced his Rule 26 reports and completely -- as I expected, they were completely inadequate. They're very long, very verbose. And when one looks at what they really are, it's a medical record summary -- a good one, by the way, but that's what it is: A medical record summary.

And when one actually gets to his opinion in his Rule 26 reports, it's -- it's one or two sentences. Completely conclusory. No analysis. Just a black box. A pure *ipse dixit*.

We communicated with counsel saying, "It doesn't cut it under Rule 26." The response we got was, "Yes, it does." We challenged that premise by filing a motion to strike the Rule 26 reports, trying to be as clear as possible that we were not

making a *Daubert* challenge at that time. *Daubert* would come at a different time, if ever.

Judge Hogan heard that argument, that motion, and overruled or denied our motion to strike.

Between the filing of our motion and Judge Hogan's hearing, Dr. Dahlgren submitted what purported to be a supplemental report for each of the four plaintiffs. There was a one-page report on each, and in that what he said -- what he did, literally he took a couple of sentences, black box sentences from his Rule 26 report, reproduced them and said, "Oh, and by the way, I hold these opinions to a reasonable degree of medical probability" -- because one of the grounds of our motions to strike the Rule 26 report is he had not said that he did, in fact, hold his opinions to that standard. And I know that might seem very formalistic and silly, frankly, but based on prior experience, I wanted to make sure that Dr. Dahlgren would say under oath he really did think that it rose to the level of reasonable medical or scientific probability. So he said the words. In our view, it didn't solve the problem.

In any event, Judge Hogan then denied our motion. And then after all the briefing, after my deposition of Dr. Dahlgren, after all of my experts analyzed Dr. Dahlgren's report and wrote their reports, and after all my experts were deposed on Dr. Dahlgren's opinions and lack of method, then

and only then do we get a 39-page supplemental affidavit from Dr. Dahlgren, to which I believe we had four days to file a reply brief, obviously without benefit of any expert consultant, obviously without the benefit of a deposition of Dr. Dahlgren on what are new opinions, in our view. And so we objected to that and we have raised that objection in our reply.

We've cited to this Court's Sixth Circuit authority that gives you the authority and, indeed, in our view respectfully we submit, requires you to strike that report and it ought not be considered. It's just plain unfair, and it's exactly the ambush that I knew was coming when I filed our motion to strike the report. It's exactly what I knew was going to happen and it has happened and it's prejudiced us.

Now that said, we are prepared to proceed with this. I'm not asking for an adjournment of anything, but I am making that procedural point.

Now with that, if it please the Court, I would call David Garabrant to testify.

THE CLERK: Please raise your right hand.

(Duly sworn by the Clerk.)

THE CLERK: Please be seated.

THE WITNESS: Good morning.

THE COURT: Good morning.

DAVID GARABRANT, M.D.

a witness herein, having previously been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RIFF:

Q. Are you all set in?

A. Yes.

Q. Okay. Dr. Garabrant, there's no jury here and so I do not want to prolong this portion of your testimony. But please remind the Court of who you are professionally and in -- and just tell us about your education, your experience, your profession, what you do for a living, and your qualifications in the area of medicine, epidemiology and occupational medicine, please.

A. Well, it's hard to know where to start.

Q. Start at college.

A. Okay. College. Let's see. I received my undergraduate degree in chemical engineering with high honors from Tufts University. Then I went to medical school also at Tufts University. Got my M.D. in 1976.

I trained in internal medicine at Georgetown University Hospital for two years. Then I trained in occupational medicine at the Harvard School of Public Health for two years and concurrently received a master of public health degree and a master of science in physiology.

I then completed by internal medicine residency training

at Boston University Medical Center in Boston. That was in 1981.

I became board certified in internal medicine in 1982 and in preventive medicine and occupational medicine in 1983.

Upon completing my training in 1981, I joined the faculty of the University of Southern California School of Medicine where I was in the Department of Preventive Medicine, which was grouped doing cancer epidemiology, and for the next seven years my research focused on occupational cancer epidemiology.

In addition, I practiced occupational medicine and taught it. I achieved tenure at the University of Southern California and then was offered the position as head of Occupational Medicine at the University of Michigan.

So in 1988 I moved to Ann Arbor, Michigan, and I have been there for 20 years, advancing to Professor of Occupational Medicine and Professor of Epidemiology.

In those 20 years I have served as Director of the Occupational Medicine program, Director of the Occupational Health program, director of a cross university center for occupational health and safety engineering.

I've served as a director of the Cancer Prevention Training grant. I was the founding director of the Risk Science Center. So I've had a lot of administrative titles over the 20 years.

In 2007, I took emeritus status. I'm currently Emeritus

Professor of Occupational Medicine and Emeritus Professor of Epidemiology.

I've taught occupational medicine, research methods in occupational epidemiology, epidemiology courses, and risk assessment. So I've taught in those areas for 20 years. I think that's a brief summary.

Q. Okay. One of the subjects before us is whether or not there is methods accepted by science -- accepted in science for determining whether or not a substance did, in fact, cause an adverse health effect in humans.

Do you know anything about that topic?

A. Yes. I teach that.

Q. Would you describe generally what is the method, the scientific method, used by physicians and other health professionals in analyzing, in coming to those conclusions? And take your time on this, please.

A. Sure. Could I possibly use the easel and just write down the points as I do this?

THE COURT: Certainly.

MR. RIFF: If it meets with the Court's approval, let me help move some things there.

THE COURT: Mrs. Brown will help you a little bit. It tends to be a two-person operation. And if you could just move it over into the well, that would be fine.

MR. RIFF: The only thing we need is a writing

implement.

THE CLERK: I'll get you one.

(Witness positioned by the easel.)

MS. SWEENEY: Your Honor, may I ask that Dr. Dahlgren sit over here so he can see better as to what he senses is a challenge to him?

THE COURT: That's fine.

MS. SWEENEY: There is a chair here.

THE COURT: Oh, all right.

MR. RIFF: Sorry for not doing this beforehand, Your Honor. I didn't know we were going to do this.

A. Okay. The first question, and I'm just getting a little ahead here, is to establish a diagnosis. So that's number one. What is the diagnosis? What does the patient have?

And, so, if it's cancer, typically the diagnosis is based on pathologic examination of tissue, a biopsy, in conjunction with a clinical examination, perhaps x-ray scans, surgical findings that establish beyond a reasonable doubt what -- what the diagnosis is, what's the disease.

Question No. 2: What were they exposed to? What is the alleged exposure? And so it's important to list what the agents or mixtures or compounds or circumstances of exposure are.

So, for example, in this case we're talking about gasoline. We're talking about petroleum hydrocarbons,

mixtures. We're talking about benzenes. It is important that you talk about the mixtures that you're going to postulate caused this exposure.

Third question: Can this agent or exposure cause this disease under any circumstances known? In other words, is it possible under some circumstance? Or is it known to science under some circumstance?

Q. Give us an example of that, please. What are you talking about?

A. Well, for example, cigarette smoking. Okay. So that's an agent or an exposure.

Let's talk about small cell carcinoma of the lung. Okay. We're talking about cigarette smoking. Can cigarette smoking cause a disease under any circumstances? No. Is it -- is it known to occur? And the answer's yes. No question about it. People who are heavy and prolonged smokers clearly are at an increased risk of lung cancer.

And then question No. 4 would be: Does this agent put people at an appreciably increased risk at the exposure levels or circumstances in this case or in this instance?

So, in other words, we know smoking causes small cell carcinoma of the lung. If a teenager takes one puff of a cigarette and never smokes again, does that put that teenager at an appreciably increased risk? That's the question.

Question No. 5 is: Is there an alternative explanation?

In other words, is there some other reason that this person got this disease? Can we identify one? Is there some genetic susceptibility? Is there some genetic resistance? Is there anything else we should consider? That's the sequence -- that's the sequence of questions that we need to examine.
Q. I want to stay on this for a minute, Dr. Garabrant. Is it your understanding that in this case three of the patients have claimed adverse health effects that are other than acute myelogenous leukemia?
A. Yes.
Q. And what's your understanding of what the claimed diseases are?
A. Two of the patients have a monoclonal gammopathy. In other words, a disorder in which their lymphocytes aren't making the immunoglobins that are, under normal functioning, critical to maintaining immunity. Sometimes that's referred to as monoclonal gammopathy of unknown significance, or MGUS. So two of them have that.
One of them has -- I'll have to look at my notes as to who has what. So that's Carol Lipscomb and Jean Runck.
Mary Etta Greener-Brown had Hodgkin's disease at age 20, received mantel radiation to her chest and developed breast cancer decades later.
And then Michelle Schrader had acute myelogenous leukemia.
Q. Okay. Thank you for that.

Now, let's put aside Michelle Schrader and acute myelogenous leukemia for a minute and let's talk about the two MGUS cases, M-G-U-S, and the Hodgkin's disease. Are you with me?
A. Yes.
Q. Okay. What are you doing?
A. I'm just writing down the names.
Q. Okay. Thank you for doing that.
And let me just ask you, MGUS -- is MGUS cancer?
A. No, it is not.
Q. Is Hodgkin's disease cancer?
A. Yes.
Q. Is leukemia cancer?
A. Yes.
Q. Okay. Now I just want to focus on one of these steps in the analytical process. Can this agent cause the disease under any circumstance known? Is it possible or known? I want to focus on that.
Now, how does science answer that question with respect to, say, the substance benzene involved in this case, and the disease MGUS and the disease Hodgkin's disease? What is the method that science uses?
A. Okay. The principle body of scientific evidence as to whether a chemical, or for that matter an exposure, a habit like smoking, causes cancer in humans is epidemiology. It's

the study of patterns of disease in populations. Laboratory science is also important. Toxicology is also important. But the direct evidence as to whether people who have an exposure or have some habit are at an increased risk of disease comes from the field of epidemiology. And so we typically look to the epidemiologic science to determine whether there is evidence that people who are exposed to benzene are at an increased risk of MGUS. And the answer is, there is not a body of evidence to support that position. It's simply not there.

Q. What do you mean, a body of evidence? Explain this concept of an epidemiology study that is done by somebody like you at Michigan and published. How does that relate to the concept of a body of literature or --

A. Well, we tend to think of a single epidemiologic study as providing one point of evidence. In other words, it will typically show whether there is or is not an association between an exposure and some disease outcome.

One of the foundational principles in science is that things -- findings need to be replicated in order to be accepted as correct. And so in epidemiology, as in every other branch of science, we seek to replicate positive findings.

And in the field of cancer epidemiology, there are, in fact, dozens and dozens of studies looking at petroleum

distillate hydrocarbons, hydrocarbon mixtures, benzene in relation to many, many disease outcomes. So when I said, "body of evidence," I'm talking about all of the studies that have looked for that association.
Q. And as part of your work in this case, did you undertake a systematic and comprehensive review of the world's peer-reviewed, published, epidemiologic literature relative to the agents in question in this case and the diseases in question in this case to try to see whether -- or try to see what that body of evidence informs us on the question before us?
A. Yes, I did.
Q. Okay. And did you write a report on that?
A. I did.
Q. And you were deposed on that?
A. I was.
Q. Okay. Now, is it -- within the profession, the science of epidemiology and medicine, if you're trying to answer the question, Can the agent cause the disease, and you're looking at this body of literature, is it correct or is it not correct to focus solely on one or two studies to the exclusion of the remainder of the body of that literature?
A. No. The tradition in science for hundreds and hundreds of years is that it is based on empiricism. It is based on data. It is based on measurement.

Good scientists rely on all the available reliable evidence. That's a principle of scientific conduct. We do not pick and choose the favorable evidence and discard the things we don't like. We're obligated to consider all the evidence and to consider it fairly. So you don't -- you don't just pick the studies you like and ignore the rest.

Q. Okay. Now, so, what we've talked about so far is this method by which science evaluates whether an agent can be said to have caused a disease in a human being.

Okay. So let's assume for the sake of argument -- withdrawn.

Let's take Ms. Schrader's case. There the agent is benzene and there the diagnosis is AML. Right?

A. Right.

Q. Okay. On this question, can the agent cause the disease under any circumstance known? Is it known or possible? What's the answer?

A. Yes. Yes.

Q. Okay.

A. Benzene is widely accepted by the scientific world as being capable of causing acute myelogenous leukemia under circumstances where the cumulative exposure is above about 40 to 50 parts per million-years. So people who have -- who breathe air with, say, one part per million and they do that for 40 years, a working lifetime, that's a cumulative dose of

40 PPM-years, that is the level above which it is clear there is increased risk of AML.

Q. And below that, that cumulative dose or exposure, below 40 PPM-years, in your opinion what?

A. There is not adequate evidence to say it puts people at increased risk. It doesn't mean there's no evidence. But when you get below 40 PPM-years, there are well-done studies that find no association. There are well-done studies that find a positive association. A fair accounting of that literature below 40 PPM-years says it's not clear that people are at any increased risk. And as you get well below 40 PPM-years, there's no evidence whatsoever. None. So when you get down to the levels that the plaintiffs claim the exposures were in this case, there's no evidence at all.

If I can -- if I can fill in the levels. I'll put in 2.2, 3.1, 0.5, 0.12. These are all PPM-years.

Q. Okay. I think our record's clear, but you're making a little chart. And under the column Exposure, what is this?

A. That says benzene.

Q. Okay. That's benzene. So the benzene exposure for Ms. Lipscomb was 2.2 PPM-years, Ms. Brown, 3.1, Ms. Runck, 0.5, and Ms. Schrader, 0.12.

A. And those are Dr. Rosenfeld's calculations. The plaintiffs' exposures, those are his numbers. And I don't know whether those are right or not, but let's just take his

numbers.
Q. Okay. Now, why don't you retake your seat, unless you think there's some more you may be writing.
A. Well --
Q. I guess it depends on what I ask you --
A. Okay.
Q. -- and we'll see what happens.
(Witness regained the stand.)
Q. Now at another time and another place perhaps we will debate whether you think Dr. Dahlgren's opinion is right or wrong. That day is not today.
Today, what I want to focus on is Dr. Dahlgren's method of reaching whatever opinion he reached.
As part of your work in this case, did I ask you to be exquisitely sensitive to the question of what is Dr. Dahlgren's method?
A. I don't think you asked me to be exquisitely sensitive to it. I think you asked me to look carefully at his method, and I did.
Q. Okay. And can you tell the Court, please, what you did in order to look at that? What materials did you review, please?
A. Well, I reviewed his four reports on these four plaintiffs, including the -- I don't know how big it was, a hundred-and-some-page appendix that he submitted. I reviewed the four supplemental reports. And then I reviewed the -- I

don't know what it's called, this Exhibit C, Part 1 and Part 2 that says File 10/3/2008.
Q. Is that approximately a 39-page affidavit?
A. Yes.
Q. Okay. Did you also review the deposition of Dr. Dahlgren that I had taken in this case?
A. Yes.
Q. Okay. Now with that as background, would you tell the Court, please, what method you were able to discern that Dr. Dahlgren utilized, what scientific method did he use in reaching his ultimate opinions?
A. Well, it's difficult to say. In his four reports on the plaintiffs and his four supplemental reports, there was no systematic review of the relevant scientific literature. There was occasional reference to what I'll call positive studies, or studies that went his way, supported his opinions, but there was absolutely no systematic review of the body of literature that was relevant and reliable.
Without that, there was then no discussion whatsoever of a systematic approach to how one could conclude or argue against that these plaintiffs' diseases were caused by their alleged exposure. So there was simply nothing. It was simply they've got the disease, they were exposed, here's some positive studies, exposure caused it.
Q. And in your opinion, to a reasonable medical and

scientific probability, is that a method recognized as reliable by medicine and science?

A. Well, no, that's not a method at all. There's no systematic reliance on scientific evidence when you do that.

The principle of science is you have to rely on scientific evidence in order to reach an opinion, and you must use it in a manner that the traditions of science say is a reliable use of the scientific evidence.

Q. Okay. Did you read in the 39-page affidavit words to the effect that Dr. Dahlgren accused you of cherry picking the evidence?

A. I don't think he accused me of cherry picking. I think the exact wording is -- I can't find it offhand. Basically, he said I just did not critically review the evidence in any way. I think that was roughly his comment.

Q. Okay. Now, Dr. Garabrant, we're talking about method here. And here's my question:

Is the situation we have in this courtroom that we have two qualified experts who have properly used the scientific method in reaching different opinions and now it's up to -- to others to determine which opinions are more convincing? Is that where we are, in your view?

A. Well, that's a hard question.

Q. It's a terrible question. Let me withdraw it.

This is what I'm really trying to get at. I'll just leave

it at this:

Did you use the method in reaching your opinions that you described for the Court?

MS. SWEENEY: Objection. We're not raising any *Daubert* or methodology issues with him, whether or not he used the same methods. It's irrelevant in this matter.

THE COURT: Sustained.

Q. Okay. Last topic then. Are these diseases that are the subject of this lawsuit, do they exist at some background rate in the population at large?

A. Yes. Yeah, all of these diseases are -- I wouldn't say they're common, although monoclonal gammopathy is actually fairly common in elderly people. But Hodgkin's disease and AML are well-known tumors. They have a well-defined incidence rates in the population.

Q. Are each of these diseases -- let me say this differently.

Has medical science determined the causes, all of the causes accounted for -- 100 percent of all of the causes of these four diseases in humans?

A. No. In fact, I would say it's a fair summary -- let's talk about the Hodgkin's disease and the AML. It's a fair summary to say that we actually know very little about the causes of these two diseases. Okay? So these are diseases that, you know, frankly we can explain only a very small amount of these diseases in terms of what is it that actually

leads to them.
Q. What does the word "idiopathic" mean to a doctor?
A. It means of unknown cause; we don't know.
Q. Okay. Now let's go back to method then and the question of attributing cause from an agent to a disease.
What is the reliable, generally accepted methodology to deal with the issue of the disease in question also having idiopathic and -- an idiopathic cause? In other words, let's focus on the AML. We know that benzene's capable of causing AML in humans. We also know, I guess you're telling us, that some majority of cases of AML have no known cause.
So describe for the Court the method that is generally accepted and reliable in science to be able to say in a given patient, "No, it was the benzene and I can rule out to a reasonable degree of medical probability that this is just another one of the idiopathic causes?"
A. It's difficult to answer that the way you've asked it. Let me -- let me try and go at it by answering the other side of it.
Q. Okay. Why don't you turn and talk to the Court.
A. Yeah. In order to say that benzene has caused, for example, Michelle Schrader's AML, you have to go through the process I laid out. She does have AML. The alleged exposure is benzene at a cumulative dose of about .12 parts per million-years.

Is it known to the world of science that benzene can cause AML? Yes. Yes, it is. Under circumstances of exposure at 40 PPM-years and above. That's well-established.

Okay. So the question then in Michelle Schrader's instance is, is there scientific evidence that people exposed such as at her level are at substantially increased risk? In other words, to make my analogy back to if a teenager takes one puff of a cigarette, is there evidence that that would put that person at substantially increased risk later in life? And the answer is no, there is not, and there's no reasonable cause to think that that would be a substantial cause of lung cancer.

Well, the same for benzene. You've got to take this scientific evidence and apply it to the circumstances of the individual to say, Well, do people who have .12 part per million-year exposure have an increased risk of AML? And if they do not, then you say there is no reason to believe that that played any meaningful or any substantial role or put her at any measurable or even conceptually increased risk.

Okay. Failing that, then you're left with what I listed as: Well, is there some alternative explanation? Is there something else we know? Is this someone who had a high dose of ionizing radiation? We know that will cause AML. We know that from the Hiroshima and Nagasaki bombs that the people who survived the blast were at increased risk of AML. We know

that ionizing radiation can do it.

Did she have a high dose of ionizing radiation? Well, not to my knowledge. So you go down the list of other things that can cause it. I'm not aware that there is anything in her history.

And then you are left with, Well, there's no reason to think it is benzene. There's no reason to think it is any of these other things. We know that for AML we have very little understanding of the causes. Most of them we put in the category of idiopathic. We don't know why they arise. Some day we will; today we do not.

Q. Okay.

MR. HICKEY: Excuse me, Your Honor. We only have three hours today. I'm wondering if there's any type of time limit on this witness?

THE COURT: Well --

MR. RIFF: Yes, I'm willing to impose my own. If I could have another minute, I will sit down.

THE COURT: Mr. Riff's hour and a half to use as he chooses.

MR. HICKEY: Thank you.

Q. Were you able to locate, in any of Dr. Dahlgren's discussion in his file, anything he brought to the table, any article from the peer-review scientific literature that suggests that persons with 0.12 PPM-years of benzene exposure

were at a significantly increased risk of contracting AML?
A. No.
MR. RIFF: Okay. Then I have no other questions for you.
And, Your Honor, I'm not sure how you wish to use the time. I have no objection to cross-examination at this point if I -- if it doesn't count against my clock. However the Court wishes to handle it.
THE COURT: It won't count against your clock.
MR. RIFF: Thank you.
THE COURT: Ms. Sweeney, you can cross-examine, and you're not tethered to the lectern if you don't want to be.
MS. SWEENEY: That's --
THE COURT: You're not tethered to the lectern, but that is where the microphone is. So with that in mind --
MS. SWEENEY: Given my height, Your Honor, I appreciate that.
THE COURT: Okay.
MS. SWEENEY: Would it be all right, Your Honor, since we're not aware of what witnesses they were going to bring forward today, I have a five-minute break to consult with my counsel as to questions I may want to ask him since I didn't know the doctors were going to be here today?
THE COURT: I just want to warn you: I have a meeting at noon. So at noon, I'll be getting up and walking

off the bench.

MR. HICKEY: Two minutes.

MS. SWEENEY: Two minutes, Your Honor.

THE COURT: All right.

MS. SWEENEY: If we can have two minutes.

THE COURT: Brief recess.

THE CLERK: All rise.

(At which time, a recess was taken.)

* * *

THE CLERK: Please be seated.

THE COURT: Please proceed.

MS. SWEENEY: Your Honor, after consulting with my counsel, we decided we're not going to cross-examine Dr. Garabrant.

Thank you, sir.

THE COURT: Okay.

THE WITNESS: Thank you. Thank you, Your Honor.

THE COURT: Counselors, is there any reason to have the doctor remain available for recall?

MR. RIFF: Yes, Your Honor, there is. I would ask he stay until noon.

THE COURT: Okay.

MS. SWEENEY: Your Honor, then I'm going to reserve cross-examination for a later time if that's all right, if he brings up something I need to cross-examine him on.

THE COURT: Okay. That's fine. We can be flexible.

MS. SWEENEY: Thank you, Your Honor.

THE COURT: You may step down, sir.

(Witness excused.)

MS. SWEENEY: Your Honor, I guess we're both -- we're trying to figure out since it's his motion and I was going to -- am I supposed to be responding now? Or does he come in --

THE COURT: I'm not sure Mr. Riff has rested at this point. You have 20 minutes left.

MR. RIFF: Yes, Your Honor. I want to think about how best to use those 20 minutes.

I will rest with respect to the Dahlgren -- *Daubert* motion. I would like to submit on the papers with respect to our *Daubert* motion with respect to Dr. Chereminisoff, and I'll just give you a one-minute overview of that motion and what's going on there.

I told you, Your Honor, earlier, I told the Court earlier that if there is a trial in this case, at least half of the evidence will be about what was the dose and exposure that these four people received. Dr. Chereminisoff is a key piece of that from the plaintiffs' side. He calculated, through some very technical calculations, emissions. I'll just leave it at that.

Those emissions were then taken by another expert of the plaintiffs, a gentleman named Paul Rosenfeld, and converted

into an exposure, and then we took his numbers and converted them into dose and that's how we came up with these PPM-year numbers.

Now the fact is that in our view, Dr. Chereminisoff's analysis is really incorrect and is quite speculative and not scientific, and all the rest. And if we're right on that, those numbers go down.

But for purposes of this motion, it's not necessary that we have that discussion, in our view. So I'm going to submit on papers on that.

If we lose our motion with regard to Dr. Dahlgren, I will tell you I genuinely -- we genuinely believe our *Daubert* motion with respect to Dr. Chereminisoff is correct and ought to be granted, but I don't want to use my precious moments here to argue that.

What I would like to do in the remaining time I have is turn the podium over to my co-counsel, Jason Levin, to address our motion for summary judgment on the issue of punitive damages.

And I just will remind the Court that among the motions pending is the defendants' motion for summary judgment, which has two elements. One element is that because Dr. Dahlgren's opinions should be stricken under *Daubert*, hence plaintiffs have no medical causation testimony, that we should obtain judgment under Rule 56 on that ground.

As a second and independent ground, we have moved for partial summary judgment on the issue of punitive damages under Rule 56. And in the five or seven minutes that we have left, I'd like Mr. Levin to argue that for the Court, please.

THE COURT: Okay.

MR. LEVIN: Good morning, Your Honor. Jason Levin for the defendants. Thank you for permitting us to come here and argue these motions before Your Honor.

As Mr. Riff mentioned, our motion for summary judgment has two elements. One element has to do with the absence of medical causation evidence, and that focuses on Dr. Dahlgren's testimony. Mr. Riff has already addressed that.

The second focus of our motion for summary judgment is a partial motion for summary judgment. It addresses specifically plaintiffs' prayer for punitive damages.

I don't want to repeat the case law which we explored at length in our moving papers. I think plaintiffs' counsel has also looked at the same cases and boiled down as essence when punitive damages are available under Ohio substantive law.

There are really two factors for the Court to focus on. One is whether at any time there was a substantial probability that the emissions from this refinery in Hooven might cause the types of injuries that the plaintiffs allege here.

We know after the fact that plaintiffs' experts claim that these emissions, which contained benzene, caused these

illnesses.

But the question for punitive damages is a little different: It is looking back at the time when these emissions were occurring, between 1930 and 1986. What, if anything, did Gulf and Chevron, the operators of the refinery, know about the purported likelihood that emissions from their refinery might cause AML or Hodgkin's disease or monoclonal gammopathy in these plaintiffs or other Hooven residents?

There are -- there's two ways to look at this. First of all, there's the point of view that to prove the probability that injury would occur from these emissions, you need some sort of expert testimony, any sort of expert who would look at the amount of the emissions and the -- what is known about the risks of those emissions and render an opinion as to the likelihood of injury occurring.

We know that plaintiffs claim after the fact that injury did occur. But what were the chances back in 1930 or 1940 or 1950 that somebody thought that this type of injury might occur?

The only evidence on this point that we had came from a risk assessor that was retained by the plaintiffs. We presented in our moving papers that risk assessment evidence.

The risk assessment was done by Dr. Rosenfeld, who Mr. Riff mentioned, and he estimated based on the evidence he saw on the refinery's motions. Those are estimates we

dispute; we think they're too high. But based on those estimates, he believed at most that the excess risk from those emissions would have led to a one in one-thousandth increase of the chances of developing a disease, a cancer, of the type sustained by one of the plaintiffs. And that risk assessment goes all the way down to one in 14,000 for one of the other plaintiffs.

So comparing that risk assessment data, which is all we have from the plaintiffs' experts, comparing that data to the Ohio requirement that the actor, before they're hit with punitive damages, needs to have or appreciate a substantial probability or likelihood of injury -- well, frankly, we're far short from that standard.

But put aside the expert point of view for a second, the risk analysis. There's another line of evidence that's purely factual evidence. What do we know about what Gulf Oil knew when it was operating this refinery in 1930 or 1940 or 1950? Did they know anything or consider that there might be a one in one-thousandth chance that emissions from their refinery might produce illness? There's no evidence on that point. There's no evidence on that point at any year, at any decade.

In fact, we're just invited to speculate that just because these emissions contained benzene and just because it was known since 1948 that benzene could cause cancer, that somehow the operators of this refinery knew or should have known that

there was a probability of injury from those emissions. I think that logical step, that logical leap just doesn't make sense here.

Now when we talk about the evidence of what Gulf knew and when it knew it about its refinery's operations, the amount of its emissions and the risk of harm from those emissions, the plaintiffs, you know, frankly, put several hundred pieces of paper before the Court and say, "Without much analysis, here's our evidence. Here's a big pile of papers." And the Court has seen our objections to those documents. There's also a number of charts and explanations addressing these objections.

We could talk about the objections, if Your Honor would like. I don't think that is particularly necessary. It goes to authentication, foundation, hearsay.

But even taking those documents at face value, they have nothing to do with benzene. They have nothing to do with the risk of harm to the community. There is no document, no evidence whatsoever at any point in time anybody operating this refinery or any other refinery has ever considered it likely that people living near this refinery or any other refinery is at a likely risk of harm.

If that were the case, the number of refineries worldwide that would need to be shut down would just be all of them. I mean, these emissions, which contain benzene, they're at every refinery. Plaintiffs' experts have admitted as much. And

just because you have some benzene doesn't mean you have benzene at a dose sufficient to cause an injury.

So again looking at the evidence that has been submitted, it doesn't have anything to do with benzene, it doesn't have anything to do with the risk of harm from benzene, and it is insufficient as a matter of law to support a claim for punitive damages.

Thank you very much.

THE COURT: Thank you.

MR. RIFF: With that, Your Honor, we will turn over the podium to plaintiffs for their hour and a half.

I do want to note two things. I have in court today with us, with me, David Pyatt, P-Y-A-T-T, Ph.D., who is the subject of a *Daubert* motion brought by plaintiff, and Ranjit Machado, M-A-C-H-A-D-O, likewise. So if it turns out that it's useful for the Court to hear from them, they're available.

And then the last thing I wanted to say is, I want to make sure that we were clear on one point. It's just a technical point. It is not our view, it is not Chevron's view, that it was known in 1948 that benzene was capable of causing cancer. Mr. Levin was making reference in passing to a 1948 document from the American Petroleum Institute that does discuss adverse effects of benzene. But it's not cancer. Nobody thinks that that document related to a cancer knowledge. It related to the disease called aplastic anemia, or bone marrow

suppression, which is not cancer. So I wanted to make sure that was clear.

Thank you.

THE COURT: Thank you. Mr. Lundy or Ms. Sweeney?

MS. SWEENEY: May it please the Court, I'm Mary Brigid Sweeney, and I represent the plaintiffs in this case.

Plaintiffs filed an objection or opposition to Dr. Dahlgren -- or defendants' motion to strike or limit Dr. Dahlgren.

I think you're going to find that he's complied in every way. His methodology, with which the Court is going to address today, is sound.

But I do have to touch base about just the procedural issues addressed by my counsel pertaining to the submission of his reports. And I want to stress to the Court that their motion to strike Dr. Dahlgren's supplement to his original report was ruled against them by the magistrate and not appealed by them to this Court. So that issue is moot.

Second, the affidavit itself is extensive, but it is within plaintiffs' counsel's right to submit an affidavit in support of her motion, of our motion, and that is where that affidavit arose.

So when you look at that affidavit and you say, "This is an improper submission of testimony by Dr. Dahlgren," it is not. And, in fact, it's entirely consistent with his reports

and his deposition.

What it addresses specifically that was different was questions raised by counsel as to this motion that we're here today on: Whether or not his methodology met the standards.

So Dr. Dahlgren took the time to put in writing so this Court could see, because it was unknown as to the procedures we were going to follow, what his -- clearly what his methodology was and what he reviewed to reach the opinions that he submitted. So his affidavit, there is no basis to strike his affidavit. It is a proper affidavit in support of this -- our opposition to this motion.

The standard before this Court is *Daubert* and 702, Federal Rules of Evidence. You'll find after you listen to Dr. Dahlgren not only is his opinion relevant, but it's on point.

And as raised by opposing counsel, he didn't cherry pick the science he relies on. He's not -- he's part of the right-thinking scientists that counsel referred to. He may disagree with counsel's or Dr. Garabrant's ultimate opinion, but after you see his testimony today, you're going to find that he not only followed all of these, but he did additional things to determine what caused these four plaintiffs' illnesses. He has every right to testify in this matter. And with that, I would like to bring Dr. Dahlgren to the stand.

THE COURT: Fine.

(Duly sworn by the Clerk.)

JAMES DAHLGREN, M.D.

a witness herein, having previously been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SWEENEY:

Q. For the record, could you please state your name?

A. James Dahlgren.

Q. Dr. Dahlgren, can you please state your educational background?

A. Well, I graduated from UCLA in 1964. I attended medical school at U.C. San Fransciso, graduating in 1968.

I then did five years of post-graduate internal medicine training, first two years at Boston's Veteran's Hospital, the third year at Cedars Sinai Medical Center in Los Angeles, and fourth and fifth year at UCLA Medical Center in Los Angeles.

I then took a course in school public health and epidemiology and biostatistics.

And I've been involved as an assistant clinical professor at UCLA in the Occupational and Environmental Medicine Department since 1977, and spent my professional career involved with toxicology, evaluating and treating patients with exposure to various toxic agents.

I have had extensive experience with refinery workers and people living near refineries or similar institutions and

evaluating health effects from these kinds of occupational and environmental exposures.
Q. Can you tell me in what way has it come to you that you had involvement with refinery workers in particular?
A. Well, while I was doing my fellowship, I was doing toxicity research on antibiotics, and I was approached by individuals from the Oil, Chemical and Atomic Workers Union to help them in their trying to understand the health risks associated in working in an oil refinery.
Q. And do you treat persons that are involved in the petroleum industry?
A. Yes. Ever since that time I've seen patients and treated them from oil refineries.
Q. Tell me a little bit about your practice.
A. Well, as I say, I'm specialized in practicing the field of toxicology in the subspecialty of internal medicine. I see patients. I evaluate them. I treat some patients who are local for various illnesses that they experience.
Q. Have you seen specifically patients with AML?
A. Yes. I've seen a few over the years. It's a rare disease.
Q. Have you seen patients with non-Hodgkin's or other forms of lymphoma?
A. Yes. Malignant lymphoma is more common and I've seen more of those cases over the years.

Q. And have you seen or treated persons with monoclonal gammopathy of unspecified order?

A. Yes. Usually that doesn't require treatment, it just requires monitoring, but I have seen a number of patients with that disorder.

MS. SWEENEY: Your Honor, in preparation for Doctor's testimony, we had presented -- or had prepared a PowerPoint, but we've decided not to do that today because of just logistics and the time constraints. But we did print out a copy of our PowerPoint which I'd like to submit to the Court, if that would be --

THE COURT: That's fine.

MS. SWEENEY: Thank you.

Q. Now, in preparation for this, would it be safe to say, Doctor, that you and I covered many of the issues that were brought up by Dr. Galvin?

A. Dr. Garabrant.

Q. Garabrant. Thank you.

A. Yes.

Q. I'm awful.

A. Yes, I think we covered them very thoroughly.

Q. Okay. So if we could go to the beginning pages of our document in front of you, the PowerPoint.

Tell me -- and by the way, there was a reference to this in your reports and in your affidavit.

Tell me what the Federal Judicial Center's Reference Manual on Scientific Evidence is.

A. Well, I think in response to a growing number of torts in the federal courts involving chemicals, the Federal Judiciary commissioned a whole group of experts to write a series of chapters outlining what doctors and other experts should do when they're trying to evaluate causation.

Q. Okay. And this Federal Judicial Center's criteria which is indicated on page 3, the --

MS. SWEENEY: And, Your Honor, I gave you an enlarged version. Would you prefer a version that I'm referring to?

THE COURT: This is fine.

MS. SWEENEY: Okay.

THE WITNESS: It won't be on page 3, Your Honor. Only hers.

MS. SWEENEY: No. It is called the Outline Factors to Consider and it shows a reference guide and has little tables.

Q. Tell me the different criteria of the Reference Manual on Scientific Evidence.

A. Well, there's basically five areas that you have to evaluate:

Number one, and probably most important, is exposure.

Number two is temporality; that is, Did the disease occur after the exposure? -- which is pretty obvious.

General causation, that is what Dr. Garabrant referred to as the issue: Is it possible for the disease to be caused by the agent in question?

Number four is modifying factors, and that would be things that might increase or decrease the risk of the problem being caused by the exposure, and then in addition that would be alternative causes that might be the cause or might be contributing to the risk.

And the last item is evaluating the patient's overall medical condition thoroughly and completely.

And then using all that evidence, as it says on page 5 where there's kind of a summary which is one of the pages from the reference manual, you can arrive at specific causation if the various significant criteria are fulfilled.

Q. Now, did you use these criteria when you evaluated these four plaintiffs?

A. This has been the criteria that I've used long before the manual was printed. This is my lifetime methodology of approaching patients, you know, thorough analysis of exposure, careful evaluation of the general causation issues, and modifying factors before reaching a final conclusion about any type of a specific disease being caused by an exposure.

Q. Now when you evaluated these four plaintiffs -- and for the Court's reference, I'm going to just digress just for a minute.

You're familiar with Hooven, Ohio?
A. Yes, I've been to Hooven, Ohio, on two separate occasions now.
Q. That's right. And you examined, personally examined, all four plaintiffs in this case?
A. Yes, I did.
Q. And you also are familiar with the location of Hooven to the refinery?
A. Yes. Well, now it's just a big vacant lot, but I was told by the plaintiffs, and others that we've talked to, about the closeness of the refinery to the City of Hooven or the Village of Hooven and the Village of Cleves, and also I've seen many maps and descriptions of the environment there.
Q. Correct. But you personally actually saw the city of Hooven and the refinery --
A. Yes.
Q. -- that you visited that area?
A. Visited the site. And that's one of the issues that is in the manual on scientific evidence, the site visit. It's very helpful to actually see where the people lived and what the circumstances were under which they might have been exposed.
Q. Now when you saw the four plaintiffs, were you given, prior to your examination, their medical records from treating physicians and hospitals?
A. Yes. We had all the medical records prior to seeing them.