Q. And did you review those records prior to rendering your entire opinion?
A. Yes, as would be normal practice.
Q. Okay. Now going back to the next criteria or the criteria we talked about, let's talk about the exposure that -- and this would be on the following slide, which would be what is my page 4 -- and it says just Exposure.
A. Yes.
Q. And the methodology -- I'm really interested in your methodology of these four plaintiffs. Did you talk or discuss or obtain environmental or occupational history from these four plaintiffs?
A. Yes.
Q. Are you familiar with their lifelong occupations that they had and when they had it and where those occupations were located?
A. Yes.
Q. Were you familiar with what they did in their occupations?
A. Yes, as part of the history-taking process.
Q. Were you familiar with their residential history?
A. Yes, that was also part of my history taking.
Q. Were you familiar with the proximity of the residential history to the location of the refinery in Hooven, Ohio?
A. Yes, I did my own independent evaluation looking on maps. And when they would give me an address, I would look and see

how far from the refinery that address was.
Q. Were you then familiar with the duration that they lived in or near the proximity of the refinery while it was operational and, thus, their exposure duration?
A. Yes.
Q. You're familiar with that?
A. Yes.
Q. Were you also familiar with the magnitude of their exposure as presented by other experts in this case prior to rendering your opinion?
A. Yes. I believe at least some of the data from Dr. Rosenfeld and Dr. Chereminisoff had been made available to me when I was examining these folks.
Q. Were you provided -- in this litigation, were you provided litigations {verbatim} by plaintiffs' counsel that were obtained either from Chevron itself or from the U.S. EPA?
A. Yes. There were extensive records from both Chevron -- Chevron contractors and government agencies regarding the exposure factors that were going on in this -- in this village and at this refinery.
Q. Now I want to talk very specifically about your clinical examination of the four plaintiffs themselves. And we don't have to go into specifics -- well, let's just go into it.
Did you obtain a clinical history of their exposure from all four plaintiffs?

A. Yes. They all described what they experienced while they were living at the facility -- or near the facility, and, you know, each one of them had their own story to tell about when they noticed odors from the refinery, when they noticed symptoms. But all four did report that that was a common event for them, to notice odors from the refinery, various gases and vapors that were coming out of the facility, and that they experienced symptoms, all four of them, from those exposure, and that's called clinical indication of exposures, and it's a very important part of the reference on scientific evidence.
Q. And why in this case would these testimonies or indications of symptoms or these narratives told by the plaintiffs be important to your evaluation as to exposure?
A. Well, because if you're experiencing odor and symptoms, that actually means that you're in the parts per million of exposure. You don't get those at the low parts per billion range. And so what they were experiencing was levels that would be several orders of magnitude higher than background levels.

I think Mr. Riff said earlier there's benzene in the environment but it's so low it doesn't cause any effect. Same with, say, other chemicals. But in the case of living in Hooven or Cleves in North -- North Bend, I guess it's called, those areas that are close to the refinery, it was common for

them to experience symptoms. And that, from a clinical point of view, indicates that the exposures were much higher than these various calculated exposures that we've referred to.
Q. And we've referred to just the senominal -- or seminal paper on that issue of odor called the Drinker study; correct? This isn't just something you just created; this is something in the scientific literature, well-established, about symptoms and levels of exposure?
A. Yes. Dr. Drinker did some studies back in the '40s of trying to determine at what level of gasoline vapor one would experience symptoms, and that's where we derived the information that it would be in the parts per million range to cause the occurrence of symptoms.
Q. And we haven't really brought this to the Court's attention about the exposure and doses. At what age were these four plaintiffs experiencing these symptoms?
A. Well, all of them were experiencing them really as children. They all grew up in the area and they all had their individual different stories to tell. But each one of them was exposed as a child. Some of them were exposed in utero as an infant, but all of them were exposed during their childhood.
Q. And this clinical history of exposure, would you not agree that it's independent from Dr. Rosenthal -- other experts in this case, Dr. Rosenfeld and Dr. Chereminisoff, in evaluation

of exposures as well?
A. Well, this, as I just said, in the Reference on Scientific Evidence it says that the doctor, when trying to determine if there's causation, should take a careful history of any clinical -- those are clinical indications of exposure, and that's what -- that is important and it's independent, excuse me. The emission factors and all the other things that the other scientists used to estimate those is one way of looking at it, but the clinical indications are supplemental, an additional way, and sometimes the only indications we have of exposures, because we don't always have measurements of exposure or modeling or estimates of exposure by such experts.
Q. Okay. Let's move on just for a little bit. General causation. That is the next slide.
Now in this case in particular pertaining to these four plaintiffs, both their diseases that you're familiar with which we are not -- we do not believe is contested, you're not contesting that any -- we're not contesting that their diagnosis was wrong, are we?
A. No, that is not an issue, I don't believe, in this case.
Q. And you agree that we have two plaintiffs that have monoclonal gammopathy of unspecified --
A. MGUS.
Q. Yes.
A. Yeah. Monoclonal gammopathy of unspecified significance.

Q. And tell me what that is.
A. Well, it's a disorder that is usually referred to as an abnormality of the plasma cells, which are a certain type of bone marrow cell that produces the antibodies in the person. And if there's an exposure to something that causes an antigenic stimulation, stimulation of the immune system, that disorder can occur, and it has been described following chemical exposure to aromatic hydrocarbons, paints and related products, mineral oil and petroleum. So contrary to what was said earlier, there is epidemiological studies, although somewhat limited. It's a benign condition so it hasn't gotten a lot of attention.
But what I think is most important about MGUS, it's a pre-leukemic condition -- or it's a pre-lymphoma condition, pardon me, and that within a ten-year period, about 20 percent of the patients do develop multiple myeloma, or another closely related lymphoma, and, therefore, the causation is generally accepted to be the same as what causes multiple myeloma.
Q. And as to not disputing, we don't dispute that Carol Lipscomb and Jean Runck have those diseases, correct?
A. Correct.
Q. But are there other diseases that they have been diagnosed related to that?
A. Jean Runck has been diagnosed as having a low-grade

lymphoma. She has enlarged lymph nodes. They've been biopsied on several occasions because they've been enlarging. And the various pathologic reports have described it as unspecified lymphoma. So she has an early lymphoma condition.
Q. And Carol Lipscomb?
A. I don't think she's had -- she's had fibromyalgia, but I don't recall any other conditions besides her MGUS. It's relative to -- she has other health problems.
Q. Right.
A. In terms of exposures, that's the only one.
Q. Now going to general causation, did you review the medical and scientific literature pertaining to multiple myeloma?
A. Yes.
Q. Okay. Did you review the medical literature and scientific literature pertaining to monoclonal gammopathy?
A. Yes.
Q. Did you review the medical and scientific literature pertaining to Hodgkin's disease?
A. Yes.
Q. Did you review the medical and scientific literature pertaining to AML?
A. Yes.
Q. Did you limit your review of any of those kind of studies you reviewed to any kind of certain time period?
A. No.

Q. You did the broad range for all of this?
A. Correct. The study on benzene toxicity relates to the neoplastic agents. Really goes back to the '20s. The first leukemias were reported in the 1920s with benzene exposure.
Q. Would it also be fair to say that you also keep apprised of the medical and scientific literature that's going on currently?
A. Yes, of course.
Q. For instance, the Patel letter -- the Patel paper was published in 2008; correct?
A. 2007, I believe it was.
Q. Okay. But 2007, recently?
A. Yes.
Q. So you were keeping up with the literature. This isn't an area where you're not familiar with the current trends in dealing with these different diseases --
A. Yes.
Q. -- and this type of exposure?
A. That is correct.
Q. Are you familiar with the epidemiological data that's out there?
A. Yes.
Q. Do you take any umbrage with what Dr. Garabrant said about there are no epidemiological studies pertaining to monoclonal gammopathy?

A. Yes.

Q. Tell me why.

A. Because there are two published studies on the -- that specifically address the issues that I've mentioned.

But by and large, the other studies that have been done have not addressed this because it's, as I said, a benign condition. Almost all of the studies are looking for cancer. Since this isn't cancer, it doesn't get included in the discussion.

Q. Can you tell me have you reviewed or are you familiar with case reports in a series that pertain to benzene exposure in the industries and other such type of case reports related to their illnesses?

A. Yes, there are numerous studies of industry exposures that are related to petroleum products, benzene, and other petroleum products like naphtha.

Q. Can you tell me specifically why case reports are significant in the benzene literature?

A. Well, benzene had a very toxic effect in certain people. There was -- it was recognized very early on in the very earliest papers in the 1920s, '30s, that some people would only work for a few weeks or a few months with the benzene in whatever occupation and the exposure they were working in, and they would come down with a fatal illness. So very early on it was recognized that there was individual susceptibility,

and these case reports led to a great deal of concern by toxicologists, thus the American Petroleum Institute study in 1938 which was referred to by Mr. Riff a minute ago. They noticed that it was such an unpredictable situation, and there were large enough numbers of workers being reported getting this fatal aplastic anemia, and also others who recovered from the aplastic anemia who developed leukemia. So their leukemia was part of that original concern about benzene.

But the American Petroleum Institute convened a committee, a toxicological committee, to study these case reports, and their statement was based on their review literature of that literature that there was no absolutely safe level other than zero for benzene exposure.

So I think the medical community became very definite on this individual susceptibility issue, which fast-forwarding up to the present is now more well-understood. We actually understand that some people metabolize benzene to an intermediate metabolite, and it's that metabolite that causes the damage to the DNA. It actually attaches to DNA, forms a covalent bond with the DNA that is not broken, and so that DNA, when it reproduces in that cell, carries an abnormal signal forward.

Some people who are trying to then -- the next step for that metabolite is for the body to remove it. That's the purpose of metabolism. So it goes to that toxic intermediate,

it causes an adverse effect, but in most people the toxic metabolite is removed. But there are some people who have a genetic tendency to make more of the toxic metabolite and remove less of it. And it's relatively uncommon; maybe less than ten percent of the population who have that duo defect. But they're the ones who experience a much greater effect. We can understand why some of these people in these early case reports, they probably had that defect. And then recent research has shown there are some people who repair DNA less well. So even if they don't have a build-up of the toxic intermediate, they don't repair the damaged DNA. There are DNA repair enzymes. And people who have deficiency in those DNA repair enzymes are even more susceptible. So we now understand why some people when they're exposed to low levels of short-term benzene develop the aplastic anemia and leukemias and lymphomas.

Q. Okay. Are you familiar with the phrase dose -- the dose-response relationship?

A. Yes.

Q. Tell the Court about that.

A. Well, in -- even in patients that are exposed to low levels can experience some adverse effect and that the percentage of people and the severity of the adverse effect can increase if the dose increases. But there's what's called the ceiling effect: That if you get to a certain dose and

there's not too much greater effect from adding on, the damage is done, so to speak.
Q. And was the dose-response relationship part of your consideration when you reviewed these four plaintiffs' medical history and their exposure history?
A. Yes. What we have to now recognize, and I think everybody is being more aware, that the dose response is different depending on the individual's susceptibility issue.
Q. Now going down to the next slide, if I can direct the Court's attention to that, which is called Medical Conditions, we've reviewed the patient's history, you reviewed the patient's history, the patient's records, you gave them a physical examination yourself; correct?
A. Correct.
Q. And you reviewed all the laboratory pathological tests, the clinical tests and the radiologic tests?
A. Yes, and these four plaintiffs had a very large amount of medical records.
Q. Now modifying factors, did you consider and did you review with these four plaintiffs -- did you review their smoking issue, whether or not they had a smoking history?
A. Yes.
Q. Did you review their alcohol consumption?
A. Yes.
Q. What other modifying factors would you have reviewed?

A. Well, as Dr. Garabrant mentioned, there's things like whether they've been exposed to ionizing radiation. Have they been exposed to chemotherapeutic agents? Have they been exposed to "other organic solvents?" Have they had exposure, let's say, to perchloro-ethylene in the dry-cleaning industry? -- things which have been shown to increase risk at least for lymphoma and in some cases leukemia.
Q. Did you review the family histories of all four plaintiffs when you examined them?
A. Yes.
Q. And what did you find generally?
A. Well, some of them had siblings who had similar -- you know, one had lymphoma, for example, and I think one of them had a patient with breast cancer -- had a family member with breast cancer. So there's clearly, you know, some family history issues. But that, I believe in this case, would probably reflect more a susceptibility or a gene environment interaction that they shared.
Q. Did you review the adequacy of the medical diagnosis that you reviewed in the medical records, meaning from their treating physician? Did you review their diagnosis of what these plaintiffs were suffering from?
A. Yes.
Q. And by the way, those doctors, none of those reports, not one of them, attributed any kind of causation. They were

never asked to do that. And you didn't see any records of even documenting exposure from these treating physicians; correct?
A. No, none of the doctors commented on causation and I think that's mainly because that's not something doctors routinely do. They make a diagnosis, they provide treatment, but they don't look into the issue of causation as a general rule.
Q. But you took that into consideration when you looked at these records; correct?
A. Yes.
Q. And did you look at the latency or the timing of their disease from their exposure to when they developed the disease? Did you look into the latency of those diseases?
A. Yes.
Q. And tell me about that. What did you look at?
A. Well, with cancer, you don't get the disease within, you know, a few days or a few months. It can be as short as a few years or as long as 30 or 40 years after your exposure. And there's a lot of factors that enter into latency. But the key thing is if someone is exposed and has cancer diagnosed, say, within a year or two of that exposure, it raises the question as to whether or not the exposure was the cause. So you have to have sufficient time for the condition to occur.
Q. And as to your findings in these four cases, you found they were well within the latency period of their diseases;

did you not?
A. Yes.
Q. Did you also document or have a discussion with the plaintiffs about their response physically, mentally and emotionally, if it may be, to the removal from the exposure?
A. Well, the issue of symptoms associated with exposure, the nausea or other symptoms that they reported, they did report that that subsided when they moved to other -- you know, other areas far away from the refinery. So that was a consistent.
Q. And did they also report a difference from when they finally shut down in the 1980s?
A. Yes. Oh, yes. Definitely. There's a big difference in the odor complaints and the symptom complaints.
Q. Now let's talk about the Hill criteria, because we've gone through all of the different things according to the federal -- the guidelines that we talked about, but you also on top of that have the Hill criteria. Tell me about the Hill criteria.
A. Well, I put the Hill "criteria" in quotes because Dr. Bradford Hill was an epidemiologist back in 1965, gave a lecture to the Royal College of Physicians on the issue of how do you determine causation. And Dr. Hill had been one of the major researchers finding that cigarette smoke could cause cancer.
And so he went through nine features that he felt should be evaluated in terms of looking for causation and using

epidemiology to help you decide whether a given condition and a given group of people or individual was related to the exposure in question.
Q. And some of these Hill criteria are very similar to what we just discussed, but some of them are in addition; correct?
A. Well, I think it addresses some of the issues Dr. Garabrant raised as to how do you evaluate this body of literature. You've got hundreds of different studies. So how do you sort through it and come to some type of a conclusion as to what -- you know, what's the truth and what isn't?
Q. And in these four cases did you evaluate the strength of association between benzene and their diseases?
A. Yes. "Strength of association" means how much of an increase is there in the occurrence of the various diseases. And I think it would be absolutely no question and I hope that in the reports that I've written and the articles I've put forward you could see that there is a great strength of association in almost every study. When the studies are small with small numbers, they may not be "statistically significant." But even in small studies there is almost always an excess. And so that is important in terms of assessing this body of information.
Q. It talks about how consistency applied, because that is one of his criteria.
A. Well, he's just trying to say that if you've got 20

studies of non-Hodgkin's lymphoma and Hodgkin's disease and associated with benzene exposures and various settings, you want to see consistency if you think benzene is the causative agent between benzene in one setting, benzene in another setting, so that you're not making a mistake about what the causative agent is. And that, he felt, was an important issue for looking at, let's say, benzene.

Q. And did you use -- was that part of your evaluation in these four cases?

A. Yes. I mean, contrary to what was said earlier, what's come forward is that benzene in people that use pure benzene, benzene in all kinds of mixtures, benzene even in the environment near roadways and refineries, is associated with the development of lympho-hematopoietic cancers. That includes leukemias, lymphomas, and all the cancers that are related to the stem cell and the bone marrow.

Q. And did you -- and I know that Dr. Garabrant brought it up, but the biological plausibility, did you review that as to these four cases?

A. Well, the biological plausibility has to do with what we know about the mechanism of the disease. And in the case of benzene, we know that it tends to concentrate its metabolites, concentrate on the bone marrow.

There's a higher amount in the bone marrow than in any other tissues. So right away we know that there's something

going on that might explain why bone marrow disease would be associated with benzene.

And then we've got the studies that have shown in animals and in in vitro that the DNA damage that I just mentioned occurs in stem cells, and the stem cell is the original cell in the bone marrow that forms the red cells, the white cells, the platelets, the -- white cells being lymphocytes and granucytes.

Now AML is the cancer of the granucytes. It's one of the white cell elements. But it's now been clearly shown in numerous mechanism studies that depending on what animal species you look at or what modifying factors are present, you can get a cancer of any of those cells arising from the stem cell because the damage is done in the stem cell.

Q. But you reviewed that in these four cases, that was part of your consideration?

A. Well, this is the question of biological plausibility.

Q. Right. Right.

A. The question is, is there an explanation? And as Dr. Hill pointed out, we sometimes will have epidemiological studies that show a problem. But we don't necessarily have the knowledge yet of how the mechanism for that disease process occurs.

With benzene, because of enormous interest in it over the last, you know, hundred years, there's been a lot of research.

And we know a lot more about benzenes than we know about almost any other chemical in terms of how it has its adverse effect and what organs it operates.
Q. Did you also review -- or explain to the Court how experiment and coherence pertain to your review of these four plaintiffs.
A. Well, this is another one of the discussion points by Dr. Hill. The "coherence" means does it make sense, does it hang together as a plausible. Again, it's a little bit of an overlap in terms of the concepts. But, you know, he used the word "coherence" as another thing to evaluate in terms of looking at all the studies.
Q. And we've already talked about temporality, the disease coming -- what time the disease shows.
A. Yeah. I mean, that seems pretty obvious. If the disease occurs before the exposure, the exposure's not the cause.
Q. And you didn't find that in this case; did you?
A. No. These people were exposed before the onset of their illness.
Q. How does analogy and specificity apply to these four cases?
A. Well, analogy says that if you can extrapolate from one situation to another to infer a causation, he felt that you could cause your common sense to see whether a given chemical having an effect to some other chemical with similar toxicity

to the DNA, for example, you could assume it probably also has some adverse effects in terms of causing cancer.

Specificity has to do with the issue of, in these various studies, are you seeing a similar pattern of illness? I mean, that doesn't necessarily always apply, but in this particular case the defendants have tried to say that AML is the only disease associated with benzene. Well, that's just not true and it's not generally accepted. I think every scientist that has studied this, even studied -- the doctors who have worked for industry have agreed that clearly all leukemias and lymphomas are associated with benzene exposure.

Q. In this case, in these four plaintiffs' cases, you reviewed all the medical literature?

A. Yes, including the studies that were "negative."

Q. Right. And they were not just medical but also scientific?

A. Yes. Well, there's mechanistic articles which I've referred to. I haven't done an extensive review in my reports about these mechanistic studies, but they're very important for understanding why the diseases occur.

Q. You also used the Judicial Center's manual?

A. Yes.

Q. You also used the Hill criteria --

A. Yes.

Q. -- as part of your evaluation?

A. Of course.
Q. And the greater weight of the evidence in consideration of all of that, what did that lead you to, the conclusion about these four plaintiffs' diseases?
A. Well, they all four have diseases of the bone marrow -- one leukemia, one lymphoma, and two monoclonal gammopathy, which is a pre-lymphoma condition. And there's no other reason why these people would have these considerations. To call them "disease of unknown cause," I think, goes against what we know about the issues in this case.
Q. And your opinion today, your opinion when you wrote your expert report and when we supplemented your expert report and when you reiterated your opinion in your affidavit, was all within a reasonable degree of medical certainty or probability; correct?
A. Well, we have to add dose to this discussion because, obviously, as Mr. Riff has said, if a person has inadequate exposure -- in other words, Dr. Garabrant made the point that do we have evidence that people in similar situations, similar exposures, develop these diseases? We have to take that into consideration. The issue of PPM-years has to be taken into consideration if we have that information.
Q. Yes, but your opinion, in and of itself, including dose as it pertains to the plaintiffs, all your opinions are within a reasonable degree of medical probability today, correct?

A. Correct.
Q. Okay. Now, we have -- or you have been challenged on certain issues by the other side.
MS. SWEENEY: And I'd like to address that, if I may, directly to the Court and to Dr. Dahlgren.
Q. Dr. Dahlgren, did you take into consideration that any of these diseases -- AML, the monoclonal gammopathy, the lymphomas, the Hodgkin's -- were de novo or idiopathic? And if you want to distinguish between de novo and idiopathic, feel free to do that.
A. No, I think those are synonymous terms. Well, I think logically if a bone marrow disease is -- follows exposure to a chemical known to cause bone marrow disease, it's no longer idiopathic, with the proviso that the dose has to be sufficient and the exposure has to take place before the disease comes on, and there can't be an alternative cause. But as long as we have a well-established cause for the disorder and then the other criteria being fulfilled, then we wouldn't call it idiopathic anymore. It wouldn't be of unknown cause. It would be a known cause.
Q. And when you originally met these plaintiffs and you evaluated that, until you got all the evidence, until you had your medical examinations, until you reviewed their medical records, you reviewed the fact that there's a possibility that these four plaintiffs could be idiopathic or not related to

benzene exposure; correct?
A. Absolutely. That's the purpose of doing all of this work, if you will.
Q. And you ruled it out; correct?
A. Yes. Well, as I just said, I think given all the facts that we have, it's not of an unknown cause.
Q. There's -- another causation issue that they bring up is that they're -- they're saying as the general population. Tell me about that.
A. Well, they're saying there's no increased risk in these people above the general population based on dose. They're saying you have to have 40 PPM-years. That's just not true.
Q. Are you familiar with the ASTDR {verbatim} report by the EPA that said that this community was at an eight times risk of developing disease?
A. Well, the -- yes, the ATSDR commissioned the Ohio Department of Health to study Hooven and they found an excess of cancer in the community and recommended that further studies be done.
Q. So in your opinion, or your methodology, it was proper to say that they are not necessarily the same as the general population; correct?
A. Yes. I think it's fair to say that this community has had an exposure that is significantly higher than the general population; that there is -- well, they've had to spend tens

of millions of dollars to remove the contaminated soil. That is because of the fact that the chemicals in the refinery site and, of course, the chemicals that were there before are hazardous, and if you lived there, you would be exposed to more than the general population for sure.
Q. They've raised the issue, and I think we're going to address it in a minute or two so I'm not going to bring it up, but in fact I want to direct the Court's attention to the slide that says Mehlman on it, and it's Mehlman 2008.
A. Page 24.
Q. And it's page 24 or --
A. 12 on ours.
Q. 12 on ours, 24 on yours?
A. (Nods head affirmatively.)
Q. Thank you. Now it's been said you cherry picked the scientific literature, that you chose only that literature to cite in your report and in your affidavit, that we should let the Court know -- and I'm sure you know we've burned a lot of paper, killed a lot of trees.
How many, just off the top of your head, how many papers did you cite that you reviewed over -- in your lifetime and in relationship to these four diseases you're familiar with in these cases?
A. Well, there's thousands of articles in my personal database on benzene and its health effects. In terms of the

epidemiology and the case reports related to these four plaintiffs, it's hundreds of citations that I've included in my reports.

Q. In fact, when defendants' counsel talked about your appendix, a lot of your appendix are scientific papers; correct?

A. Well, the entire appendix was general causation and addressed the literature --

Q. Right.

A. -- that's already been published on the subject.

Q. And once again, you reviewed all literature, not just literature favorable to these four plaintiffs?

A. That's correct. And as I said, sometimes the paper was negative but it still had important information. For example, Dr. Wong's study of refinery workers, sometimes referred to by the defendants as being negative for certain diseases, and that was because it didn't reach statistical significance for, say, Hodgkin's disease or multiple myeloma. But there's still an excess. And the reason it didn't reach statistical significance is because there were small numbers.

So that when Dr. Martin Smith or Dr. Infante went back and reviewed the entire literature, including those negative studies, but when you add the numbers together, what's called the meta analysis, you do get significance. And that's why I say that it's generally accepted that all of these cancers are

related to the benzene exposure and that there's solid scientific evidence to back that up.
Q. And can you just point out and talk very briefly about Dr. Mehlman's article that we have cited as -- for that proposition? It's in one of the papers.
A. Well, it's one of the papers.
Q. One of the papers.
A. Yeah. He clearly -- he refers to earlier studies that have been done, document the occurrence of lymphoma, multiple myeloma, all forms of leukemia as being related to benzene exposure in various settings, and I think going back to that, that's very important.
We now know that the active agent that causes these problems is the benzene. It can be in gasoline. It can be in adhesives. It can be in paint. And the same patterns of disease occur regardless of what mixtures it's in.
Q. Can you talk about the -- we're going to refer to the papers -- the papers refer to it as the Chinese Worker Study. There's many authors to that study; correct?
A. Yes. Back in the 1980s, the National Cancer Institute entered into an extensive multi-year study, which is still going on.
As I said earlier, there's been a great deal of interest in the whole question of what diseases does benzene cause and at what dose does it occur.

And so they recruited 28,000 workers from China who were exposed to benzene in numerous different industry settings in different occupations. And then they recruited 28,000 controls who were matched to the exposed workers. And then they started a prospective study to follow those workers, go into the factories where they were working and measure their benzene exposure using both air monitoring and biological monitoring, measuring the amount of urine with metabolites of benzene, and then following those people up to the present time.

And the reason that's important is because (A) it's by far the most well-designed prospective study to determine the health effects of benzene. It has good characterization of exposure, which is not true for -- almost every other study in the literature does not have actual measurements of exposure. They have estimates and models of what they may have been exposed to, the ranges of exposure. But this study, the NCI, the National Cancer Institute study, has very precise and exact measurements of exposure.

And number two, they've also included in their study a number of people exposed below one part per million to benzene, down at the low, low levels, because the important issue is: Do people get adverse effects at those low, low levels. So anyway, that's the study that's been put in place.

Q. But it's not --it's not merely one study. There's at

least 50 peer-review articles of a wide variety of scientific literature that's come out of this study?

A. Yes. Remember I said earlier the studies of the chromosomes and people with different enzymatic steps, people that are more susceptible to benzene poisoning because they metabolize more of the benzene due to its toxic intermediate and they don't remove the toxic intermediate as sufficiently due to the deficiencies in their enzymes. Well, those studies have been done on these same group of workers. So we know much more about the genetic predisposition and the susceptibility issues than we knew before.

And we also -- Dr. Nathaniel Rothman and I presented a paper last year at the toxicology meetings in Montreal where it was pointed out that at low levels, you're actually getting more of an adverse effect than you would predict from extrapolation from high-dose models. So the focus and attention right now is on those low exposures, down at the two-tenths, one-tenth of a part per million range. And we know from those studies that have been done by -- I just mentioned -- that people were experiencing adverse effects on their bone marrow at two-tenths and one-tenth of a part per million if they're in that susceptible sub-group.

Q. And that's where the next slide that we would have showed, was the Hayes paper. That was one of the many papers that showed low-dose exposure to benzene can cause disease?

A. Well, yes, and that was an earlier paper before they got into some of the chromosome studies. But, yes, they clearly showed at ten parts per million-years they were still experiencing lympho-hematopoietic cancers rated at twice the expected rate.

Q. And did the Land paper of 2004, part of the Chinese Workers Study group of people, also indicate that you can develop diease at low dose?

A. And let's go to that slide. That gets to this point about the genetic susceptibility, page 14 and 28, low-dose exposure and susceptibility under one part per million.

The average level of exposure for those workers was two-tenths of a part per million. And that wasn't for years. That was just a minimum of six months exposed at that level. And then they measured the white count and it's -- on this -- on my graph here, you can see that the most susceptible people, the ones that have that genetic defect in terms of metabolizing more of the toxic intermediate and less ability to remove it, they have a very large drop in their white blood cell count, down into the range where it would be predictive of developing leukemia.

Q. Now the Yin paper from 1996, which also is from the Chinese Worker Study, indicates what?

A. That actually the risk of lymphoma was twice the risk of leukemia, which was a little bit unexpected. But, you know,

again this is the most well-done study with the best controls and the best exposures and the largest numbers. So it definitely has to be looked upon as the most persuasive and important studies that were done to date.

Q. And it also found that all lympho -- I can never pronounce things.

A. Lympho-hematopoietic. That means all leukemias and lymphomas were increased significantly.

Q. Were increased.

Specifically as to Michelle Schrader, another consideration as to whether or not her -- Michelle Schrader is the plaintiff who has AML. Specifically to her, you were able to review medical records that indicated that she had chromosomal changes; correct?

A. Yes. Her doctors did chromosomal studies at Children's Hospital here in Cincinnati.

Q. And what does the medical literature say? You reviewed the medical literature pertaining to that; correct?

A. Yes, of course.

Q. And how did that assist you, part of your methodology, in determining the cause of her disease?

A. Well, she has what's called trisomy 8. That means the eighth chromosome has an extra chromosome, so-called three instead of two arms, and that's been described in the benzene-exposed workers with leukemia. So that makes it --

it's consistent with the reported chromosomal changes that are typically of that exposure.
Q. And there's other literature, though, that says the trisomy 8 occurs in other types of diseases and in some other AML's; correct?
A. Yes. It has been seen in patients who have AML where there's been no indication they were exposed to benzene. On the other hand, we don't know if they may have been exposed, because right at the moment you can't use that as a marker, per se, of exposure, because there are other reasons why it might have occurred. But it's certainly consistent with benzene and with, underscore, the need for --
Q. And she also had, Doctor, a chromosomal translocation of the 11 q23 chromosome at 9 and 11; correct?
A. Correct.
Q. And does the medical literature and scientific literature that you've read, across the board, is that also an element that indicates a possible benzene link?
A. Yes, that's been reported. Chromosomal 11 in particular has been reported with benzene exposure.
Q. And when you have both a trisomy at the eighth chromosome and you have the 11 q23 translocation, what would that do to your opinion as to whether or not this may be related?
A. Well, as I said, it's consistent with the reported changes in both benzene exposure --

Q. Both parts --
A. That's right.
Q. As to these four plaintiffs, there's been a challenge that your methodology in your evaluation of Michelle Schrader's latency is wrong, that the medical literature does not indicate that somebody who was exposed at childhood and then had a large period of time -- between 17 and 18 years -- that she then developed a disease, and that is not in the window of the latency in the scientific literature; is that correct?
A. That's not correct. The incidence is higher at ten years, but it continues at 20 and 30 years. So it's not correct to say that the literature limits you and says, "Oh, if you're past ten years, it couldn't be related." That's just not true. And the latency studies referred to by the defendants was looking at adult workers exposed on the job, mostly male. And as you've just indicated, we have a different situation here. These people -- or Michelle Schrader -- was exposed as a child, so we don't have a lot of data on latency. But to say if it's 20 years it's too long, that's just -- there's just no support for that.
Q. And that there's plenty of support in the medical literature that there are incidents of AML induced by benzene exposure beyond 20 years?
A. And beyond 30 years, yes.
Q. And we've cited those papers on 17 and 18, I believe?

A. Yes.

Q. It's also been talked about, and Mr. Riff stressed, about dose. And in some of this we're getting into the actual opinions of theirs and ours, but I do think we need to address the issue of dose. All right?

Now, what does the American Petroleum Institute say about doses of benzene?

A. Well, I mentioned earlier that in 1948, the Toxicology Committee of API said due to the fact that there had been many, many, many cases -- not epidemiological studies; these were just case reports -- on benzene causing people to develop these aplastic anemia and some of them have survived, developed leukemia subsequently, that the only absolute safe level to prevent benzene was zero. Now, I don't think that's probably true. There probably is a level which -- below which probably wouldn't see much of a significant increase, but certainly it's down in the below one part per million range, and probably will end up being in the parts per trillion range.

OEHHA, the Office of Hazardous Substance in California, has reviewed the literature in 2001 and indicated that level in drinking water ought to be drastically reduced due to its potency to cause cancer and also reproductive effects. So it's -- and then they also have published very low levels of exposure for a total dose that individuals should receive of

benzene.

So the level that is going to have no adverse effect because of these susceptibility differences is going to be much lower than we had previously thought. And in fact, over the years since 1950s to the present, every few years the acceptable level of benzene is reduced and reduced markedly.

Q. Dr. Garabrant talked about 40 PPM-years, that that's a well-settled number.

Tell me: Is that a well-settled number in the scientific and medical literature pertaining to benzene?

A. No. There's -- well, the American -- the U.S. Petroleum Institute recently published a study where they looked at petroleum refinery workers and they found that there was a significant increase in the risk at one- to two parts per million-years and -- you know.

Q. You're saying one- to two parts?

A. One- to two PPM-years. And Dr. Glass in the final paragraph of that paper says that, "We have not identified as yet a threshold, a level below which the risk is not going to increase." So that's the current state of the science.

And the 40 PPM-years is, I think, something that's way, way back in time, way back in the '70s, where that was used -- that the one PPM eight-hour average, which would result in 40 PPM-years, would only result in, you know, maybe a seven per hundred increase in leukemia risk. But since then, I don't

think anyone would -- most companies have adopted much lower exposure limits based on our current knowledge that these low levels of exposure are the dangerous levels.

Q. So the scientific literature is evolving, if you want to call it --

A. Yes.

Q. With the safe level of exposure at 40, you don't believe that it indicates today, as we sit here today, that 40 PPM-years is the dose that is a safe level?

A. And I would say that the generally accepted level is -- well, NIOSH, National Institute of Occupational Safety and Health, has recommended that the occupational exposure limit be reduced to one-tenth of a part per million and work from there, and that is based on the concept that the one PPM in the air, which is the current level that's allowed, is outdated and should be lowered.

Q. What diseases does the literature indicate can develop as a result of a low-dose exposure to benzene?

A. Well, all of the lympho-hematopoietic cancers, the leukemias and lymphomas, Dr. Mehlman did this reanalysis of the Plioform -- Pliofilm workers which has been widely cited, the Rinsky studies and the Infante studies, and Dr. Mehlman had access to the data and went back and looked at the PPM years, and it's on slide -- page 19, or page 38 and 39.

And you can see that many of the PPM years were similar to

Michelle Schrader, and these are adult males who were being exposed and developing AML and lymphomas and multiple myelomas, chronic leukemias.

And so it's clear that the 40 PPM-years is absolutely not a protective level, not a level you must get to, and it has to do with the susceptibility issue.

Q. And in some of these summaries that we're looking at, you don't see -- and I just want to stress this again -- you don't see MGUS, do you, monoclonal gammopathy of unspec -- I can't say it.

A. Well, look: They're not going to include those in a cancer study.

Q. But they're a precursor to cancer; correct?

A. Correct.

Q. Is there any studies out there that deal with low dose and dose diseases, or doses and MGUS?

A. No. They do deal with multiple myeloma and B-cell lymphomas. But, no, not MGUS for the reason I just stated: It's not a disease that's been in the study for that purpose.

Q. Has there been papers in the scientific community below one PPM-years as a baseline for the risk? Is there literature out there below one PPM?

A. Yeah. I've just given you several examples of people developing leukemias below one part per million.

Q. Are you familiar with any literature or -- well, you are

familiar. Tell me about the Patel study.
A. Well, around 2000 -- there was a study published in 2004, but they did the study a few years earlier. The Pennsylvania Department of Health looked at a small town in Pennsylvania, Hazleton Town -- Hazelton, Pennsylvania, and they experienced a gasoline leak from underground storage tanks that was underneath the homes. So they did a study of the leukemia rate and other cancer rate, and they found a fourfold increase in the people that were involved in the affected area.
And then they did some measurements of the benzene level. And they reported that the average level was 0.03 PPM-years for developing the leukemia. And I think that underscores the issue that was -- that I've been talking about, which is the level at which you can get this leukemia is quite low. And that study is very parallel to what's going on here in Hooven. There's gasoline in the air and there's gasoline in the soil, under the homes, and, therefore, you would expect an increase in the cancer risk. And the dose at which it occurs could very well be down in the range that we're seeing with these four people, totally consistent with -- with what I've been saying all along.
Q. Doctor, has there -- you've been -- we've been talking for a while and we've reviewed, I think pretty thoroughly in a general sense, the issues raised before the Court.
But is there any other methodology that you used that I

have not covered that we need to discuss?
A. Well, I think we went through the process of ruling out other causes, determining the base. There are some Hodgkin's disease studies we haven't discussed, including one I did of a group of people living next to a abandoned closed refinery in another state, where we found a significant excess of Hodgkin's disease, and that study is currently impressed to be published within the next month or so by a peer-review journal.
Q. And you've participated in other peer-review journals which we've given to -- part of your appendix. It -- you've published before, is what I'm saying.
A. Of course.
Q. Some of these theories we've talked about today, the methodology, you've addressed in some of these papers; correct?
A. Yes, the methodology that we talked about is the basis for all those published studies.
Q. And those published studies are in peer-reviewed documents; correct?
A. Yes.
MS. SWEENEY: Thank you.
THE COURT: Doctor, let me ask you. You referenced studies by Otto, Wong, Hayes, Yin, Patel, Reynolds and Wilkinson. Those aren't readily accessible to those of us

outside the profession.

Are those voluminous, or is it possible that the Court could obtain copies of those studies?

THE WITNESS: Be glad to provide them.

MS. SWEENEY: Your Honor, I think in my car today I have a disk of just benzene papers, and many of those papers are on that disk. So I could provide that disk to the Court today.

THE COURT: Let me also ask: You referenced in your filed materials and also today your upcoming publication. Is there a copy of that available?

THE WITNESS: I can give you a preprint.

THE COURT: A -- I'm sorry?

THE WITNESS: A preprint.

THE COURT: Okay. And those can be provided not only to the Court but also the defense, yes?

THE WITNESS: I think it's already been done, but I'll do it if it hasn't been done.

MS. SWEENEY: Thank you.

MR. RIFF: May I ask a few questions on cross-examination?

THE COURT: You certainly may, Mr. Riff.

MR. RIFF: Thank you.

CROSS-EXAMINATION

BY MR. RIFF:

Q. Dr. Dahlgren, you say that -- oh, by the way, good morning.

AML is a relatively rare disease. You'll confirm for us, won't you, that there are approximately 12,000 new cases each year in the U.S. Sure?

A. I don't have in my memory the number, but if that's -- I wouldn't have a reason to argue with you about that if that's what you --

Q. Okay. And you will -- you would agree with me that the majority probably -- in your opinion to a reasonable degree of medical probability -- of those cases are in fact idiopathic?

A. As I said in my deposition, yes, that's true. But that that's also true that in many cases there's no effort made to find a cause.

Q. All right. Now --

MR. HICKEY: Excuse me, Your Honor. Mr. Riff did not reserve any time to cross-examine. We have some other issues we need to address also.

THE COURT: All right.

MR. RIFF: Then let me -- may I just have two minutes? Because I -- I don't know if -- I don't know what to do, Your Honor. I'm at your --

THE COURT: Well, actually you rested without any cross of Dr. Garabrant. So let's just leave it at that, and we'll let Dr. Dahlgren step down.

And counselors?

MR. HICKEY: Thank you.

MS. SWEENEY: Your Honor, I think that we've shown that his opinion has met the *Daubert* challenge. He not only used his medical knowledge, his educational background, but as a treater and as an expert in this field, his theories have been peer reviewed. He has reviewed all of the medical literature. He took a personal exam, independent of any kind of modeling. He took a personal history. He reviewed their exposures. He took the Hill criteria and went through those with consideration of all of those criteria -- the Judicial Manual, the Hill criteria -- and he came to one conclusion: The Hooven refinery that was operational when these people were children and they lived directly across the street, emitted enough benzene for them to inhale to cause their disease.

He developed those opinions by both his own clinical diagnosis and by the modeling and the expert opinions of Dr. Rosenfeld and Dr. Chereminisoff. On those bases, I believe that he has met his burden -- or that we have met our burden.

MR. PAVLIK: Good morning, Your Honor. My name is David Pavlik. I'm one of the plaintiffs' attorneys and I'm going to address the punitive damage summary judgment issue.

THE COURT: Okay.

MR. PAVLIK: Thank you. Your Honor, as has been already put before this Court, to prove punitive damages there must be a great probability of causing harm. And in our response to defendants' summary judgment in the punitive damages, we attach the API document that's been referenced now several times. Again, what's critical is what's been brought up by the defense, is the time frame, the 1930s to the mid-1980s.

This document was generated in 1948. And I'd like to draw your attention to some language in this document. And it states:

"Workers who must be exposed to benzene vapors should be rotated in order to reduce their exposure time to a minimum."

I believe that's important, because at that time, 1948, the industry was put on notice of the need of workers who were in the refining business being exposed. Their health was in danger and that they needed to be rotated on a regular basis.

This document also states:

"The concentration of benzene vapor in the air should be checked regularly in situations where excessive exposures are apt to be encountered."

So this document again is pointing out that there must be some precautions taken, including actual air monitoring to prevent harm to the workers.

And it goes unsaid that Chevron and/or Gulf were members

of the API during this time. And so it's an important document to show that Chevron was put on notice very early on to the harms and hazards of benzene.

I would also like to point out another document that we have submitted to the Court, and it is -- it was submitted under Document 223-6. It is an attachment as Exhibit 2 to Dr. Rosenfeld's affidavit. And it's entitled "Benzene - An Historical Perspective on the American and European Occupational Setting."

And, Your Honor, why this document is important is that it does a thorough review of all of the studies that were done on benzene exposure throughout the world; in fact, the first paragraph headed "Early Warnings" states since the 19 -- or, excuse me -- since the 1897 report. So beginning back in 1897, reports began to be generated concerning benzene exposure. It goes on to the early 1920s.

This document was written and authored by Dr. Infante, who is well-renown in research in benzene. And his 1977 study is, again, in that time frame of the 1930s to the mid-1980s, is -- really put the whole industry on notice. It was published -- it published the results of the first cohort study of workers exposed specifically to benzene. The workers were engaged in a manufacture of a certain food wrap. The study demonstrated a five- to tenfold risk of leukemia among workers exposed to technical-grade benzene at levels that were generally

considered within the various limits recommended over the time period, which is very important, Your Honor, 1940 to 1971.

So Dr. Infante in 1977 published an article, again showing the hazards of benzene. And on top of this -- in coherence with this article are numerous references to previous studies done, prior to 1977, that would indicate to the industry that the inhalation of benzene was dangerous and needed to be addressed.

And that brings me to the second point I'd like to raise, Your Honor: Is that the actions taken by Chevron during the time period that they ran that refinery reflects that they rose to a level of malice. And what I'd like to point out in that is that's a U.S. District Court from the Central District of California -- it's a 2005 opinion, Your Honor; this was submitted in one of our documents yesterday -- and it's *Lawrence O'Connor versus Boeing North American*. And in it, the court states:

"That so long as plaintiffs demonstrate that the wrongful conduct in question replicates prior transgression, such proof of harmful conduct is admissible to determine willful, wanton and malicious conduct which may result in an award of punitive damages."

Your Honor, our brief highlights numerous examples of wrongful conduct on the part of Chevron. In particular, I'd just like to briefly touch upon a few. One of them is the

recordkeeping. Our experts pointed out that the lack of their recordkeeping, their measures, clearly indicate Chevron management never placed any priority on any type of control, also the hiding of information, which we address in our brief.

There is, in 1998, nearly ten years -- well, in 1998, an internal Chevron e-mail states that there's likely to be 10E6 to 10E8 liters of NAPL beneath Hooven alone. What this statement means, Your Honor, is that there are -- that there's 2.6 million to an incredible 26 million gallons of hydrocarbon contamination under Hooven alone. That information was not made available to the community.

And that takes me to the third one, is the failure to warn the community. Chevron, in the 1977 e-mail, indicates that they knew that the hydrocarbon plume had migrated already underneath Hooven in its elementary school, which is a critical fact. Despite this, though, Chevron mails out in 1977 a community update to Hooven residents that makes no mention of the plume migrating underneath their homes or the school.

And again, Your Honor, to tie in with the final -- the probability of causing harm, it was pointed out that you're taking a leap when you're stating that Chevron knew that releasing these millions and millions of gallons of benzene-laden fuel into the soil or air would not cause harm to a community across the street.

It's not a great leap, Your Honor, when you see that there was strong scientific testimony that's been brought out today that indicates since the early 1900s, throughout this century, that benzene exposure is very harmful.

Thank you, Your Honor.

MR. RIFF: We have one more issue.

MR. HICKEY: Your Honor, I'd also submit that there's a lot of documents that are still in a privilege base. We just received hundreds. So I would submit that this issue is premature.

THE COURT: That the punitive --

MR. HICKEY: Punitive damages is premature at this time.

MR. LUNDY: May it please the Court, Hunter Lundy for the plaintiffs. And since we just have a few minutes, Your Honor, I'm just going to address briefly the opposition to the motion to exclude Dr. Nick Chereminisoff in which counsel said he only had a couple comments, he was out of time. And that's kind of entwined with our motion to exclude Mr. Marchada, who is the gentleman they use for calculating emissions.

And, Your Honor, I'm gonna just point out a couple things to the Court that I think are imperative to look at. Their whole argument or the thrust of their argument is that Dr. Chereminisoff chose 2.1 as the composition number for benzene in gasoline for the upper bound range.

And what these experts do, Your Honor, when you're trying to reconstruct historical emissions from a plant, they come up with a lower range and an upper range. And Dr. Chereminisoff used a .71 percent of gasoline content and crude oil in a lower range and used 2.1 percent gas -- I mean, benzene and gasoline as the upper range, and that's what they raised Cain about.

And, Your Honor, Dr. Chereminisoff said you just can't go pull something out of a book necessarily on this case; you've got to look at the history of the plant. And the EPA says that. EPA says you've got to look at the age of the refinery, you've got to look at the age of the equipment, and you've got to look at the history of the refinery.

And in our opposition to the motion to exclude Dr. Chereminisoff, we didn't point a specific document out to the Court that I want to point out right now, and it's Exhibit N to the opposition for motion for summary judgment in this case that we filed.

Exhibit N is the exact reason why you've got to look at the plant's history before you come up with an emission factor to calcuate a dose. An emission factor's given to a model and then the model comes up with these numbers that have been discussed this morning.

The Exhibit N was a 1950 document. When you read it, Your Honor, you're going to note that they're looking at their pump

leaks at this plant site all over the refinery. And when you do the math, it shows that they were sending waste oil to an open ditch to the tune of 9,000 gallons -- 9,500 gallons a day, 230 barrels a day. This was filed in support of the punitive damage argument.

But this document is just evidence of the egregious conduct of this plant of letting product out, and all the product has benzene in it, all this oil has benzene it in that was being exposed to the environment.

These numbers are astronomical when you do your math. They did it over three days and they calculated a total volume of barrels, 1,240 barrels of waste in a three-day period that they were putting in the environment. That's Exhibit N in opposition to the motion for summary judgment.

Also, Your Honor, Dr. Chereminisoff said he didn't use Dr. Infante's high number of benzene and gasoline. That's in an article, Your Honor. Let me point this exhibit out to you. It's -- it's the 2000 study of Peter Infante where he says -- and, incidentally, Peter Infante was a toxicologist with OSHA with 25 years, who published the first epidemiology study on benzene and injured workers in 1977. That is -- and he's been cited from that point on as an authority with benzene and oil refineries.

And in this 2000 study, he says that the average content of gasoline -- of benzene in gasoline in North America is

between one- and five percent. In North America. Not in Europe, in North America. That's in the article. Dr. Chereminisoff chose 2.1 percent.

There's another article: It's Exhibit I1 in the -- that's attached to the motion to exclude. It's in our reply brief. It's called "Assessing the accuracy of self-reported data: An evaluation of the toxics release inventory."

There's another article, Your Honor. The benzene -- it's a 2002 study: "Benzene in Gasoline and Crude Oil" -- it's in the IHA Journal -- "Occupational and viable implications." It's an article that talks about in recent years refineries and oil companies in this country have been able to reduce their -- their benzene content in -- in gasoline from the five percent range down to the one percent range. So all the literature indicates that benzene in gasoline in the United States has been in the range of one- to five percent.

Now a document that was not attached to any of the motions, Your Honor --

THE COURT: Mr. Lundy, two things. You're out of time.

MR. LUNDY: Okay.

THE COURT: But second, you just told me that, or co-counsel perhaps mentioned, a 2005 California case that was included in your submission yesterday. We have local rules. We have deadlines. We have dates by which responsive

pleadings are to be filed. And we don't expect you to be filing responses seriatim up to the eve of a hearing. I don't know why I should even consider that. And I really am loath, and that's to put it mildly, to consider anything that is first raised today that could not have been included in prior pleadings.

MR. LUNDY: Yes, ma'am. All I'm doing is pointing out a document that was filed in opposition to our motion for summary judgment for the Court's consideration on this *Daubert* hearing. That's what I was pointing -- it was previously filed.

And those are my comments. I know I'm out of town -- out of time, Your Honor. I just was going to try to highlight some of these articles that support why 2.1 percent of composition of benzene in gasoline was a conservative number to use for the calculation of the emission factor for the upper bound level of exposure coming out of this refinery.

THE COURT: Okay. Well, counselors, I'm sorry that we didn't have more time. Circumstances overcame us.

I understand that you all have very esteemed experts whose time and attendance is commensurately dear to their eminence in their fields, but I have to close the hearing.

MR. RIFF: Your Honor, would the Court consider a quick request, in 30 seconds? A request, not an argument.

THE COURT: I'll hear it.

MR. RIFF: Well, the request is this: Will the Court please permit both sides contemporaneously to file a not more than, say, ten-page closing brief? There are things that Dr. Dahlgren said that I couldn't sleep at night without responding to.

I fear you might have been misled on some very important facts. I'd really like to get something in front of you to make sure you have -- you're fully informed.

THE COURT: Mr. Lundy, how do you feel about a ten-page post-hearing --

MR. LUNDY: I don't think it's necessary, Your Honor. Everything was covered.

THE COURT: Okay. I think we have enough. Thank you.

MR. RIFF: Thank you, Your Honor.

MR. LUNDY: Your Honor, had we had time, we would have called Dr. Chereminisoff. And all I'm asking to do is to proffer a PowerPoint that we would have used with him had we had the time, and it's just basically a summary of the arguments and the evidence we would have presented.

May I proffer that, Your Honor?

THE COURT: You may proffer it to the extent that it's consistent with your previous filings. I'll consider it a summary.

MR. LUNDY: Thank you.

THE CLERK: All rise. (12:08 p.m.)

\- - -

PROCEEDINGS CONCLUDED

\- - -

C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Mary Ann Ranz
Official Court Reporter