**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Carolyn Baker, <u>et al.</u>,           )
                                        )
                Plaintiffs,      ) Case No. 1:05-CV-227
                                        )
       vs.                              )
                                        )
Chevron USA, Inc., <u>et al.</u>,       )
                                        )
                                        )
                Defendants.      )

<u>MEMORANDUM OF DECISION</u>

        This matter is before the Court on motions for summary
judgment filed by Defendants Chevron USA, Inc., <u>et al.</u>, (Doc.
Nos. 385, 386, 387, 388, 389, 391, 392, 393, 394 & 395).   On
October 23, 2009, the Court entered an order (Doc. No. 446)
granting the motions.  This Memorandum of Decision sets forth the
Court's analysis and the reasons for granting these motions.

I. <u>Background</u>

        Plaintiffs in this case are residents of the villages
of Hooven, Ohio and Cleves, Ohio who assert claims for personal
injury and property damage allegedly resulting from the Gulf Oil
refinery, now owned by Defendant Chevron USA, Inc ("Chevron").[1]
For case management purposes, the matter was bifurcated between
personal injury claimants and property damage claimants.  The
parties were permitted to select bellwether plaintiffs for each

_____

        [1]    Also named in the complaint as defendants in the case
are a number of Chevron's affiliates and/or subsidiaries.  For
ease of reference, the Court will refer collectively to all of
the defendants as "Chevron."

trial group.  This aspect of the case concerns the claims of the bellwether property damage claimants: William and Emma Balsley, 103 Jefferson Avenue, Hooven, Ohio, Cathy L. Beale, 116 Ohio Avenue, Hooven, Ohio, Michael Hutchinson, 305 Chidlaw Avenue, Hooven, Ohio, Marcia Klosterman, 4067 Elvista, Cleves, Ohio, Wilmer L. Lane, 14 Skidmore Avenue, Cleves, Ohio, Donna and Theodore Moses, 109 Chidlaw Avenue, Hooven, Ohio, Benny and Phyllis Muncy, 113, 117, and 121 Bassett Street, Cleves, Ohio, Joseph A. Simpson, 304 Hooven Road, Hooven, Ohio, Diane and Richard Tenkotte, 5160 and 5172 State Route 128, Hooven, Ohio,[2] and Daisy and Karl Zoller, 207 Chidlaw Avenue, Hooven, Ohio.

Most of the historical facts in this case are not disputed.  Hooven and Cleves are small towns located in the western part of Hamilton County, Ohio.  State Route 128 runs along the eastern edge of Hooven.  Between 1930 and 1985, Gulf Oil Company ("Gulf") operated a gasoline refinery on a site located adjacent to Hooven between Route 128 and the Great Miami River.  Gulf refined leaded gasoline, diesel fuel, jet fuel, and fuel oil at this site.  Additionally, Gulf operated an asphalt plant here.  Gulf and Chevron merged in 1985 and Chevron operated the refinery until approximately 1986.

Petroleum products were released into the ground during the life of the refinery, mainly through spills and leaks.

---

[2]     These are contiguous or adjoining parcels of land.

These liquid fuel products - light non-aqueous phase liquid

("LNAPL") in the vernacular of environmental engineers - seeped

through the soil into the groundwater creating a hydrocarbon

plume.  The plume migrated off-site to the south and west, passed

beneath Route 128, and now lays under Hooven at a depth of

anywhere from 50 to 70 feet below the ground surface.  The

parties dispute the dimensions of the footprint of the plume, but

for purposes of summary judgment it may be assumed that it

underlays all of Hooven.  It is not disputed, however, that no

part of the plume is underneath Cleves or the properties of

Richard and Linda Tenkotte,[3] which are situated near but north of

the refinery site.  The parties also dispute the volume of fuel

released; however, Chevron has recovered about 3.5 million

gallons of LNAPL through groundwater pumping since remediation

efforts commenced in 1986.

LNAPL floats free on top of the groundwater.  As the

groundwater fluctuates up and down, LNAPL becomes trapped in the

soil creating what is called a smear zone.  Fuel trapped in the

soil is in the aqueous phase.  Fuel in the aqueous phase may

vaporize, i.e., turn into a gas, and the vapors may migrate back

up through the soil column to the surface.  Under the right soil

---

[3]     See Report of Plaintiffs' expert Dr. Robert Simons
(Doc. No. 398-1, at 21) (indicating that the Tenkotte's property
is north of the refinery site and not above groundwater
contamination).

conditions, however, the vapors may biodegrade through a process called natural attenuation.

In 1993, Chevron and the United States Environmental Protection Agency ("the EPA") entered into an Administrative Order on Consent which governs the remediation of the refinery site and the hydrocarbon plume beneath Hooven. Pursuant to the consent order, a number of monitoring wells have been installed throughout Hooven. The monitoring wells assist in determining the footprint of the plume as well as provide a means to conduct vapor testing. Soil vapor testing has been conducted throughout Hooven and the EPA has conducted sub-slab, i.e., below the basement, soil vapor testing beneath Hooven Elementary School as well as the homes of some of the Plaintiffs in this case. The principal contaminant of concern in the LNAPL is benzene, which is a known carcinogen in sufficient doses. Benzene is also a constituent of many household products, such as glue and paint. Other sources of benzene include vehicle exhaust and cigarette smoke. See United States Environmental Protection Agency, Benzene TEACH Chemical Summary, Toxicity and Exposure Assessments for Children (Doc. No. 415-2).

Plaintiffs assert state law claims against Chevron for negligence, gross negligence, negligence per se, conspiracy and fraud, strict liability, trespass, private nuisance and conversion, and failure to warn. The general nature of

Plaintiffs' claims is set forth in the final pretrial statement filed by the parties. Doc. No. 428, at 3-5. Recovery for each of the claims, however, is predicated on the harm to Plaintiffs' property allegedly caused by the hydrocarbon plume.

Chevron filed the instant motions for summary judgment on the claims of each of these bellwether Plaintiffs on August 14, 2009. Plaintiffs filed a consolidated memorandum in opposition to the motions for summary judgment on August 28, 2009. Doc. No. 409. Plaintiffs, however, did not address Chevron's motions directed to the claims of Plaintiffs Lane, Klosterman, and Muncy. As indicated, the properties of these Plaintiffs are located in Cleves and it is not disputed that they have not been directly affected by the plume. Consequently, under Ohio law, as will be explained further below, these Plaintiffs have no claim for damages against Chevron. Chevron filed a consolidated reply brief on September 11, 2009.

II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party,

who is given the benefit of all favorable inferences that can be drawn therefrom.  United States v. Diebold, Inc., 369 U.S. 654 (1962).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The Court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id.

     The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties'

differing versions of the truth at trial." <u>First National Bank</u>
<u>v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with
extreme caution since it operates to deny a litigant his day in
court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert.</u>
<u>dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court
has stated that the "[s]ummary judgment procedure is properly
regarded not as a disfavored procedural shortcut, but rather as
an integral part of the Federal Rules as a whole, which are
designed to 'secure the just, speedy and inexpensive
determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 327 (1986). According to the Supreme Court, the
standard for granting summary judgment mirrors the standard for a
directed verdict, and thus summary judgment is appropriate if the
moving party establishes that there is insufficient evidence
favoring the non-moving party for a jury to return a verdict for
that party. <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper
"against a party who fails to make a showing sufficient to
establish the existence of an element essential to the party's
case and on which that party will bear the burden of proof at
trial." <u>Celotex Corp.</u>, 477 U.S. at 322. Significantly, the
Supreme Court also instructs that the "the plain language of Rule
56(c) mandates the entry of summary judgment, after adequate time

for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

As stated, Plaintiffs assert state law claims against Chevron for negligence, gross negligence, negligence per se, conspiracy and fraud, strict liability/ultrahazardous activities, trespass, private nuisance and conversion,[4] and failure to warn.[5]

---

[4] Real property is not the proper subject of a conversion claim. Federal Land Bank Ass'n v. Walton, No. 16-94-9, 1995 WL 359856, at *4 n.1 (Ohio Ct. App. June 16, 1995).  A party may, however, assert a claim for conversion of groundwater to the extent that the defendant interferes with the property owner's use of his or her own groundwater.  E.g., Portage County Bd. of Comm'rs. v. City of Akron, 846 N.E.2d 478, 496 (Ohio 2006); see also McNamara v. City of Rittman, 838 N.E.2d 640, 646 (Ohio 2005) (holding that homeowners have property rights in groundwater

Each of these claims sounds in tort and an essential element to be proved in every tort case is injury or damages proximately caused by the defendant's tortious conduct.  <u>Mussivand v. David</u>, 544 N.E.2d 265, 270 (Ohio 1989)(elements of ordinary negligence); <u>Winkle v. Zettler Funeral Homes, Inc.</u>, 912 N.E.2d 151, 161 (Ohio Ct. App. 2009) (elements of gross negligence); <u>Chambers v. St. Mary's School</u>, 697 N.E.2d 198, 200-01 (Ohio 1998)(elements of negligence per se); <u>Williams v. Aetna Fin. Co.</u>, 700 N.E.2d 859, 868 (Ohio 1998)(tort of civil conspiracy requires proof of actual damages); <u>Banford v. Aldrich Chem. Co.</u>, 904 N.E.2d 582, 590-91 (Ohio Ct. App. 2008)(elements of strict liability/ultrahazardous activities); <u>Allstate Fire Ins. Co. v. Singler</u>, 236 N.E.2d 79, 81 (Ohio 1968)("[T]o recover compensatory damages, it is necessary

---

which may be protected against governmental taking).  Plaintiffs'
complaint may be construed to assert a claim for conversion of
groundwater.  Nevertheless, in this case, as will be explained
below, the record fails to demonstrate that Chevron interfered
with Plaintiffs' groundwater rights.

[5]     This is not a products liability claim.  Rather, this
is essentially another negligence claim in which Plaintiffs
allege that Chevron negligently and recklessly failed to provide
warnings concerning the dangers created by emissions and
contamination from the refinery.  In <u>Otte v. Dayton Power & Light
Co.</u>, 523 N.E.2d 835, 837 (Ohio 1988), the trial court merged a
failure to warn of potential dangers claim with plaintiffs'
negligence claim.  The Court's research has not uncovered any
Ohio cases creating a failure to warn cause of action in a non-
products liability context.  The <u>Otte</u> court's merger of the
failure to warn and negligence claims, therefore, seems like a
sensible and practical resolution of the problem.  Consequently,
the Court considers Plaintiffs' negligence and failure to warn
claims to be coextensive.

to prove that the trespass proximately caused the harm for which

compensation is sought and to prove the amount of the damage.");

Brown v. Scioto Cty. Bd. of Comm'rs., 622 N.E.2d 1153, 1160 (Ohio

Ct. App. 1993)(claim for nuisance requires showing of

unreasonable risk of harm resulting in injury).  In this case,

the record fails to show that the hydrocarbon plume caused any

damage to Plaintiffs' property or interfered with their property

rights or with the use and enjoyment of their properties.[6]

       With the exception of the Tenkottes and the Plaintiffs

who live in Cleves, it may be assumed for purposes of summary

judgment that the plume lies beneath each Plaintiffs' property at

a depth of anywhere from 50 to 70 feet below the ground surface.

The mere fact, however, that the plume is beneath Plaintiffs'

properties is not dispositive of the issue whether they have

suffered any cognizable damages resulting from the plume.  The

scope of Plaintiffs' subsurface property rights is delineated and

controlled by the Supreme Court of Ohio's decision in Chance v.

BP Chem., Inc., 670 N.E.2d 985 (Ohio 1996).

---

       [6]    Chevron asserts other grounds for granting summary
judgment in its favor, including the contemporaneous possession
rule, absence of evidence of intent to trespass, absence of
evidence of an agreement or conspiracy, and Plaintiffs' admission
that the risk from the alleged ultrahazardous activity could have
been eliminated through the exercise of reasonable care.  These
arguments appear to be meritorious in whole or in part. Given,
however, the Court's conclusion that Plaintiffs have failed to
adduce evidence of actual damages from the plume, it need not
definitively resolve these arguments.

In Chance, BP Chemicals, Inc. ("BP") had a permit from
the State of Ohio and the EPA to dispose of hazardous waste by
injecting it into wells drilled to a depth of some 2,600 feet
below the ground surface.  There, the injectate mixed with the
groundwater and migrated in some instances to nearly five miles
away from BP's property.  Plaintiffs brought claims against BP
for, inter alia, trespass on the grounds that the injectate
contaminated the groundwater beneath their properties.  The
Court, however, rejected the proposition that plaintiffs'
property rights extended indefinitely below the surface.
Instead, the Court adopted the holding from Village of Willoughby
Hills v. Corrigan, 278 N.E.2d 658 (Ohio 1972), a case involving a
claim of absolute ownership of air rights.  Chance, 670 N.E.2d at
992.  In Willoughby Hills, the Court held: "We own so much of the
space above the ground as we can occupy or make use of, in
connection with the enjoyment of our land.  This right is not
fixed.  It varies with our varying needs and is coextensive with
them.  The owner of the land owns as much space above him as he
uses, but only so long as he uses it."  See id. at 991-92.
Adapted to claims concerning subsurface rights, the holding from
Willoughby Hills is: "The owner of the land owns as much space
below him as he uses, but only so long as he uses it."  The Court
then stated that plaintiffs' "subsurface rights in their
properties include the right to exclude invasions of the

11

subsurface property that interfere with [their] reasonable and foreseeable use of the subsurface." Id. at 992. Additionally, plaintiffs were required to adduce proof of physical damages or interference to recover against BP. Id. Moreover, the Court held that absent physical damage to or interference with their properties, plaintiffs could not recover damages for loss in value of their properties resulting from the stigma from the public perception that their properties were contaminated. Id.

In the end, the Chance Court held that plaintiffs had not demonstrated an unlawful entry on their properties by BP. The Court stated that a number of factors influenced this decision, including that BP operated the wells pursuant to a permit and that plaintiffs' claims were novel in that they concerned the non-negligent operation of a deep-well. Id. at 993. It is clear, however, based on the Court's discussion and analysis, that the primary reasons for its decision were the limited nature of plaintiffs' property rights and the fact that the injectate did not interfere with their reasonable and foreseeable use of their properties.

In this case, as Chance indicates, Plaintiffs' possess subsurface property rights to the extent of the their actual and reasonable use of the subsurface. Moreover, Plaintiffs may only recover damages to the extent that the plume actually interferes with their use of the subsurface. Here, however, none of the

bellwether Plaintiffs have demonstrated that the plume actually

interferes with their use of the subsurface.  Plaintiffs do not

use the groundwater for any purpose.  Plaintiffs' water supply

does not come from ground wells; rather, they have a municipal

water source.  Plaintiffs have not indicated that the plume has

caused them to abandon any particularized and non-speculative

plans which require drilling or excavation on their properties.[7]

    Since the LNAPL plume does not interfere with

Plaintiffs' use of the subsurface, the only other source of

interference with the use of their properties is harmful vapors

from the plume entering their homes or rising to or near the

surface of their properties.  Plaintiffs, however, have not

adduced any admissible evidence that harmful vapors <u>from the</u>

<u>plume</u> have penetrated their homes or have reached the surface of

their properties.

---

[7]    Plaintiff Simpson testified that he thought about
adding new rooms to his home.  Simpson Dep. at 60 (Doc. No. 409-
8, at 15). Plaintiff Emma Balsley testified that she and her
husband abandoned plans to put up new siding and to build a deck.
Balsley Dep. at 76-78 (Doc. No. 409-10, at 19-20).  While
Plaintiff Hutchinson testified that he did not want to invest
anymore money in his home because of the plume, at the time of
his deposition he had already made all the improvements he wanted
to make and had no plans for further improvements.  Hutchinson
Dep. at 77, 79 (Doc. No. 409-14, at 20).  Plaintiff Donna Moses
testified that when she and her husband bought their house that
they "thought" they would dig out and finish their basement and
put in a family room when their children grew up and they became
more financially secure.  Moses Dep. at 75 (Doc. No. 409-16, at
19).

One of Plaintiffs' experts, Dr. Philip Bedient,

provided a report and opinion that all of the homes and

properties in Hooven have been adversely affected by the plume.

Additionally, Dr. Bedient testified that the only source for the

positive hydrocarbon soil vapors recorded in Hooven was the

plume.  Setting aside for a moment the procedural violations of

Dr. Bedient's report,[8] which for the purposes of summary judgment

are assumed to be harmless, the Court agrees with Chevron that

Dr. Bedient's opinion on this subject is not admissible under

Fed. R. Evid. 702.  Dr. Bedient is not qualified to give this

opinion.  Moreover, Dr. Bedient's opinion is not reliable because

it is conclusory and fails to adequately explain or account for

other obvious sources for the positive soil vapor samples.

Finally, Dr. Bedient's opinion is not helpful to the trier of

fact because it is too general and too vague.

Pursuant to Federal Rule of Evidence 702 and Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993), in order to

be admissible, an expert's opinion must have a reliable

foundation and be relevant to the case.  An expert may not

testify if he lacks expertise in the field in which his opinion

is being proffered.  Sigler v. American Honda Motor Co., 532 F.3d

_____

      [8]      Dr. Bedient's report does not include his
qualifications and list of publications, a list of the trials in
which he has provided opinions in the preceding four years, or a
statement of his compensation.  Thus, Dr. Bedient's report does
not comply with Fed. R. Civ. P. 26(a)(2)(B).

14

469, 479 (6th Cir. 2008). An opinion that is conclusory or "that is connected to existing data only by the ipse dixit of the expert" is not admissible. Nelson v. Tennessee Gas Pipeline Co. 243 F.3d 244, 254 (6th Cir. 2001)(quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). An expert is not required to eliminate all other possible causes of the injury in order for his opinion to be admissible. Jahn v. Equine Services, PSC 233 F.3d 382, 390 (6th Cir. 2000). Nevertheless, an expert's opinion may be excluded if he ignores or fails to adequately account for confounding factors or other obvious causes of the injury. Nelson, 243 F.3d at 253-54; Fed. R. Evid. 702; Advisory Committee Notes to 2000 Amendments; see also Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 794 (6th Cir. 2002)(expert's opinion was admissible where he ruled out plausible alternatives and accounted for variables raised by opposition's expert). Dr. Bedient's opinion on the important issue of the source of the surface and shallow soil hydrocarbon contaminants fails under each of these criteria.

Dr. Bedient is not a soil vapor expert and testified that he does not hold himself out as one. Bedient Dep. at 65. Therefore, by his own admission he is not qualified to render an opinion on the source of surface and shallow soil hydrocarbon contaminants. Dr. Bedient did not perform any analysis to determine whether there is a completed pathway from the plume to

the surface which would permit hydrocarbon contaminants to migrate to the surface.  Id.  Therefore, his opinion that the only explanation for the presence of the contaminants at the surface and shallow subsurface is the plume is conclusory.  Id.  Moreover, Dr. Bedient did not take into consideration or try to account for the fact that other obvious explanations for the positive test results were surface releases of hydrocarbon contaminants, the presence of hydrocarbon contaminants in the ambient air, or subsurface releases of contaminants from septic tanks.  See Maguire Report, Doc. No. 397-6, at 17.  Indeed, Dr. Bedient did not even know whether the positive test results reflected the presence of contaminants above ambient air levels.  Bedient Dep. at 51.  Finally, Dr. Bedient's opinion that all of Hooven has been adversely affected by the plume is too broad, too general, and too vague to be helpful to the trier of fact.  The issue here is whether the plume interferes these particular Plaintiffs' property interests.  An opinion that they were "adversely affected" has little or no evidentiary value.

Accordingly, for all of these reasons, Dr. Bedient's opinion fails to meet Rule 702's admissibility standards and cannot be considered by the Court on a motion for summary judgment.  Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009)("Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make her case with a showing of

facts that can be established by evidence that will be admissible at trial.").[9]

Plaintiffs also cite a document called "Risk profiles for all site components" as evidence that vapors from the plume are entering their homes.  Doc. No. 409-7.  This document, which was apparently prepared for Chevron by one its consultants, includes a page entitled "Conceptual model for the Hooven vapor risk assessment" which indicates "complete pathway" for resident adults and resident children.  Id. at 5.  This report does not bolster Plaintiffs' claims.  The report is clearly a theoretical model of exposure pathways that does not reflect the actual conditions of any of the bellwether Plaintiffs' properties.

---

[9]     Plaintiffs filed a separate motion (Doc. No. 430) in which they move the Court to supplement their response in support of the admissibility of Dr. Bedient's opinion.  Attached to the motion are documents - mainly letters from the EPA reporting test results - that they contend support Dr. Bedient's opinion that vapors from the plume are entering their homes.  There is no indication in Dr. Bedient's report, however, that he relied on these documents in forming his opinions.  Moreover, all but one of the EPA reports concern properties not at issue in this bellwether phase of the case.  Therefore, those reports have no relevance here.  The EPA report to Plaintiff Simpson, although indicating a possibility for benzene vapors to enter through the basement, reflects test results well below the level considered safe by the EPA.  Doc. No, 430-2.  Additionally, according to the report, a person would have to live in the basement 24 hours per day, 365 days a year, for a period of 70 years at a level above the safe level of exposure for harm to result.  Therefore, even assuming that the benzene vapor sampled comes from the plume, the report actually supports the conclusion that the plume has not caused any injury or damage to Plaintiff Simpson.

Thus, this evidence is insufficient for Plaintiffs' to withstand summary judgment.

In their brief, Plaintiffs also point out that they have smelled oil, gasoline, and diesel fuel odors in their homes and around their properties. A closer look at the relevant deposition excerpts, however, shows that, assuming the odors came from the plume, the incidents were too insubstantial as a matter of law to recover damages. Banford v. Aldrich Chem. Co., Inc., 904 N.E.2d 582, 596 (Ohio Ct. App. 2008) (recovery for annoyance and inconvenience requires a material and substantial injury). Although Plaintiff Simpson testified that he smelled odors in his basement, he also said that he could not describe them, it only occurred a "handful" of times every year, he could not recall the last time it occurred, and that the odors did not cause him to worry about his safety. Simpson Dep. at 22-26 (Doc. No. 409-8, at 6-7). Mrs. Balsley testified that she smelled an odor like rotten eggs or diesel fuel outdoors, but the last time this occurred was close to ten years before her deposition. E. Balsley Dep. at 25-27 (Doc. No. 409-10, at 7). Plaintiff Beale said that she noticed "several times where there's been odors," but no other specifics as to the type of odors, how often they occurred, or their strength and duration. Beale Dep. at 73 (Doc. No. 409-13 at 9). Plaintiff Hutchinson stated that he smelled diesel fuel outdoors, and occasionally there were some unexpected

18

odors in his basement, but he also said it was nothing that

alarmed him.  Hutchinson Dep. at 27 (Doc. No. 409-14, at 7).

Mrs. Moses testified that she thinks she smells diesel fuel in

her basement periodically but she does not know where the odor is

coming from.  Moses Dep. at 24-26 (Doc. No. 409-16, at 6-7).  The

Zollers' tenant mentioned that he smelled diesel fuel in the

house he rents from them after a heavy rain, but he really was

not complaining about the odor.  Zoller Dep. at 44-45 (Doc. No.

409-17, at 11-12).  This testimony shows that to the extent the

odors can be attributed to the plume - which is entirely <u>arguendo</u>

- they occur only intermittently and do not result in any

substantial annoyance or discomfort to Plaintiffs.  Therefore,

under these circumstances, the odors Plaintiffs claim to

experience do not result in any compensable harm.

Plaintiffs have testified that because of the plume, they

now fear illness and disease, have stopped using their basements,

refuse to allow children and pets to play in their yards, ceased

activities such as gardening, and refuse to drink the tap water.

The record, however, does not reflect that the plume presents a

health hazard to Plaintiffs now or that it is reasonably likely to

become a health hazard in the future.  Therefore, these reactions to

the plume are not reasonable.  Plaintiffs may not recover damages

resulting from their fear of a non-existent peril.  <u>Lueke v. Union</u>

<u>Oil Co. of Ca.</u>, No. OT-00-008, 2000 WL 1545077, at *5(Ohio Ct. App.

Oct. 20, 2000)(affirming district court's grant of summary judgment to defendant oil company where benzene level in home never posed danger to plaintiff; plaintiff could not recover for distress caused by non-existent peril); see also Banford, 904 N.E.2d at 602 (noting that while plaintiffs can recover damages for worry and fear, their fears may not be irrational).

Finally, pursuant to Chance, because there has been no physical damages to or interference with Plaintiff's properties,[10] they are barred from recovering damages for loss in market value allegedly caused by environmental stigma.  670 N.E.2d at 993.

In summary, construing the record in their favor, and assuming all other elements of their claims can be established, Plaintiffs have failed to demonstrate that they have sustained any compensable damages resulting from the presence of the plume beneath their properties.

Accordingly, Chevron's motions for summary judgment are well-taken and are **GRANTED**.  These bellwether property claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**

Date November 4, 2009          s/Sandra S. Beckwith
                                  Sandra S. Beckwith
                          Senior United States District Judge

---

[10]    To reiterate, the plume is not below the Tenkottes' properties or the properties of the Plaintiffs in Cleves. Therefore, summary judgment against these Plaintiffs is appropriate for this reason alone.