**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Carolyn Baker, <u>et al.</u>,        )
                                     )
                Plaintiffs,          )  Case No. 1:05-CV-227
                                     )
        vs.                          )
                                     )
Chevron USA, Inc., <u>et al.</u>,    )
                                     )
                Defendants.          )

<u>MEMORANDUM OF DECISION</u>

On August 1, 2011, the Court entered an order (Doc. No. 625) granting Defendant Chevron USA, Inc.'s motion for summary judgment (Doc. No. 567).  This Memorandum of Decision sets forth the Court's analysis and reasons for granting for that motion.

I. <u>Summary Judgment Standard of Review</u>

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (internal quotation marks omitted).  In reviewing a summary judgment motion, credibility judgments and weighing of

the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Thus, the facts and any inferences that can be drawn from those facts, must be viewed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. Background and Analysis

The Court has probably already summarized the nature of these proceedings to the point to tedium, but another summary of the case is nevertheless still appropriate.

The Village of Hooven, Ohio is a small community that lies in the western part of Hamilton County, just north of State Route 50.  The eastern boundary of Hooven is demarcated by State Route 128.  From approximately 1930 to 1985, Gulf Oil Company ("Gulf") operated a petroleum refinery adjacent to Hooven, just across Route 128.  Defendant Chevron USA, Inc. ("Chevron") purchased the refinery from Gulf in 1985 and closed it down in 1986.  Gulf and/or Chevron manufactured gasoline, diesel fuel, jet fuel, heating oil, sulphur, and asphalt at the refinery.  The refinery is situated such that the southwestern corner of its property line essentially abuts the northeastern corner of Hooven.  The refinery itself sits in the flood plain of the Great

2

Miami River, which establishes the eastern boundary of the refinery.

In 1985, a passerby noticed what appeared to be gasoline seeping from the riverbank inside the refinery property line into the Great Miami River. It was later determined that gasoline and diesel fuel which had been leaked or spilled at the refinery had migrated through the soil column and entered the groundwater. The gasoline and diesel fuel created an LNAPL (light, non-aqueous phase liquid)[1] plume on top of the groundwater.[2] In turn, due to the movement of the groundwater, the LNAPL plume over the years has migrated from the refinery's

_____

[1]    Nonaqueous phase liquids (NAPLs) are hydrocarbons that exist as a separate, immiscible phase when in contact with water and/or air. Differences in the physical and chemical properties of water and NAPL result in the formation of a physical interface between the liquids which prevents the two fluids from mixing. Nonaqueous phase liquids are typically classified as either light nonaqueous phase liquids (LNAPLs) which have densities less than that of water, or dense nonaqueous phase liquids (DNAPLs) which have densities greater than that of water.

United States Environmental Protection Agency, Ground Water Issue, at 1 (available at http://www.epa.gov/nrmrl/pubs/ 540s95500/lnapl.pdf (visited June 30, 2011).

[2]    Prior orders of the Court essentially assumed that gasoline and diesel fuel spills and leaks were responsible for the plume because that point seemed not to be disputed. Plaintiffs now contend, however, that improperly managed solid waste management units ("SWMU's") on the refinery property are the cause of the plume. For purposes of resolving Chevron's motion for summary judgment, the cause or source of the plume is not particularly relevant. The Court, therefore, will continue to assume that the plume was caused by fuel spills and leaks.

3

boundaries, crossed below State Route 128, and has entered at least the eastern subterranean area of Hooven.[3]

The LNAPL creates another problem. The level of the groundwater fluctuates up and down, depending on the local rainfall. The record shows that the aquifer beneath Hooven is influenced by the Great Miami River so that if the river level is up, so will be the level of the groundwater, and vice versa. Additionally, Chevron periodically engages in high grade pumping to recover LNAPL from the groundwater. This pumping lowers the level of the groundwater. As the groundwater rises, however, it carries the LNAPL with it. When the groundwater subsequently falls, a "smear zone" of LNAPL-saturated soil is left behind. When the smear zone is not covered by the water table, constituents from the LNAPL remaining in the soil can volatize into vapors which have the potential to reach the surface, depending, among other things, on the chemical properties of the particular constituent, the depth of the smear zone, and the porosity of the soil.

The Plaintiffs in this case are individuals who reside in Hooven and/or own property in Hooven. Broadly speaking, the Plaintiffs fall into two categories: 1) individuals who claim to have suffered a personal injury, or who are at an increased risk

---

[3]    The Court further discusses the dimensions of the plume, at least as established by this record, infra, at 6-18.

4

of suffering a personal injury, as a result of Chevron's alleged
negligence in operating the refinery; and 2) individuals who
claim property damage as a result of Chevron's alleged negligence
in releasing contaminants into the groundwater.  The Court has
bifurcated the personal injury/medical monitoring claimants from
the property damage claimants.  Chevron's motion for summary
judgment addresses the claims of the remaining property damage
Plaintiffs.[4]   These Plaintiffs are:

Odis Davis, 113 Ohio Avenue
Linda Eckenroth, 211 Chidlaw Avenue
Marcus Greer, 105 Ohio Avenue
George and Melissa Hunt, 110 Ohio Avenue
Douglas King, 113 Hooven Avenue
Scott Mattlin, 106 Hooven Avenue
Virginia Pappin, 306 Chidlaw Avenue
Melissa Pruitt, 326 Brotherhood Avenue
Clarence Roy, 112 Chidlaw Avenue
Larry Stafford, 301 Chidlaw Avenue, 5108, 5111, 5140 S.R. 128,
and 409 Hooven Avenue
Margaret Whitaker, 111 Ohio Avenue
Diana and Steve Zeinner, 107 Hooven Avenue and 9661 Hooven Avenue
Brian Scott and Julie Balsley, 407 Hooven Avenue
Emma and William F. Balsley, 103 Jefferson Street
Patricia Bauer, 118 Ohio Avenue
Alita and Daniel Brockman, 208 Ohio Avenue
Melody and Ray Chaney, 504 Hooven Avenue
Frances Clark, 101 Jefferson Street
Michael and Mary Conn, 209 Hooven Avenue
Larry and Olivia Detmer, 410, 9780, and 9768 Hooven Avenue
Brenda and Robert Eldridge, 212 Jefferson Street
Clifford Fennell, 117 Adams Street

---

[4]     The Court previously established bellwether groups and
held a summary jury trial on the claims of those Plaintiffs in an
attempt to reach a comprehensive settlement of the case.  The
parties, however, were unable to reach a settlement and the Court
ultimately granted summary judgment to Chevron on the claims of
the bellwether Plaintiffs.  Other Plaintiffs have been dismissed
from the case for various reasons.

Denny Gambrell, 406 Hooven Avenue
Charles Garner, Jr., 313 Hooven Avenue
Marcus and Mary Greer, 301 and 303 Ohio Avenue
Lori and William Hall, 308 Hooven Avenue
Mary Hollingsworth, 307 Hooven Avenue
Albert Huffman, 101 Monroe Street
Jennifer Klem, 406 Ohio Avenue
Carl Kreger, 106 Jackson Street
Russell McKernan, 202 Hooven Avenue
Peggy Meadows, 106 Madison Street
Karen Mondary, 101 Brotherhood Avenue
Hosea Myers, 102 Madison Street
Melissa Nixon, 203 Ohio Avenue
Jeffrey and Jo Ellen Story, 404 Hooven Avenue
Kelly Thompson, 502 Ohio Avenue
Lisa Tyler, 207 Ohio Avenue
Mabel Wheeler, 606 Hooven Avenue
Rodney Wheeler, Sr., 505 Hooven Avenue
Edward Whitt, Sr., 503 Hooven Avenue

### A. The Footprint of the LNAPL Plume and Smear Zone

A prior order of the Court noted that the parties disputed the dimensions of the footprint of the plume. The Court, nevertheless, assumed that the plume underlaid all of Hooven because greater specificity was not required to resolve the claims of the bellwether property Plaintiffs. Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2009 WL 3698419, at *1 (S.D. Ohio Nov. 4, 2009). Since the issuance of that order, however, the record has been more fully developed and there are no longer material issues of fact concerning the footprint of the plume and the smear zone. The Court begins, however, with a more specific description of Hooven's metes and bounds.

Aerial or satellite photographs included in the record show that the residential area of Hooven is nearly perfectly

rectangular in shape.  See, e.g., Doc. No. 570-1, at 16 (Hagemann Report, Figure 2).[5]  Brotherhood Avenue runs east and west and represents the southern border of Hooven.  Ohio Avenue also runs east and west and represents the northern border of Hooven.  The map indicates that roughly two city blocks, or about 400 feet, separate Ohio Avenue and Brotherhood Avenue.  Hooven Avenue is the other major east-west street in Hooven and runs between Brotherhood Avenue and Ohio Avenue.  See generally id.

The western edge of Hooven is marked by Jackson Street, which runs north and south.  State Route 128 runs north and south and essentially represents the eastern edge of Hooven.  Jackson Street and State Route 128 are separated by about 1,400 feet. There are four other major north-south streets spaced more or less equidistantly between Jackson Street and State Route 128. They are, from west to east, Monroe Street, Madison Street, Jefferson Street, and Adams Street.  Id.

The other principal street in this case is Chidlaw Avenue.  Chidlaw Avenue is located in the far eastern part of Hooven and runs southwest to northeast, beginning at or near Hooven Elementary School and intersecting State Route 128 just north of Ohio Avenue.

---

[5]     A commercial area of Hooven, referred to as the "Southwest Quadrant" is also over the plume and smear zone.  None of the properties in this case, however, are located in the Southwest Quadrant.

As already stated, the northeastern border of Hooven and the southwestern border of the refinery more or less abut, separated only by State Route 128.  Hooven, however, is on a plateau that is anywhere from 25 to 45 feet higher than the refinery.  Thus, the plume is deeper beneath Hooven than it is under the refinery property.  The plume has migrated from the refinery in a generally southwesterly direction and has spread out under the eastern portion of Hooven.  Ohio Department of Health, Health Consultation, Former Chevron Refinery (Feb. 18, 2011), at 9 (Doc. No. 585-4, at 13).

In his expert report, one of Plaintiffs' experts, Matthew Hagemann, a former geologist with the U.S. Environmental Protection Agency, prepared two exhibits with his estimation of the footprint of both the plume (Figure 1, Doc. No. 570-1, at 15) and the smear zone (Figure 2, Doc. No. 570-1, at 16).[6]  The smear zone covers a larger area than the LNAPL plume itself and, as stated, also represents a potential source of contamination of Plaintiffs' properties.  The Court, therefore, will refer only to the smear zone map as establishing the footprint of contamination from the refinery.

---

[6]     Chevron has moved to exclude Hagemann's opinions pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Doc. No. 570, but concedes for purposes of summary judgment that his opinion as to the footprint of the plume is accurate.  Doc. No. 567, at 29.

Hagemann's smear zone map is either an aerial or a satellite photograph of Hooven.  Representations of Plaintiffs' properties were superimposed on the photograph in various colors and are identified by street number.  Finally, a brown tint was superimposed on the photographs to represent the smear zone. Hagemann Dep. (Doc. No. 580-2), at 39-41.  The map shows that the smear zone, starting at about the intersection of Chidlaw Avenue and State Route 128, gradually arcs in a southwesterly direction towards Adams Street.  Approximately halfway between Ohio Avenue and Hooven Avenue, the smear zone plunges more or less due south for about 200 feet, and then spreads west and south again, towards the Southwest Quadrant, in the vicinity of Brotherhood Avenue.  Figure 2, Doc. No. 570-1, at 16.  Thus, this map shows that the smear zone stops just short of Adams Street, although it does in fact underlie most of the area bounded by Adams Street and State Route 128 on the west and east, respectively, and by Ohio Avenue and Brotherhood Avenue, on the north and south, respectively.

Consequently, as Chevron correctly demonstrates in its motion for summary judgment, the smear zone only underlies all or part of the following properties: 113 Ohio Avenue (Davis), 211 Chidlaw Avenue (Eckenroth), 105 Ohio Avenue (Marcus Greer), 110 Ohio Avenue (Hunt), 113 Hooven Avenue (King), 106 Hooven Avenue (Mattlin), 306 Chidlaw Avenue (Pappin), 326 Brotherhood Avenue

9

(Pruitt), 112 Chidlaw Avenue (Roy), 301 Chidlaw Avenue
(Stafford), 111 Ohio Avenue (Whittaker), and 107 Hooven Avenue
(Zeinner).

Plaintiffs, on the other hand, have not created a
genuine issue of material fact as to whether the plume and smear
zone extends west of Adams Street.  Indeed, two of Plaintiffs'
experts, Hagemann and Cheremisinoff, generally agree that the
plume does not extend west of Adams Street.  Hagemann Dep. (Doc.
No. 580-2), at 92-93 (agreeing that LNAPL has never been sampled
in monitoring wells drilled west of Adams Street);[7] Cheremisinoff
Dep. (Doc. No. 583-1, at 156) (agreeing that Hagemann's maps
accurately reflect the lateral extent of the plume and testifying
that the plume has been fixed in place for close to 20 years).
The testimony of these experts comports with the findings of the
EPA, Doc. No. 587-2, at 13,[8] the Ohio Department of Health
("ODH") (Doc. No. 585-4, at 16-17), and the U.S. Department of
Health and Human Services ("HHS").  Doc. No. 585-1, at 8 (both
ODH and HHS note that due to pumping by Chevron, the groundwater

_____

[7]    Hagemann's report stated that shallow soil and sub-slab
vapor detections of isopentane and 2,2,4 trimethylpentane in
areas west of Adams Street indicated the presence of the plume
and the smear zone.  Doc. No. 570-1, at 7.  Hagemann retreated
from this position in his deposition, however, agreeing on cross-
examination that these results only indicated the possibility of
a completed pathway that should be examined further.  Hagemann
Dep. (Doc. No. 580-2), at 90-92.

[8]    "The plume of contaminated groundwater is not expanding
beyond the area where it already exists."

flow beneath Hooven is towards the refinery); Doc. No. 580-6, at 51 (February 2011 Ohio Department of Health report showing LNAPL plume stopping east of Adams Street).

In arguing that the plume extends west of Adams Street, Plaintiffs refer to the opinion of their third expert, Dr. Bedient.  Plaintiffs note that Dr. Bedient testified that the aquifer under Hooven is "very, very, very fast" and that the plume is "uncontrolled."  Plaintiffs and Dr. Bedient also apparently rely on the <u>absence</u> of data from monitoring wells located west of Adams Street to conclude that the plume extends west of Adams Street.  For instance, Plaintiffs and Dr. Bedient criticize Chevron for not installing additional wells west of MW-130[9] and for measuring the groundwater elevation in the western part of Hooven only once in 2005.  Doc. No. 581, at 10-12; <u>see also</u> Plaint. Mem. in Opp. at 20 (Doc. No. 581, at 25) (arguing that the extent of the contamination from the plume is evidenced in part by the absence of monitoring wells west of Adams Street).  Dr. Bedient's opinions are the subject of a <u>Daubert</u> motion filed by Chevron (Doc. No. 605).  The Court generally agrees with Chevron that Dr. Bedient's opinions are not admissible pursuant to <u>Daubert</u>, but they fail to carry the day for Plaintiffs for other reasons as well.

---

[9]     MW-130 is the westernmost monitoring well, located approximately at the intersection of Hooven Avenue and Madison Street.  Doc. No. 580-6, at 51.

First, both Plaintiffs and Dr. Bedient improperly shift the burden of proof to Chevron when they discuss Chevron's failure to conduct additional sampling tests and install additional monitoring wells.  It is not Chevron's burden to show the plume's absence beneath Plaintiffs' properties; it is Plaintiffs' burden to show the plume's presence beneath their properties.[10]

Second, even accepting Dr. Bedient's opinion that the plume extends west of Adams Street, he fails to take the next step and provide his opinion as to what properties overlay the plume west of Adams Street.  Thus, it is impossible for a juror to use Dr. Bedient's opinion to reach a reasonable conclusion that the plume is beneath, for example, 606 Hooven Avenue, the westernmost property in this group of Plaintiffs.  See Doc. No. 570-1, at 16 (map showing that 606 Hooven Avenue is west of Jackson Street).[11]  Indeed, Dr. Bedient testified that he was not retained to offer an opinion on the Plaintiffs and properties

---

[10]     The Court notes that both Mr. Hagemann and Dr. Cheremisinoff also improperly shift the burden of proof to Chevron.  See e.g. Hagemann Supp. Aff. (Doc. No. 581-3) ¶ 16(d)(finding a vapor pathway complete because Chevron has not produced evidence rebutting the conclusions of the ODH); Cheremisinoff Supp. Aff. (Doc. No. 581-1) ¶ 18 ("The defendant has not offered a single shred of evidence to support that chemicals it has detected between 30 feet below grade all the way to the surface are from surface activities.").

[11]     Dr. Bedient in fact conceded at his second deposition that the plume is not as far west as MW-130.  Bedient Dep. at 58-59 (Doc. No. 584-5, at 17).

affected by the plume.  Bedient Dep. (Doc. No. 584-5, at 6-7), at 17-18.  Whether this means that Dr. Bedient's opinion is excludable under Federal Rule of Evidence 702 because it is not helpful to the trier of fact, or whether it means that Plaintiffs west of Adams Street failed to carry their burden to demonstrate that the plume affects their properties is inconsequential.  In either event, they have not established a material issue of fact concerning whether the plume extends west of Adams Street.

Third, and finally, it is evident that to the extent that Dr. Bedient has an opinion that the plume is uncontrolled and extends west of Adams Street it is excludable under Daubert because he is merely speculating.  Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 670-71 (6th Cir. 2010).  In his January 2009 deposition, Dr. Bedient testified that because the aquifer is a "very, very, very fast system," movement of the aquifer several hundred feet to the west of Adams Street would be "easily accomplished."  Bedient Dep. at 116 (Doc. No. 584-4, at 31).  He also testified that there was a "great opportunity" for the plume to migrate west of Adams St.  Id. at 115.  This testimony really just represents Dr. Bedient's educated guess about what movement could occur given the particular characteristics of the plume, but it falls short of a reliable opinion that the plume in fact has migrated or likely will migrate west of Adams Street. See id. at 671 ("[T]he courtroom is not the place for scientific

13

guesswork, even of the inspired sort.") (quoting <u>Rosen v.
Ciba-Geigy Corp.</u>, 78 F.3d 316, 319 (7th Cir. 1996)).  In his
January 2011 deposition, Dr. Bedient actually stepped back from
this position.  Dr. Bedient admitted that some areas of the plume
are now controlled and that while he would like to see more data,
he all but conceded that the plume is stabilized to the east of
Adams Street.  Bedient Dep. at 28, 57-60 (Doc. No. 584-5, at 9,
16-17).[12]  Moreover, according to Dr. Bedient's most recent
testimony, the uncontrolled area of the plume seems to be in the
Southwest Quadrant, an area not relevant to this lawsuit.  <u>Id.</u> at
58-59 (Doc. No. 584-5, at 17).  Dr. Bedient's recent opinion now
tends to fall in line with all of the other evidence in the
record indicating that the plume stops short of Adams Street.  In
any event, Dr. Bedient's opinion fails to establish with any

_____

[12]   Here, Dr. Bedient testified as follows:

Q. Given the amount of testing that was done in 2009
west of Adams, is there enough data to reasonably
suggest to a remediation professional that LNAPL is not
likely to migrate west of Adams?

A. I would want to see a whole other year.  In other
words, I don't disagree with you that this past year
and 2009, it's been a successful year with respect to
the issue you raise.  But it's also a - an unusual year
with respect to the elevation of water in the river.
So because of that, if I had one more year of that
data, the I would - I would be - I would be very - feel
a lot more confident that, indeed, the LNAPL is not
migrating further west.

14

degree of reliability that the plume has migrated west of Adams Street.

The only other piece of evidence which suggests that the plume has migrated west of Adams Street is Dr. Cheremisinoff's supplemental affidavit, which states that testing records show a completed vapor pathway in the past at VW-129. VW-129 is located at approximately the intersection of Jefferson Street and Hooven Avenue, approximately one block west of Adams Street.  Doc. No. 580-6, at 51.  This affidavit is subject to a motion to strike by Chevron, but even if the Court were to consider this supplement, it still fails to create an issue of fact concerning whether the plume is west of Adams Street.

In his supplemental affidavit, Dr. Cheremisinoff states:

> Slide 8 is another plot of measured concentrations but this time for VW-129.  This plot is also a scatter plot that reflects the influence of changes in groundwater elevation.  The plot demonstrates again that there are both time periods in which the pathway is complete and there are periods when it is not complete.  On the average basis there is contamination from just below the surface to the groundwater table–but according to Chevron, there is never any contamination between 20 and 30 feet below grade.

Cheremisinoff Aff. ¶ 17(j) (Doc. No. 581-1, at 20).  The Court first observes that none of the attachments to Dr. Cheremisinoff's affidavit is designated "Slide 8."  There is, however, an Exhibit 27 which is a graph purporting to show concentrations in parts per billion by volume ("ppbv") versus

15

depth below grade surface of ethylbenzene, m.p. xylene, methyl
ethyl ketone ("MEK"), toluene, acetone, and 2-propenyl at VW-129.
Doc. No. 581-1, at 135.  Presumably, this is the exhibit to which
Dr. Cheremisinoff is referring.  This aspect of Dr.
Cheremisinoff's affidavit, however, is not reliable evidence that
the plume extends beyond Adams Street.

     Dr. Cheremisinoff's supplemental affidavit is
apparently not intended to state an opinion on the location of
the plume.  Rather, it appears that Dr. Cheremisinoff intended to
offer an opinion that a complete pathway for vapors sometimes
exists in the vicinity of VW-129.  If according to Dr.
Cheremisinoff a completed pathway for vapors exists at VW-129,
then the plume must presumably be in the vicinity as well.  The
Court, therefore, considers whether Dr. Cheremisinoff's opinion
indicates that the plume is west of Adams Street.  See Swanson v.
University of Cincinnati, 268 F.3d 307, 317 (6th Cir. 2001)(Rule
56 requires the district court to construe the evidence in favor
of the non-movant, "but no rule requires a court to examine it
only for the purpose intended by [the proponent].").

     On balance, the Court is persuaded that Dr.
Cheremisinoff's supplemental opinion is insufficient to establish
that the plume has migrated west of Adams Street.  Nothing in Dr.
Cheremisinoff's supplemental affidavit indicates that he is
retracting his prior testimony that the plume has remained stable

16

east of Adams for the last fifteen or twenty years. <u>See</u>
Cheremisinoff Dep. at 156 (Doc. No. 594-1, at 40).  Presumably,
therefore, Dr. Cheremisinoff continues to adhere to that opinion.
That being the case, then, it is not more likely than not that
the source of contamination documented in Dr. Cheremisinoff's
Exhibit 27 was the plume.  As stated, VW-129 is about one block
west of Adams Street, or anywhere from two to three hundred feet
from the western edge of the smear zone as indicated by Mr.
Hagemann's map.  <u>See</u> Doc. No. 570-1, at 16.  Guidance issued by
the EPA indicates, however, that unless an occupied building is
within 100 feet of the source of contamination, a vapor intrusion
pathway should be considered incomplete without further testing
or analysis.  <u>See</u> United States Environmental Protection Agency,
<u>OSWER Draft Guidance for Evaluating the Vapor Intrusion to Indoor</u>
<u>Air Pathway from Groundwater and Soils (Subsurface Vapor</u>
<u>Intrusion Guidance)</u>, at 16-18 (Nov. 2002), available at
http://www.epa.gov/osw/hazard/ correctiveaction/eis/vapor.htm
(visited July 7, 2011).[13]  Since VW-129 is more than 100 feet
from the plume, it is unlikely, according to the EPA, that the

---

[13]     The OSWER Guidance does state that 100 feet does not
establish an absolute safe zone.  The Guidance states that if
there are "significant preferential pathways," such as fractures,
micropores, utility conduits, or subsurface drains, there is a
potential for vapor migration beyond 100 feet from the plume.
<u>Id.</u> at 17.  There is no evidence in the record, however, that
there are significant preferential pathways in the vicinity of
VW-129.

plume is the source of the contamination found at VW-129.[14]  The data cited in Exhibit 27, therefore, do not reliably suggest the presence of the plume at or near VW-129.

Accordingly, the record demonstrates that the lateral extent of the LNAPL plume stops just to the east of Adams Street.

B. Plaintiffs Not Situated Over the Plume Have Not Suffered Any Damages as a Result of the Release of Contaminants from the Refinery

The property damage Plaintiffs have sued Chevron for negligence, gross negligence, negligence per se, conspiracy and fraud, strict liability for ultrahazardous activities, trespass, private nuisance and conversion, and failure to warn.  As the Court explained in its order addressing the claims of the bellwether Plaintiffs, an essential element of each these causes of action is an injury or damage proximately caused by the defendant's tortious conduct.  Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2009 WL 3698419, at *3 (S.D. Ohio Nov. 4, 2009).

In light of the analysis of the footprint of the plume in Part II.A., it is evident that the claims of all the Plaintiffs with properties west of Adams Street, with three exceptions to be discussed later, must fail because the record shows no infringement of their property interests by the plume. These Plaintiffs and properties are:

---

[14]    Dr. Cheremisinoff testified that his vapor pathway analysis was consistent with EPA guidance.  Cheremisinoff Dep. at 69 (Doc. No. 594-1, at 18).

18

Brian Scott and Julie Balsley, 407 Hooven Avenue
Emma and William F. Balsley, 103 Jefferson Street
Patricia Bauer, 118 Ohio Avenue
Alita and Daniel Brockman, 208 Ohio Avenue
Melody and Ray Chaney, 504 Hooven Avenue
Frances Clark, 101 Jefferson Street
Larry and Olivia Detmer, 410, 9780, and 9768 Hooven Avenue
Brenda and Robert Eldridge, 212 Jefferson Street
Clifford Fennell, 117 Adams Street
Denny Gambrell, 406 Hooven Avenue
Charles Garner, Jr., 313 Hooven Avenue
Marcus and Mary Greer, 301 and 303 Ohio Avenue
Lori and William Hall, 308 Hooven Avenue
Mary Hollingsworth, 307 Hooven Avenue
Albert Huffman, 101 Monroe Street
Jennifer Klem, 406 Ohio Avenue
Carl Kreger, 106 Jackson Street
Peggy Meadows, 106 Madison Street
Karen Mondary, 101 Brotherhood Avenue
Hosea Myers, 102 Madison Street
Melissa Nixon, 203 Ohio Avenue
Jeffrey and Jo Ellen Story, 404 Hooven Avenue
Kelly Thompson, 502 Ohio Avenue
Lisa Tyler, 207 Ohio Avenue
Mabel Wheeler, 606 Hooven Avenue
Rodney Wheeler, Sr., 505 Hooven Avenue
Edward Whitt, Sr., 503 Hooven Avenue

The plume is not underneath the properties of these Plaintiffs nor are the properties close enough to the plume to be exposed to a completed vapor pathway from the plume.  Therefore, these Plaintiffs have not been injured as a matter of law by Chevron's alleged tortious conduct.  See, e.g., Chance v. BP Chemicals, Inc., 670 N.E.2d 985, 993 (Ohio 1996) (plaintiffs' trespass claims failed because they failed to show an unlawful entry on their properties by the defendant); Brown v. Scioto Cty. Bd. of Commrs., 622 N.E.2d 1153, 1161-62 (Ohio Ct. App. 1993)

(noting that there cannot be a trespass unless some substance has entered the land itself).[15]

The following properties are not over plume, but based on Mr. Hagemann's map, appear to be within 100 feet of the smear zone, and thus within an area that could experience a completed pathway according to the OSWER Guidance: Steve and Diana Zeinner, 9661 Hooven Avenue, Russell McKernan, 202 Hooven Avenue, and, Michael and Mary Conn, 209 Hooven Avenue. The Court, therefore, will analyze the claims of these Plaintiffs along with the claims of the "on plume" Plaintiffs.

C. The "On Plume" Plaintiffs

1. Preliminary Matters

a. Ripeness

One of the principal issues in this case is whether the Plaintiffs have suffered any damages as a result of Chevron's

---

[15]    The Court observes that a nuisance claim is based on a non-trespassory invasion of another's property interest. See Brown, 622 N.E.2d at 1158. Thus, the plume would not have to actually encroach on Plaintiffs' properties to constitute a nuisance. Nevertheless, it appears that Plaintiffs' nuisance claims are based solely on potential vapor intrusion and the fact that the plume had the potential to contaminate the village water supply. See Doc. No. 581, at 31-32. As discussed at length, however, the record reflects that these Plaintiffs' properties are not subject to vapor intrusion from the plume. Moreover, the record reflects that although the village water supply was threatened by plume, it was never contaminated by the plume and Chevron has since paid to move the water supply to an area safe from the plume. See Ohio Department of Health, Health Consultation, Former Chevron Refinery (Feb. 18, 2011), at 6 (Doc. No. 585-4, at 10).

alleged tortious conduct. In that regard, Plaintiffs and their
experts repeatedly emphasize the fact that the hydrocarbon plume
presents an indeterminate health risk or that the health risk
from the plume is unknown. See Doc. No. 581-1 (Plaint. Mem. in
Opp.) at 16 (stating that long-term risks from the plume remain a
concern); id. at 17 (noting that according to ODH the plume does
not currently present a health risk but that it "left open the
issue of long-term health threats) (emphasis in original);
Hagemann Report at 13 (Doc. No. 582-4 at 14) (stating that Hooven
residents may be at risk if the HSVE systems fails and that they
face uncertain health risks from hydrocarbon vapors); id. at 2,
7-8, 13 (noting that according to EPA, health risks from plume
are indeterminate); Doc. No. 581 at 18 (reiterating that health
risks are uncertain); Hagemann Report (Doc. No. 582-4, at 9)
("Hooven residents do not know long-term risks to their
health."); Cheremisinoff Report (Doc. No. 571-1) at 7, 64 (noting
that according to HHS, health risks from plume are
indeterminate); Cheremisinoff Supp. Aff. (Doc. No. 581-4) ¶ 7
("Chevron's failure to act on this knowledge is a violation of
the Clean Water Act, has placed the public at an indeterminate
level of risk[.]"); id. ¶ 24 ("[Chevron's] misrepresentation has
placed the public at an indeterminate level of risk from exposure
to hydrocarbon fumes including benzene and other known
carcinogens."); id. ¶ 32 (same); Hagemann Supp. Aff. (Doc. No.

21

581-3) ¶ 6(c)("Health risks on basis of recent data have only been preliminarily assessed and are 'indeterminate' according to the Ohio Department of Health[.]"). To the extent, however, that Plaintiffs base their claims on the fact that the health risks from the plume are unknown, their claims are not ripe for adjudication.

"Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." National Rifle Ass'n of America v. Magaw, 132 F.3d 272, 284 (6th Cir. 1997). The Sixth Circuit requires weighing several factors in deciding whether to address the issues presented for review. United Steelworkers, Local 2116 v. Cyclops Corp., 860 F.2d 189, 194 (6th Cir. 1988). The court must address the hardship to the parties if judicial relief is denied. Id. at 195. The court must "pay particular attention to the likelihood that the harm alleged by plaintiffs will ever come to pass." Id. at 194. The court must consider whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims. Id. at 195. Because ripeness implicates this Court's Article III subject matter jurisdiction, the Court may raise ripeness sua sponte. Bigelow v. Michigan Dept. of Natural Res., 970 F.2d 154, 157 (6th Cir. 1992).

As the Court reviews the ripeness factors, the one that stands out in this case is whether "the likelihood that the harm

alleged by plaintiffs will ever come to pass," i.e., whether the plume will ever present a health risk to the Plaintiffs.

As the above-referenced citations to the record indicate, much of Plaintiffs' case is based on the fact that the health risks presented by the plume are unknown, which is precisely the reason this aspect of their case is not ripe.  The latest ODH report makes abundantly clear that the plume does not presently pose a health risk to the residents of Hooven.  Ohio Department of Health, Health Consultation, Former Chevron Refinery (U.S. EPA Vapor Intrusion Investigation) (Feb. 18, 2011), at 6-7 (Doc. No. 585-4, at 10-11).[16]  Moreover, although the EPA/ATSDR previously categorized the health risk from the

_____

[16]    The ODH stated:

>    Conclusion: The levels of vapor-phase petroleum hydrocarbons detected in the indoor air of residences and the Hooven Elementary School as part of the USEPA quarterly sampling did not pose a public health hazard to residents, students, or staff.  The HAS concludes that the indoor air of area residents and the Hooven Elementary School is not expected to harm people's health at the current time because the levels of vapor-phase petroleum hydrocarbons detected in the sub-slab soil gas sample, with several isolated exceptions, did not exceed health-based sub-slab screening values.

Id. (emphasis added); see also id. at 7 ("The levels of contaminants detected by USEPA sampling are not expected to pose a significant increased risk of developing cancer or developing other adverse health effects among residents and school children.").

plume as "indeterminate,"[17] "indeterminate" means just what one would expect, "no conclusions about public health hazard can be made because data are lacking." Agency for Toxic Substances & Disease Registry, Public Health Hazard Categories, available at http:// www.atsdr.cdc.gov/com/hazcat.html (visited July 11, 2011). There is no evidence in this record that Plaintiffs are likely to be exposed to harmful levels of vapors emanating from the plume in the future. Even Plaintiffs' experts do not opine that they are likely to be exposed to harmful vapors from the plume. Thus, whether Plaintiffs will be exposed to harmful vapors from the plume in the future is an event that may or may not occur. Consequently, this factor weighs heavily, if not conclusively, in finding that this aspect of Plaintiffs' claims is not ripe for adjudication.

The other two factors generally also favor finding that whether the plume presents a future risk of harm is not ripe. The Court discerns no hardship to Plaintiffs if the Court does not resolve this issue. The Court can see no reason at this time why Plaintiffs could not file new claims if in the future the plume is found to have become a health threat. The last factor, whether the record is sufficiently developed to adjudicate the claims, is substantially related to the Court's discussion of

_____

[17] See Ohio Department of Health, Health Consultation Former Chevron Refinery (Soil Vapor Intrusion in Hooven, Ohio (Nov. 27, 2006) (Doc. No. 585-1), at 2, 19.

likelihood of harm.  Put succinctly, at this point, Plaintiffs can only speculate that the plume may, in the future, expose them to harmful vapors.  The record is simply insufficient to adjudicate future harm that may result from the plume.

Accordingly, to the extent that Plaintiffs base their claims on the indeterminate or unknown health risks presented by the plume, their claims are not ripe for adjudication.

b. The 2011 ODH Health Consultation Report

Another problem that tends to permeate Plaintiffs' brief as they oppose Chevron's motion for summary judgment are their misstatements of the conclusions of the Ohio Department of Health's most recent report on vapor intrusion in Hooven. Ohio Department of Health, Health Consultation, Former Chevron Refinery (U.S. EPA Vapor Intrusion Investigation) (Feb. 18, 2011) (Doc. No. 585-4).  By way of background, in 1999, Chevron installed a horizontal soil vapor extraction ("HSVE") system. Basically stated, the HSVE consists of three pipes or tubes that run horizontally beneath Ohio Avenue, Hooven Avenue, and Brotherhood Street.  The Brotherhood tube, however, bends slightly downwardly toward Hooven Elementary School.  See id. at 58 (map showing estimated zone of influence of HSVE system).  The HSVE system essentially vacuums vapors from the soil and into the system where they are incinerated/destroyed.

Despite the fact that the HSVE system was installed to mitigate the risk of vapor intrusion from the plume, and despite the fact the EPA required Chevron to operate the HSVE during periods when the water table was low, or when Chevron was engaged in high grade pumping,[18] some residents of Hooven, presumably including some of the Plaintiffs in this lawsuit, exerted political pressure on the EPA to conduct experiments to see what would happen under a "worst case scenario" in which the HSVE was not operating during low water table periods or during high grade pumping.[19] In order to investigate the "worst case scenario" the 2006 AOC was modified and the EPA prohibited Chevron from operating the HSVE from approximately January 2008 to October 2009. The EPA then took a number of soil vapor samples during the period when the HSVE was not in operation. In part, the

---

[18] See Doc. No. 587-1, at 40 (2006 EPA/Chevron Administrative Order on Consent) ("[T]he SVE system installed beneath Hooven will continue to operate during periods of low water table and when the high grade pumping is performed. The operation of the SVE at this time will serve both to capture any volatile constituents vaporizing from the smear zone and to further deplete these constituents from the upper portion of the LNAPL smear zone beneath Hooven, thus reducing the future source of benzene vapor beneath Hooven.").

[19] See February 2011 Health Consultation Report at 17 ("Hooven citizens expressed concerns regarding the potential vapor intrusion under the village during the drought in 2007 when very low groundwater levels had likely exposed a large portion of the smear zone for most of the summer. The concerned community contacted former Congressional Representative Steven Chabot's office in October 2007. In December 2007, Representative Chabot sent a letter to the USEPA Administrator, forwarding the health concerns of the residents of Hooven.").

February 2011 Health Consultation reported the results of the
"worst case scenario" experiment.

Perhaps not surprisingly, with the HSVE system shut
down, near VW-96 and VW-99, the concentration of contaminants of
concern increased over time and depth, with many contaminants
exceeding the screening levels.  February 2011 Report at 18.
However, "these concentrations decreased significantly after the
HSVE system under the village was turned back on in October
2009[.]" Id.  In fact, "[a]ll concentrations of all the
contaminants dropped well below screening levels at the three
depths sampled (10 ft, 20 ft, and 30 ft bgs)." Id.  The
experiment also detected a few instances where contaminants of
concern were slightly above screening levels in some residential
sub-slab sampling, but the ODH concluded that these contaminants
were not related to the plume. Id. at 19.  Sampling of indoor
air in two residences found three contaminants of concern over
screening levels. Id.  In determining whether this experiment
showed a completed pathway for vapors, the ODH concluded:

> These contaminants of concern (COCs) were detected all
> the way to the ground surface only under "worst case
> scenario" conditions, when the HSVE system was not in
> operation and the groundwater elevation was below 463
> ft msl. The concentration of contaminants increased at
> deeper soil gas sample intervals demonstrating a
> gradient from higher concentrations at the smear zone
> to lower concentrations near the ground surface (Figure
> 5). The data shows that only when the HSVE system was
> shut down and when the smear zone was exposed for about
> a month, did levels of certain contaminants of concern
> in the soil gas exceed screening levels.  Indoor air

27

concentrations of contaminants did not increase to above levels of concern under these specific conditions. However, <u>the levels of these contaminants detected in the soil gas under the village indicate that under specific "worst case scenario" conditions, there can be a completed exposure pathway and a resulting vapor intrusion concern under the Village of Hooven.</u>

<u>Id.</u> at 22 (emphasis added). The ODH also stated that:

At the east end of the Village of Hooven, in the vicinity of monitoring wells VW-96 and VW-99, lowering the water table through operation of the High-Grade pumping system or during drought conditions will expose the smear zone and thus can generate significant levels of vapor-phase petroleum hydrocarbons. These vapor concentrations can increase to levels that pose a health threat due to vapor intrusion over a short period of time (approximately 4 weeks) in the soil gas beneath homes in the vicinity of monitoring wells VW-96 and VW-99 in the Village of Hooven. Under these conditions, there is a completed vapor intrusion pathway.

<u>Id.</u> at 29. Thus, a vapor intrusion pathway can be completed when the water table is low or when Chevron is engaged in high grade pumping <u>and</u> when the HSVE system is not in operation. Moreover, the potential pathway is limited to the areas in the vicinity of VW's 96 and 99. But since the AOC requires Chevron to operate the HSVE system on these occasions, it would be unlikely, according to the ODH report, for a vapor pathway to in fact become completed in this area.

Despite the unmistakably limited conclusions reported by the ODH, Plaintiffs argue that this report indicates the "[p]resence of hydrocarbons <u>throughout Hooven</u>[.]" Doc. No. 581,

at 21 (emphasis added). Additionally, Plaintiffs contend this report found "a completed vapor intrusion pathway had occurred in Hooven in September 2009 during low-water table conditions and while Chevron was operating its high-grade recovery system near vapor wells VW-96 and VW-99." Doc. No. 581-1, at 11-12. As discussed further, infra at 47-49, Plaintiffs considerably overstate the ODH's conclusions. First, it is clear that the ODH did not find that completed pathways exist "throughout Hooven." Rather, to the extent there is a completed pathway, it is limited to the discrete area in the vicinity of VW-96 and VW-99. Second, considering the report as a whole, the most reasonable interpretation is that the ODH found that there is only the potential for a completed pathway to become complete under the specific conditions the EPA and the ODH intentionally created to conduct the "worst case scenario" experiment. As stated, however, those conditions are not likely to ever prevail given the requirements of the AOC. This report in fact substantially undercuts Plaintiffs' claims.

c. It Is Not the Function of the Court to Supervise the Remediation Project in Hooven

As indicated, supra at 26 n.18, Chevron and the EPA have entered into a comprehensive consent order which governs the remediation of the refinery site and the plume. The consent order includes and covers, among other things, requirements for high grade pumping, placement of monitoring wells, schedules for

29

sampling the monitoring wells, and operation of the HSVE system. See Doc. No. 587-1 (Order on Consent), at 6-12, 39-40; see also Remedy Implementation Plan for Final Groundwater Remedy Chevron Cincinnati Facility Hooven, Ohio (Dec. 13, 2007) ("RIP") and Operation, Maintenance and Monitoring Plan for Final Groundwater Remedy Chevron Cincinnati Facility Hooven, Ohio (Dec. 13, 2007) ("OMM") both available at http://www.epa.gov/reg5rcra/wptdiv/ sites/chevron/(visited July 18, 2011). The consent order sets forth a schedule of penalties in the event Chevron does not comply with the remediation plan. Doc. No. 587-1, at 16-20.

Despite this comprehensive remediation plan, Plaintiffs devote discussion in their brief to steps or actions they believe Chevron should take to remediate the plume. For instance, Plaintiffs argue that Chevron should have installed additional monitoring wells west of Adams Street (Doc. No. 581-1, at 6) and that Chevron should conduct another human health risk assessment at a more protective cancer endpoint. Id. at 18. Plaintiffs also complain that some wells were not sampled more often. Id. at 10. Plaintiffs also contend that Chevron has not properly delineated the boundaries of the plume and suggest that Chevron just wants to cut and run from the remediation of Hooven as soon as possible. Because, however, the consent decree has been approved and entered, and the remediation is ongoing, the Court, does not have jurisdiction to either require Chevron to implement

30

specific remediation projects or impose liability on Chevron for things Plaintiffs think Chevron should have done - like drill additional monitoring wells.  See, e.g., United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1454-55 (6th Cir. 1991) ("[O]nce the consent decree is entered by a federal court - giving the decree the force of law - alternative state remedies may not be pursued.") (CERCLA).

Finally, whether Chevron has some illicit motive - as Plaintiffs contend - to terminate the remediation of Hooven prematurely is not relevant.[20]  The fact of the matter is that Chevron is still bound by the consent decree and is still involved in remediating the site.  Moreover, Chevron will continue to be bound by the consent decree until specific objective criteria for groundwater contaminants are achieved. Consent Decree (Doc. No. 587-1) Art. VI, § 19(e), Art. XIX, and Attachment 1.

d. Miscellaneous Non-relevant Arguments & Matters

1. Alleged Prior Bad Acts of Chevron

Plaintiffs interject in their brief a number of assertions and arguments concerning alleged bad conduct on the part of Chevron that have no relevance at all to their claims:

---

[20] Plaintiffs theorize that Chevron conspired with its subcontractors to skew the soil vapor test results with the goal of terminating its responsibility for remediating the site in a shorter time frame.  Doc. No. 581, at 32-33.

31

i. "Chevron failed to ensure that its hazardous wastes did not contaminate the Great Miami River aquifer, used as a drinking water source by the Hooven community (located directly across the street), and the Cleves Water Works (located just across the river)." Doc. No. 581, at 8. Chevron unquestionably discharged petroleum products into the Great Miami River, but the indisputable evidence in this case is that Hooven has used the Cleves municipal water supply since the 1950's. Additionally, although the Cleves water supply was threatened by the plume, it has been moved to a secure location. Moreover, there is no evidence in this case that any of the property damage Plaintiffs used the groundwater under Hooven as their drinking supply.[21]

---

[21] In this regard, Plaintiffs misleadingly cite the record. Citing generally to 199 page of answers to interrogatories (Ex. 36, Doc. No. 590-6), Plaintiffs state that "[e]ven Plaintiffs associated with this litigation have provided interrogatory responses to Chevron acknowledging that they have used residential wells while living in Hooven while the refinery was in operation." Doc. No. 581 at 29. The Court's review of this exhibit indicates that ten Hooven residents indicated prior use of a private well: Benny Muncy (Doc. No. 590-6, at 33), Betty Muncy (Doc. No. 590-6, at 49), Carol Lipscomb (Doc. No. 590-6, at 78), Earl Utterback (Doc. No. 590-6, at 94), Inez Benter (Doc. No. 590-6, at 113), James Barker (Doc. No. 590-6, at 129), John Breeding (Doc. No. 590-6, at 146), Mary Greenham (Doc. No. 590-6, at 162), Olivia Detmer (Doc. No. 590-6, at 181), and Walter Barker (Doc. No. 590-6, at 198). Of these ten individuals, however, only Olivia Detmer is a property damage Plaintiff in this case. Thus, whether the other nine individuals had their wells contaminated by the plume is irrelevant. While Olivia Detmer is a property damage Plaintiff, according to Mr. Hagemann's map, her home (302 Ohio Avenue) is well outside of the smear zone. Moreover, Detmer apparently last used her well in 1976. There is, in fact, no evidence in this record that any private drinking well in Hooven has actually been contaminated by

ii. Contaminants in the groundwater exceed levels established for drinking water. Id. at 9. Again, there is no evidence that the property damage Plaintiffs use the groundwater for drinking.

iii. Relying on Dr. Cheremisinoff's deposition, Plaintiffs argue that "Chevron is also liable to the Plaintiffs for its violation of ORC Chapter 6111 and § 01(a), 33 U.S.C. § 1311(a) of the Clean Water Act ("CWA") for discharging oil and hazardous waste into the Great Miami River, which contributed to the groundwater contamination, without a permit to do so." Doc No. 581, at 25-26 (citing Cheremisinoff Dep. at 133-37 (Doc. No. 583-1, at 35-36)). Review of Dr. Cheremisinoff's deposition, however, as well as his report, indicates that Chevron's alleged Clean Water Act violation involved dumping waste water onto the property of a neighboring gravel pit, an entity not a party to this litigation. See id.; Cheremisinoff Report (Doc. No. 571-1), at 6 ("Chevron appears to have violated the Clean Water Act by improperly operating and dispensing contaminated treatment water on its neighbor's property."); id. at 55-57 (discussing discharge of treatment water into neighboring gravel pit). Ohio Rev. Code § 6111.01(A), which Plaintiffs may be attempting to cite, is only the statutory definition for pollution in Ohio.[22] In any event,

---

Chevron.

[22] Section 6111.01(A) of the Ohio Revised Code states: "'Pollution' means the placing of any sewage, sludge, sludge materials, industrial waste, or other wastes in any waters of the

Chevron's alleged Clean Water Act violation has no relevance in
this case.

## 2. <u>The Court's Discovery Orders</u>

In their pleadings, Plaintiffs mention that they
obtained certain documents through Freedom of Information Act
requests and third-party subpoenas because the Court denied their
motion to reopen discovery and their motion for reconsideration
of this order.  Doc. No. 581, at 20; Doc. No. 612, at 3.   There
frankly is no reason for Plaintiffs' counsel to refer to this
order at all.  The Court stands by its original analysis of
Plaintiffs' discovery requests and declines to reconsider the
matter despite Plaintiffs' implied requests to do so.

## e. <u>Analysis</u>

It bears repeating at this point that each of the
Plaintiffs in this case bears the burden of directing the Court
to facts in the record that support each element of his claims
(at least to the extent those elements are put at issue by the
movant).  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)
("[T]he plain language of Rule 56(c) mandates the entry of
summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's

---

state."

case, and on which that party will bear the burden of proof at trial.").

Given this burden, it is interesting and surprising that Plaintiffs' brief in opposition to Chevron's summary judgment motion makes no attempt to correlate the evidence in the record to the claims of the individual Plaintiffs.  As opposed to Chevron, which provided appendices discussing what it believes is the evidence relevant to each of the property damage claimants, Plaintiffs' brief argues as if the Village of Hooven is the injured party in this case.  Plaintiffs in fact are not even mentioned individually in their brief.  Indeed, Dr. Cheremisinoff testified that he had not even performed a vapor pathway analysis for the individual property claimants in this case. Cheremisinoff Dep. (Doc. No. 583-1), at 58.  Consequently, after reading Plaintiffs' brief, the Court has no idea, for example, what evidence specifically supports Plaintiff Odis Davis's claims, how the plume has adversely affected his use and enjoyment of his property, and whether there is evidence supporting finding a completed pathway on his property.  Thus, each of the Plaintiffs have arguably failed to meet the most elementary requirement under Rule 56 - to actually direct the Court to specific evidence that supports the elements of their claims.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989); Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029,

1034 (D.C. Cir. 1988)("Appellant's failure to designate and reference triable facts was, in light of the language of Rule 56(c) and governing precedent, fatal to its opposition."). The Court, therefore, would arguably be justified in granting Chevron's motion for summary judgment on that basis alone.

Despite Plaintiffs' procedural shortcomings, the Court has carefully reviewed the record, and, as was the case with the bellwether Plaintiffs, is persuaded that they have failed demonstrate they suffered any cognizable damages from the release of contaminants into the groundwater by Chevron. Plaintiffs have not demonstrated that the plume substantially impairs their use and enjoyment of their properties. Moreover, to the extent the record demonstrates a completed pathway for vapors, the record at best shows that a completed pathway was intermittent and of limited duration. Therefore, any intrusion from a completed pathway was de minimis and, therefore, not compensable. This conclusion is all the more justified since none of the Plaintiffs has adduced any specific evidence of a completed pathway on his or her property.

It should be fairly well understood at this point that a property owner in Ohio does not have absolute subsurface ownership rights in his land. Rather, a land owner owns only so much of the subsurface as he can reasonably use and enjoy, and even then, only to the extent he actually uses it. Chance v. BP

36

Chemicals, Inc., 670 N.E.2d 985, 991-92 (Ohio 1996). The same is true for groundwater. A landowner only has property rights in ground water to the extent he reasonably uses it. Id. at 992 ("Our analysis above concerning the native brine illustrates that appellants do not enjoy absolute ownership of waters of the state below their properties[.]"); McNamara v. City of Rittman, 838 N.E.3d 640, 644 (Ohio 2005) (land owner has a property right in the reasonable use of his groundwater). Similarly, a landowner can only recover damages for nuisance for real, substantial, and material injury and not for "trifling annoyance[s] and unsubstantiated or unrealized fears." Banford v. Aldrich Chem. Co., Inc., 932 N.E.2d 313, 317 (Ohio 2010); see also id. ("Fear, standing alone, is not an item of compensable damages."); Antonik v. Chamberlain, 78 N.E.2d 752, 759 (Ohio 1947)(liability for nuisance requires "an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort, and not merely a tendency to injure. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort."). In this case, as Chevron demonstrates in its motion for summary judgment, the plume has not interfered with the on- or near-plume Plaintiffs' use and enjoyment of their properties and groundwater and has not resulted in substantial and material discomfort to Plaintiffs.

37

a. <u>Odis Davis - 113 Ohio Avenue</u>

Odis Davis owns 113 Ohio Avenue, which is a four-unit apartment building that he bought for investment purposes. Davis has never lived and never intends to live in this building. Davis has not had any complaints from his tenants about the plume and there is no evidence that the plume affects his tenants' use and enjoyment of their apartments. He has not used and has no intention of using the groundwater beneath this property. Doc. No. 567, Ex. 2. Accordingly, Davis has failed to demonstrate that he suffered any impairment of his use and enjoyment of this property. Nor has the plume resulted in any substantial and material discomfort to Davis or his tenants. Davis has not identified any foreseeable uses of this property that he has had to abandon in consequence of the plume. Therefore, Davis has not been injured by the presence of the plume beneath this property.

b. <u>Linda Eckenroth - 211 Chidlaw Avenue</u>

Eckenroth owns and lives at 211 Chidlaw Avenue, which is a single family residence. Eckenroth knew about the potential contamination of this property when she bought it in 2009. Eckenroth has never used the groundwater beneath this property and has no future plans to use the groundwater. The plume has not substantially interfered with Eckenroth's use and enjoyment of the property. She testified that the contamination has caused her to drink only bottled water, but there is no rational reason

38

for this change in behavior since Hooven's water supply is isolated from the plume.[23]  Eckenroth also testified that because of the plume she would not grow a garden, but then she has never grown a garden on this property and apparently has not abandoned any concrete plans to plant a garden.  In fact, she said that switching to bottled water was the only change the plume has caused in her use of the property.  Id. Ex. 7.  The plume, therefore, has not resulted in any substantial and material discomfort to Eckenroth.  She has not identified any foreseeable uses of this property that she has had to abandon in consequence of the plume.  Therefore, Eckenroth has not been injured by the presence of the plume beneath this property.

### c. Marcus Greer - 105 Ohio Avenue

Marcus Greer owns 105 Ohio Avenue, which has a single family house on it.  The property was apparently abandoned and the home was about to be razed when Greer bought it in 2004 with the intention of fixing it up and turning it into a rental property.  Greer is in the process of rehabilitating the house but stated that he does not have much money invested in the project.  Greer testified that people have approached him about renting his property, but the house is not inhabitable because

---

[23]     Eckenroth's testimony is somewhat ambiguous on this point because she also stated that she switched to bottled water because of the taste of the municipal water before she was even aware of the potential contamination.

there is no water or electricity.  Id. Ex. 10.  Greer obviously
has not suffered any loss of use or enjoyment of this property.
His rehabilitation project is apparently moving along at a
snail's pace and would not be inhabitable at any rate because of
the lack of water and electricity, conditions completely
unrelated to the plume.  Therefore, Greer has not been injured by
the presence of the plume beneath this property.

> d. George and Melissa Hunt - 110 Ohio Avenue

George and Melissa Hunt own 110 Ohio Avenue, where they
live in a single family home.  The Hunts do not use, have never
used, and do not intend to use the groundwater beneath this
property.  The plume has not affected the way they use and enjoy
their property.  The Hunts have not presented any evidence of
non-speculative plans for improving the property that they have
abandoned because of the plume.  George Hunt testified that they
do not go into the basement too much for fear of vapors from the
plume, but he did not indicate whether they would use the
basement more than they do now if the plume were not there.
George Hunt generally feels like the plume ruins his good moods
when he is at home.  George Hunt expressed fear of vapor
intrusion, but the Hunts presented no evidence of actual vapor
intrusion into their home.  George Hunt also expressed fear of
becoming ill from the plume in the future, but there is no
reasonable basis for this concern.  Id. Exs. 14 & 15.  As the

40

Court's discussion of the case has shown, each of the responsible government agencies has concluded that the plume does not currently present a health risk and there is no evidence in the record that it presents a health risk in the future. Accordingly, the Court must conclude that the plume has not substantially interfered with the Hunts' use and enjoyment of their property.  See Banford, 932 N.E.2d at 317.  Moreover, the plume has not resulted in any substantial and material discomfort to the Hunts.  They have not identified any foreseeable uses of this property that they have had to abandon in consequence of the plume.  Therefore, the Hunts have not been injured by the presence of the plume beneath their property.

### e. Douglas King - 113 Hooven Avenue

Douglas King bought 113 Hooven Avenue in 1998 and has lived there with his mother.  King does not use and has no plans to use the groundwater.  King testified that the plume has not affected his use and enjoyment of the property in any way.  King testified that he smells a faint gasoline smell in his basement about once a month.  Id. Ex. 17.  The record thus demonstrates that plume has not substantially interfered with King's use and enjoyment of his property.  Moreover, the plume has not resulted in any substantial and material discomfort to King.  He has not identified any foreseeable uses of this property that he has had

41

to abandon in consequence of the plume.  Therefore, King has not been injured by the presence of the plume beneath this property.

f. <u>Scott Mattlin - 106 Hooven Avenue</u>

Scott Mattlin owns and lives at 106 Hooven Avenue. Mattlin has not used and has no plans to use the groundwater. Mattline is concerned that he will not be able to sell his home in the future, but then he has no current plans of selling his home.  Mattlin claims that the plume has prevented him from finishing the basement, but admitted that he had not taken any concrete steps, such as developing plans or receiving estimates to complete the project.  Mattlin said that he stopped having bi-monthly cookouts because of the plume, but it actuality it appears that the real reason for this was because he and other neighbors put up signs in their yards about contamination.  <u>Id.</u> Ex. 21.  The Court must conclude that the plume has not substantially interfered with Mattlin's use and enjoyment of this property.  <u>See</u> <u>Banford</u>, 932 N.E.2d at 317.  Moreover, the plume has not resulted in any substantial and material discomfort to Mattline.  He has not identified any foreseeable uses of this property that he has had to abandon in consequence of the plume. Therefore, Mattlin has not been injured by the presence of the plume beneath this property.

### g. <u>Virginia Pappin – 306 Chidlaw Avenue</u>

Virginia Pappin owns 306 Chidlaw Avenue and lives in a mobile home on the property.  Pappin does not use and does not intend to use the groundwater.  She maintains a vegetable garden and continues to eat what it produces.  Pappin testified that every now and then there is a "foul odor" that lasts 20 minutes to an hour.  Pappin presented no evidence that this odor emanates from the plume.  <u>Id.</u> Ex. 24.  The record thus demonstrates that plume has not substantially interfered with Pappin's use and enjoyment of her property.  Moreover, the plume has not resulted in any substantial and material discomfort to Pappin.  She has not identified any foreseeable uses of this property that she has had to abandon in consequence of the plume.  Therefore, Pappin has not been injured by the presence of the plume beneath this property.

### h. <u>Melissa Pruitt – 326 Brotherhood Avenue</u>

Melissa Pruitt owns 326 Brotherhood Avenue and lives in a single family home there.  Pruitt has no plans to sell this property and in fact intends for her sons to inherit the property so they can live on it as well.  She does not use and does not intend to use the groundwater.  Pruitt testified that the plume has caused her not to plant a tomato garden.  Otherwise, although she worries about contamination, Pruitt testified that the plume has not affected her use of the property.  She also mentioned

43

fear of sickness, but as already discussed, this is not rational concern in light of the public health reports. Ex. 26. The record thus demonstrates that plume has not substantially interfered with Pruitt's use and enjoyment of her property. Moreover, the plume has not resulted in any substantial and material discomfort to Pruitt. She has not identified any foreseeable uses of this property that they have had to abandon in consequence of the plume. Therefore, Pruitt has not been injured by the presence of the plume beneath this property.

### i. Clarence Roy - 112 Chidlaw Avenue

Clarence Roy bought 112 Chidlaw Avenue in 1965. Although Roy still owns the property, he has not lived there since 1980 or 1981. Roy's ex-wife and children now live at 112 Chidlaw Avenue, but he said the plume does not affect either his or his children's use of the property. Roy even testified that the plume has not damaged the property in anyway. Id. Ex. 28. The record thus demonstrates conclusively that the plume has not substantially interfered with Roy's use and enjoyment of this property and that he has not suffered any material discomfort as a result of the plume.

### j. Larry Stafford - 301 Chidlaw Avenue

Larry Stafford owns a number of properties in Hooven but 301 Chidlaw Avenue is the only one located over the plume. Stafford has been living in this property since 2008. Stafford

44

testified that the plume has not affected his use and enjoyment of this property. He does not think the plume has endangered his health or safety. Id. Ex. 29. The record thus conclusively demonstrates that the plume has not substantially interfered with Stafford's use and enjoyment of this property and that he has not suffered any material discomfort resulting from the plume.

### k. Margaret Whitaker – 111 Ohio Avenue

Margaret Whitaker owns a single family home at 111 Ohio Avenue. She does not use and has no plans to use the groundwater. The plume does not affect her use and enjoyment of her property. "I do exactly what I've always done," she testified. Id. Ex. 36. The record thus demonstrates that the plume has not interfered with Whitaker's use and enjoyment of this property and that she has not suffered any material discomfort resulting from the plume.

### l. Steve and Diana Zeinner – 107 Hooven Road

Steve and Diana Zeinner own a single family home at 107 Hooven Avenue. The plume has not affected the way in which the Zeinners' use this property. They installed an above-ground pool and continue to maintain a vegetable garden and eat what they grow. The Zeinners have no current plans to sell this property. Every now and then Diana Zeinner smells an odor in the basement, but she cannot describe it and does not know where it comes from. The Zeinners have never used and have no plans to use the

45

groundwater.  The Zeinners do not believe that the plume has endangered their comfort, safety, or health.  Exs. 37 & 38.  The record thus demonstrates that the plume has not interfered with the Zeinners' use and enjoyment of this property.  Nor have the Zeinners suffered any material discomfort resulting from the plume.  Therefore, the Zeinners have not been injured by the presence of the plume beneath this property.

### m. <u>The Zeinners - 9661 Hooven Avenue</u>

The Zeinners also own a rental property at 9661 Hooven Avenue, also known as 207 Hooven, with two mobile homes on it. Steve Zeinner testified that the plume has not affected his tenants' use and enjoyment of this property, nor has it affected the Zeinners' use and enjoyment of this property.  The Zeinners have not used and have no plans to use the groundwater.  <u>Id.</u> Ex. 38. The record thus demonstrates that the plume has not interfered with the Zeinners' use and enjoyment of this property and that they have not suffered any material discomfort resulting from the plume.

### n. <u>Russell McKernan - 202 Hooven Avenue</u>

Russell McKernan owns 202 Hooven Avenue, but he does not live there.  Instead, McKernan bought the property for his parents.  Neither McKernan nor his parents use or intend to use the groundwater.  McKernan said that the plume has not personally affected his use of this property although he said his mother is

concerned about it.  Nevertheless, the plume has apparently not affected the way in which his parents use and enjoy this property.  Id. Ex. 72.  The record thus demonstrates that the plume has not substantially interfered with McKernan's use and enjoyment of this property.  Nor has the plume caused McKernan any material discomfort.  Therefore, McKernan has not been injured by the presence of the plume beneath this property.

       o. Michael and Mary Conn - 209 Hooven Avenue

      Michael and Mary Conn own a home located at 209 Hooven Avenue.  Other than long-term concerns of illness, the plume has not affected their use and enjoyment of the property.  As already discussed, however, there has never been a finding that the plume presents a future health risk, so this concern is unfounded.  The Conns both complained about a bad smell that occurs after it rains, but there is no evidence that this smell comes from the plume.  In fact, it is likely, according to his testimony, that the smell comes from the sewer system.  Id. Ex. 26 & 27.  The record thus demonstrates that plume has not substantially interfered with the Conns' use and enjoyment of this property.  Moreover, they have not suffered any material discomfort as a result of the plume.  Therefore, they have not been injured by the presence of the plume beneath this property.

n. <u>Summary</u>

As the foregoing discussion illustrates, the plume has not substantially affected these Plaintiffs' use and enjoyment of their properties.  Nor has there been any showing that the plume constitutes a nuisance resulting in compensable damages because at most it is a trifling annoyance.  Additionally, the evidence demonstrates that none of these Plaintiffs use or intend to use the groundwater beneath their properties.  Thus, Plaintiffs' claims for conversion of their groundwater fail as well.  The most typical complaint about the plume is that these Plaintiffs believe that their homes no have no market value because there will be no buyers once they learn about the plume.  The Supreme Court of Ohio has made clear, however, that a landowner cannot recover stigma damages, which is really what these Plaintiffs want, absent physical damages or interference with the use of the property.  <u>Chance</u>, 670 N.E.2d at 993.  In this case, Plaintiffs have demonstrated neither; thus, they cannot recover stigma damages.  Consequently, all of their claims fail because of the absence of damages.

3. <u>To the extent there is a completed pathway
in Hooven it is only temporary and intermittent</u>

The most vigorously contested issue in this case is whether there is or has been a completed pathway for vapors from the plume to reach the surface.  Plaintiffs' position is that governmental agencies have "repeatedly confirmed" the existence

48

of vapor pathways in Hooven, Doc. No, 581, at 13, but that considerably overstates their conclusions.

The 2006 Health Consultation did report a completed pathway for BTEX in the vicinity of VW-96 in 1997 and in the vicinity of VW-93, VW-96 and VW-97 in August 1998. Doc. No. 585-1, at 19. On the other hand, however, in responding to public comments concerning its plan to remediate the groundwater, the EPA suggested that the results of the 1997 vapor tests were invalid because of the sampling methodology. See Doc. No. 587-2, at 14 ("The initial August and September 1997 [tests] did not use summa canisters and the samples also yielded results with high detection limits, leaving uncertainty as to the actual results."). In fact, the EPA confirmed at that time (August 2006) that there were no completed pathways for vapors in Hooven. Id. at 18 ("A 'clean zone' free of VOCs is identified between 20 and 35 feet in all these sampling events confirming an incomplete pathway for inhalation exposure for the residents of Hooven."); see also id. at 587-1, at 46 ("[T]he U.S. E.P.A. has determined that currently there are no exposure pathways from Chevron's contamination to the community residents[.]").

Obviously, the ODH and certain Hooven residents were not satisfied with these reports, which is why the EPA conducted the "worst case scenario" tests in 2008 and 2009. The results of this test were reported in the February 2011 Health Consultation.

49

The Report indicates that to the extent there is a completed pathway in Hooven, it exists only under a limited set of conditions that are not likely to occur: Chevron must be engaged in high-grade pumping and/or the water table must be low _and_ the HSVE system must not be in operation.  Doc. No. 585-4, at 33.[24] Moreover, the area where a completed pathway exists is limited to the vicinity of VW-96 and VW-99.  Id.  This limited set of circumstances is not likely to exist, however, because the 2006 AOC explicitly requires Chevron to operate the HSVE during high-grade pumping or low water table conditions.  See Doc. No. 587-1, at 40.  Thus, there is no reason to suppose that a completed pathway in this area will ever exist.[25]

Thus, what the governmental agencies actually repeatedly confirm is that there are no completed pathways for

---

[24]    There is some ambiguity in the language of the Report on this issue.  The Report states two times that a completed pathway "can occur" under the specific conditions just outlined. See id. at 11, 26.  The Report also states "there is" a completed pathway under these specific conditions.  Id. at 33.  The use of the phrase "can occur" suggests that a completed pathway is only a possibility under these conditions.  Obviously, the last conclusion is definite.  Given, however, the Report's implicit if not explicit conclusion that a completed pathway will not occur in the absence of these especially contrived conditions, it is not really necessary to resolve the ambiguity.

[25]    Dr. Cheremisinoff's second supplemental affidavit (Doc. No. 581-4) opines that there are completed pathways for vapors throughout Hooven, but the Court's review of the data on which he relies does not support his opinion because it is based on comparison of gas chromatographs taken on refinery property and those taken on and around Hooven Elementary School, an area not at issue in this litigation.

vapors in Hooven - the exact opposite of Plaintiffs' contention. At worst, the record reflects intermittent completed pathways, depending mostly on the level of groundwater, something even Dr. Cheremisinoff's supplemental report acknowledges. See Cheremisinoff Aff. (Doc. No. 581-1) ¶¶ 17(h) & 17(j) ("The plot demonstrates again that there are both time periods in which the pathway is complete and there are periods when it is not complete."). The record, however, also shows that operation of the HSVE system essentially eliminates the risk of vapors reaching the surface. February 2011 Health Consultation Report (Doc. No. 585-4), at 29 ("Operation of the HSVE system under the Village of Hooven appears to be quite effective in rapidly reducing or eliminating vapor levels under the village when these vapors are produced via drought conditions and/or operation of the high-grade pumping by Chevron.").

Thus, in this last regard, this case is very similar to Lueke v. Union Oil Co. of Ca., No. OT-00-008, 2000 WL 1545077 (Ohio Ct. App. 2000). In Lueke, gasoline contained in underground storage tanks located at a service station leaked into the soil. The gasoline migrated across the street into the plaintiff's water well. A few months after moving into the residence, the plaintiff began experiencing fatigue, itching, burning, and urinary irritations. She actually smelled, and test results confirmed, the presence of gasoline in her tap water.

The defendant, however, quickly remedied the problem by installing carbon filters in the plaintiff's water system. The court of appeals affirmed the trial court's conclusion that the plaintiff had not suffered a substantial or unreasonable interference with the use and enjoyment of her residence due to the quick and effective remediation of the problem. Id. at *8. In this case, the sheer size of the release prevents quickly concluding remedial efforts. Nevertheless, the HSVE system mitigates the effects of the plume by preventing vapors from reaching the surface. Thus, like the carbon filters in Lueke, the HSVE system remedies the potential harm created by vapor intrusion. Consequently, like the plaintiff in Lueke, Plaintiffs have not suffered a substantial or unreasonable interference with the use and enjoyment of their properties because of vapor intrusion.

This discussion then brings the Court in a roundabout way to Plaintiffs' motion for spoliation sanctions. Plaintiffs contend that Chevron intentionally interfered with the "worst case scenario" test by surreptitiously running the HSVE system in contravention of the EPA's orders, and thus preventing a completed pathway from occurring during this experiment. The fact that Plaintiffs even bring a spoliation motion on these grounds has to be considered an admission that the HSVE system does what it is supposed to do - prevent harmful vapors from

52

reaching the surface.[26]  In other words, if the HSVE system did
not completely eliminate the completed pathway, there would be no
grounds for a spoliation motion.

Moreover, the Court wonders whether Plaintiffs, in
filing this motion for sanctions, have lost sight of what is
important.  The whole point of installing the HSVE system is to
remediate and remove harmful vapors from the soil.  OMM § 6.1
("[T]he HSVE was implemented to remove hydrocarbon mass and
mitigate potential upward migration of vapors beneath offsite
residential properties."), available at http://www.epa.gov/
reg5rcra/ wptdiv/sites/chevron/(visited July 26, 2011). Yet,
Plaintiffs now seem to be complaining that Chevron's actions
prevented them from being exposed to the very thing they claim to
be afraid of in first place.  Their position frankly makes no
sense, nor in fact did the whole "worst case scenario"
experiment.[27]  Plaintiffs' position is akin to a supermarket

---

[26]    Indeed, it seems especially noteworthy that Plaintiffs
do not challenge the actual data generated by the "worst case
scenario" test.  In other words, Plaintiffs do not contend that
Chevron fudged the actual data, only the conditions under which
the data was generated.  As discussed further, even if Chevron
secretly operated the HSVE system when it was not supposed to,
the data show that the system protects village residents from
vapor intrusion.  In fact, their brief admits that the HSVE
system cleansed the soil.  Doc. No. 581 at 33, 35.

[27]    After all, if the HSVE is supposed to run during high-
grade pumping and low water table conditions to prevent vapor
intrusion, then it could reasonably be assumed that the worst
case scenario would be that vapor intrusion would occur if the
HSVE system were not in operation during these conditions.  Why

patron complaining that the store manager spoliated evidence by cleaning up a spill before he had a chance to slip and fall on it.

But suppose Chevron did secretly run the HSVE system during the "worst case scenario" test?[28]  What then?  Under Plaintiffs' theory a completed pathway for vapors would have developed had Chevron not secretly operated the HSVE system.  But even had Chevron complied with the EPA's order, and, even, if a completed pathway had developed, it is unlikely that Chevron could be held liable to Plaintiffs for that intrusion since it occurred because Chevron was operating pursuant to the modified AOC.  See Cavallo v. Star Ent., 100 F.3d 1150, 1156 (4th Cir. 1996) ("Star cannot be held liable "for activities in conformity with the EPA Orders.")(emphasis in original).  So the Court frankly does not see that Plaintiffs' case suffered as result of Chevron's alleged malfeasance.  Beaven v. U.S. Dept. of Justice, 622 F.3d 540, 553 (6th Cir. 2010) (to be entitled to spoliation instruction, movant must show that reasonable trier of fact would find that destroyed evidence would support claim or defense).  Therefore, spoliation sanctions are not warranted.  To the extent

---

anyone thought it was necessary to run a 22 month experiment to confirm this hypothesis is a mystery.

[28]    The Court believes that it is highly unlikely that Chevron could have pulled this off, given its undisputed evidence that the EPA padlocked the system to prevent it from operating during the test.

that Chevron did violate the AOC, an issue about which the Court expresses no opinion whatever, that is for the EPA to address in the first instance, not this Court, because the AOC sets forth a comprehensive structure to address violations.  ACO (Doc. NO. 587-1) §§ X & XI; see also Ailor v. City of Maynardville, 368 F.3d 587, 589 (6th Cir. 2004) (district courts lack subject matter jurisdiction to impose penalties for wholly past violations of RCRA).

### 4. Summary

Despite the submission of thousands and thousands of pages of depositions and exhibits, each Plaintiff's claims fails because of lack of proof of damages resulting from Chevron's alleged tortious conduct.  The record at this point conclusively establishes that the vast majority of the property damage Plaintiffs do not live on or even near the plume and that as a consequence they unquestionably have not suffered any compensable damages.  The claims of these individuals should have been voluntarily dismissed before the summary judgment deadline.  The record further shows that the plume has had but a negligible effect on the Plaintiffs with properties on or near the plume. Several of the Plaintiffs even testified that the plume has not affected their use and enjoyment of their properties at all.

Of course, the principal dispute in this case was the issue of vapor intrusion from the plume.  On this point, however,

each Plaintiff's claims fail because none of them pointed the
Court to specific evidence that his or her property had
experienced vapor intrusion.  Instead, as alluded to earlier,
Plaintiffs have approached this case as if the Village of Hooven
is the real party-in-interest in this case.  But Hooven is not a
plaintiff in this case and proof that there was a completed
pathway for vapor intrusion "in Hooven" does not suffice - to
take one example - to prove that there was or is a completed
pathway at 113 Ohio Avenue.  Plaintiffs' proof of vapor intrusion
is simply at too general a level to create a triable issue of
fact on this issue.  Moreover, Plaintiffs at best have only
identified three discrete and limited times when a completed
pathway might have existed "in Hooven."  Nevertheless, the record
shows that operation of the HSVE system practically eliminates
the possibility of vapor intrusion from the plume.  Because,
however, of the brief periods in which there might have been a
completed pathway, and the fact that vapors are quickly
eliminated by the HSVE, in light of Lueke, Plaintiffs would still
not prevail even if their evidence of vapor intrusion was more
specifically tailored to their properties.

<u>Conclusion</u>

Accordingly, for all of the reasons stated, Chevron is entitled to summary judgment on all of the claims of the remaining property damage Plaintiffs.


**IT IS SO ORDERED**


Date_August 19, 2011_          _____s/Sandra S. Beckwith_____
                               Sandra S. Beckwith
                        Senior United States District Judge